UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC.,<br>Plaintiff,<br><br>v.<br><br>MGA ENTERTAINMENT, INC.,<br>Defendant. | |
| MGA ENTERTAINMENT, INC.,<br>Counterclaimant,<br><br>v.<br><br>HASBRO, INC.,<br>Counterclaim-defendant. | **C.A. No. 06-262 S** |

**OBJECTION OF DEFENDANT/COUNTERCLAIMANT MGA ENTERTAINMENT, INC. TO THE MOTION OF PLAINTIFF/COUNTERCLAIM-DEFENDANT FOR A PRELIMINARY INJUNCTION, RECALL AND EXPEDITED DISCOVERY**

Defendant/counterclaimant MGA Entertainment, Inc., objects to the above-identified motion as set forth in its accompanying memorandum of law and for the reasons set forth in its memorandum respectfully requests that the Honorable Court deny plaintiff's motion as to the requests for a preliminary injunction and recall, and for expedited discovery.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MGA ENTERTAINMENT, INC.,<br><br>Defendant. | |
| MGA ENTERTAINMENT, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HASBRO, INC.,<br><br>Counterclaim-defendant. | **C.A. No. 06-262 S** |

**DEFENDANT/COUNTERCLAIMANT MGA ENTERTAINMENT, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND RECALL FILED BY PLAINTIFF/COUNTERCLAIM-DEFENDANT HASBRO, INC.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION. ....1

II. FACTUAL BACKGROUND. ....3

A. The Classic Card-Matching Memory Game. ....3

B. MGA's Spider-Man & Friends "3-D Memory Match-Up" Three-Dimensional, Molded Plastic, Superhero Character Game. ....3

C. Hasbro's Card-Matching Memory Games And Purported Trademark. ....4

D. Hasbro's Efforts To Interfere With MGA's Marvel License. ....5

E. Hasbro's Misstatements To The USPTO. ....6

F. Hasbro's Knowledge Of MGA's Use, And Hasbro's Unreasonable Delay. ....7

G. Extensive Third-Party Use Of "Memory" And "Memory Game". ....7

III. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION. ....12

IV. HASBRO IS NOT LIKELY TO PREVAIL ON THE MERITS. ....12

A. Hasbro's Alleged "Memory" Mark is Invalid. ....12

1. Hasbro's Alleged "Memory" Mark Is Generic. ....13

a. Legal standard for genericness. ....13

b. Hasbro's 1966 adoption of the generic term "memory". ....14

c. Extensive use of "memory" and "memory games" by the public and in reference materials ....15

d. Hasbro's alleged "Memory" mark and registrations have become generic through failure to police. ....15

2. Hasbro's Alleged Mark Is Descriptive, Without Secondary Meaning. ....17

a. "Memory" describes the nature, use and characteristics of a card-matching "memory game". ....17

b. Descriptive third-party use of "Memory" for games. ....18

c. Hasbro cannot establish secondary meaning. ....19

d. The "incontestability" of the stylized registration is invalid....21

e. Hasbro's alleged mark is not suggestive. ....21

3. Hasbro Has Abandoned Its Mark By Failing to Police It. ....22

4. Hasbro Abandoned Use Of The Stylized "Memory" Registration. ....23

B. Hasbro Did Not Meet Its Burden To Prove Likelihood of Confusion....24

1. The Purported Marks Are Not Similar....24

2. The Goods Are Dissimilar. ....27

3. Channels of Trade, Advertising, And The Class Of Prospective Purchasers. ....28

4. There Is No Actual Confusion Evidence. ....29

5. MGA Had No Bad Intent It Adopting "Memory Match-Up"....29

6. Hasbro's Mark, If A Mark At All, Is Diluted By Existing In A Crowded Field Of Similar Such Uses....30

C. MGA's Defenses Preclude Hasbro's Claims. ....31

1. Use Of "Memory" Within "Memory Match-Up" Is Fair Use....31

2. Hasbro Made Misrepresentations In USPTO Filings. ....32

3. Hasbro's Requested Injunctive Relief Is Barred By Laches. ....32

4. Hasbro's Acquiescence Warrants Denial Of Its MOTION....33

D. Hasbro's Other Infringement And Unfair Competition Claims Fail....33

V. HASBRO HAS NOT ESTABLISHED IRREPARABLE HARM....33

A. Hasbro Is Not Entitled To A Presumption Of Harm....34

1. Hasbro's Delay Cancels Any Presumption Of Harm. ....34

2. Failure To Police Negates Irreparable Harm. ....35

3. Any Injury Will Be *De Minimis* And Compensable....35

B. Hasbro Will Not Suffer Irreparable Injury....35

1. Hasbro Is Not Likely To Succeed On Its Claims. .....36

2. Delay In Seeking Relief Controverts Irreparable Harm. .....36

3. Mere Allegations Do Not Constitute Irreparable Injury. .....37

a. Speculative assertions of harm are insufficient. .....37

b. Damages can address any harm to Hasbro. .....37

c. Injunctions should not be used to suppress lawful competition. .....38

VI. THE BALANCE OF HARDSHIPS WEIGHS AGAINST AN INJUNCTION. .....38

A. Hasbro Will Suffer Little Or No Hardship Absent An Injunction. .....38

B. MGA Will Suffer Severe Hardship If An Injunction Issues. .....38

1. An Injunction Would Damage MGA's Business Relationships. .....38

2. The Cost Of An Injunction Could Be Hundreds Of Thousands Of Dollars Due, In Part, To Hasbro's Delay. .....40

3. An Injunction Would Cause MGA To Lose Out On The Current Popularity Of Comic Book-Related Products. .....42

C. The Severe Potential Injury to MGA Requires Hasbro To Make A Very Strong Showing Of Likely Success on the Merits, Which It Cannot Do. .....42

VII. THE PUBLIC INTEREST WOULD NOT BE SERVED IF AN INJUNCTION WERE TO ISSUE. .....42

VIII. EQUITY WEIGHS AGAINST A PRELIMINARY INJUNCTION. .....43

IX. A PRELIMINARY INJUNCTION WOULD REQUIRE A LARGE BOND. .....43

X. CONCLUSION. .....43

# TABLE OF AUTHORITIES

Cases

24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,
277 F. Supp. 2d 356 (S.D.N.Y. 2003) ........ 22

Abercrombie & Fitch Co. v. Hunting World, Inc.,
537 F.2d 4 (2nd Cir. 1976) ........ 14

Arthur Guinness & Sons, PLC v. Sterling Pub. Co., Inc.,
732 F.2d 1095 (2d Cir. 1984) ........ 38

Astra Pharmaceutical Prods. v. Beckman Instruments, Inc.,
718 F.2d 1201 (1st Cir. 1983) ........ 24, 25, 26

Bay State Savings Bank v. Baystate Financial Services, LLC,
338 F. Supp. 2d 181 (D. Mass. 2004) ........ 13

Bayer v. United Drug Co.,
272 F. 505 (S.D.N.Y. 1921) ........ 16

Bayshore Group Ltd. v. Bay Shore Seafood Brokers, Inc.,
762 F. Supp. 404 (D. Mass. 1991) ........ 43

Beacon Mutual Ins. v. OneBeacon Ins. Group,
376 F.3d 8 (1st Cir. 2004) ........ 33

Berlent v. Focus Features, LLC,
2006 WL 1594478 (S.D.N.Y. 2006) ........ 12, 35

Biogen Idec Ma, Inc. v. Trustees of Columbia U.,
332 F. Supp. 2d 286 (D. Mass. 2004) ........ 33, 35, 37

Bionx Implants, Inc. v. Innovative Devices, Inc.,
45 F. Supp. 2d 75 (D. Mass. 1999) ........ 43

Boston Athletic Assn. v. Sullivan,
867 F.2d 22 (1st Cir. 1989) ........ 34

In re Boston Beer Co. L.P.,
198 F.3d 1370 (Fed. Cir. 1999) ........ 20

Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.,
9 F.3d 175 (1st Cir. 1993) ........ 19

Bourne Co. v. Tower Records, Inc.,
976 F.2d 99 (2nd Cir. 1992) ........ 34

Buddy Systems, Inc. v. Exer-Genie, Inc.,
545 F.2d 1164 (9th Cir. 1976) ........ 45

In re CTB Inc.,
52 U.S.P.Q. 2d 1471 (TTAB 1999) .....24

Calamari Fisheries, Inc. v. The Village Catch, Inc.,
698 F. Supp. 994 (D. Mass. 1988) .....19

Charlesbank Equity Fund II v. Blinds To Go, Inc.,
370 F.3d 151 (1st Cir. 2004) .....3, 33, 37

Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N.A.,
270 F. Supp. 2d 432 (S.D.N.Y. 2003) .....34, 35

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2nd Cir. 1985) .....34

Clonus Assocs. v. Dreamworks, LLC,
417 F. Supp. 2d 248 (S.D.N.Y. 2005) .....34, 35, 37

In re Computer Store, Inc.,
211 U.S.P.Q. 72 (TTAB 1981) .....14

In re Cooperative Produttori Latte E Fontina Valle D'Acosta,
230 U.S.P.Q. 131 (TTAB 1986) .....6, 14

Cosmetically Sealed Inds., Inc. v. Cheesebrough-Pond's USA Co.,
125 F.3d 28 (2nd Cir. 1997) .....32

In re Dillard Dep't Stores Inc.,
33 U.S.P.Q. 2d 1052 (Comm'r of Patents 1993) .....24

Dixi-Cola Labs. v. Coca-Cola Co.,
117 F.2d 352 (4th Cir. 1941) .....14

Dupont Cellophane Co. v. Waxed Products Co.,
85 F.2d 75 (2d Cir. 1936) .....16

Esso Standard Oil Co. v. Monroig-Zayas,
445 F.3d 13 (1st Cir. 2006) .....12, 38

Field Enterprises Educational Corp. v. Cove Industries, Inc.,
297 F. Supp. 989 (E.D.N.Y. 1969) .....22

Figueroa v. Wall,
2006 WL 898166 (D.R.I. 2006) .....12, 37

Flex-Let Corp. v. Curran,
111 F. Supp. 536 (D.R.I. 1953) .....12, 33

Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.,
533 F. Supp. 685 (W.D. Ark. 1981) .....39

Fritz v. Arthur D. Little, Inc.,
944 F. Supp. 95 (D. Mass. 1996) .....5, 33, 34, 36

Garnier v. Andin Int'l,
844 F. Supp. 89 (D.R.I. 1994) ........ 12, 35

Gidatex, S.r.L. v. Campaniello Imports, Ltd.,
13 F. Supp. 2d 417 (S.D.N.Y. 1998) ........ 34

Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.,
869 F. Supp. 176 (S.D.N.Y. 1994) ........ 38

Golomb v. Wadsworth,
592 F.2d 1184 (CCPA 1979) ........ 22

Grondin v. Rossington,
690 F. Supp. 200 (S.D.N.Y. 1988) ........ 42

Gruner + Jahr USA Pub. v. Meredith Corp.,
991 F.2d 1072 (2d Cir. 1993) ........ 18, 20, 26

Hasbro, Inc. v. Clue Computing, Inc.,
66 F. Supp. 2d 117 (D. Mass. 1999) ........ 9, 25, 26, 28, 29

Haughton Elevator Co. v. Seeberger,
85 U.S.P.Q. 80 (Comm'r of Patents 1950) ........ 16

Helena Rubinstein, Inc. v. Frances Denney, Inc.,
286 F. Supp. 132 (S.D.N.Y. 1968) ........ 32

Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.,
219 F.3d 104 (2d Cir. 2000) ........ 22, 23

Hewlett-Packard Co. v. Genrad, Inc.,
882 F. Supp. 1141 (D. Mass. 1995) ........ 43, 44

Horizon Mills Corp. v. QVC, Inc.,
161 F. Supp. 2d 208 (S.D.N.Y. 2001) ........ 14, 16, 23

I.P. Lund Trading ApS v. Kohler Co.,
163 F.3d 27 (1st Cir. 1998) ........ 19, 24

ImOn, Inc. v. ImaginOn, Inc.,
90 F. Supp. 2d 345 (S.D.N.Y. 2000) ........ 34

Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing,
103 F.3d 196 (1st Cir. 1996) ........ 24, 25, 26, 28

Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc.,
925 F.2d 6 (1st Cir. 1991) ........ 45

J. Kohnstam, Ltd. v. Louis Marx & Co.,
280 F.2d 437 (C.C.P.A. 1960) ........ 14

Kadant, Inc. v. Seely Machine, Inc.,
244 F. Supp. 2d 19 (N.D.N.Y. 2003) ........ 38

Kellogg Co. v. Nat'l Biscuit Co.,
305 U.S. 111 (1938)....44

King of the Mountain Sports, Inc. v. Chrysler Corp.,
968 F. Supp. 568 (D. Colo. 1997)....29

King-Seeley Thermos Co. v. Alladin Indus., Inc.,
321 F.2d 577 (2d Cir. 1963)....16

Labrador Software, Inc. v. Lycos, Inc.,
32 F. Supp. 2d 31 (D. Mass. 1999)....18

Le Cordon Blue, S.A. v. BPC Publ., Ltd.,
327 F. Supp. 267 (S.D.N.Y. 1971)....32

Leathersmith of London, Ltd. v. Alleyn,
695 F.2d 27 (1st Cir. 1982)....24

Lever Bros. Co. v. Mattel, Inc.,
609 F. Supp. 1395 (S.D.N.Y. 1985)....39

Litton Sys., Inc. v. Sundstrand Corp.,
750 F.2d 952 (Fed. Cir. 1984)....39

MacDonald v. Chicago Park Dist.,
132 F.3d 355 (7th Cir. 1997)....43

Mattel, Inc. v. Azrak-Hamway Int'l, Inc.,
724 F.2d 357 (2d Cir. 1983)....20

Mead Johnson & Co. v. Abbott Labs.,
201 F.3d 883 (7th Cir. 2000)....46

Mego Corp. v. Mattel, Inc.,
203 U.S.P.Q. (BNA) 377 (S.D.N.Y. 1978)....39

Miller Brewing Co. v. G. Heileman Brewing Co.,
561 F.2d 75 (7th Cir. 1977)....7, 14

In re Miteyfast Service Centers, Inc.,
223 U.S.P.Q. 342 (TTAB 1984)....22

Morningside Group Ltd. v. Morningside Capital Group, LLC,
182 F.3d 133 (2d Cir. 1999)....26

Nabisco, Inc. v. PF Brands, Inc.,
50 F. Supp. 2d 188 (S.D.N.Y. 1999)....41, 46

National Nonwovens, Inc. v. Cons. Prods. Enterprs., Inc.,
397 F. Supp. 2d 245 (D. Mass. 2005)....13, 14

Orient Express Trading Co., Ltd. v. Fed. Dept. Stores, Inc.,
842 F.2d 650 (2nd Cir. 1988)....32

Original Appalachian Artworks, Inc. v. Blue Box Factory Ltd.,
577 F. Supp. 625 (S.D.N.Y. 1983) ....................28

Orson, Inc. v. Miramax Film Corp.,
836 F. Supp. 309 (E.D. Pa. 1993) (50-day delay)....................34

Paco Sport, Ltd. v. Paco Rabanne Parfums,
86 F. Supp. 2d 305 (S.D.N.Y. 2004)....................21

Philip Morris Inc. v. Star Tobacco Corp.,
879 F. Supp. 379 (S.D.N.Y. 1995) ....................46

Phillip Morris, Inc. v. Brown & Williamson Tobacco Corp.,
230 U.S.P.Q. 172 (TTAB 1986) ....................22

Pignons S. A. v. Polaroid Corp.,
657 F.2d 482 (1st Cir. 1981)....................3, 13, 24, 25, 26, 27, 28, 29, 30, 34, 38, 43

Profitness Physical Ther. v. Pro-Fit Orthopedic,
314 F.3d 62 (2nd Cir. 2002)....................32

Programmed Tax Sys., Inc. v. Raytheon Co.,
419 F. Supp. 1251 (S.D.N.Y. 1976)....................32

Public Serv. Co. of N.H. v. West Newbury,
835 F.2d 380 (1st Cir. 1987)....................36, 37

In re Quik-Print Copy Shops, Inc.,
616 F.2d 523 (CCPA 1980) ....................22

In re Redken Labs., Inc.,
170 U.S.P.Q. 526 (TTAB 1971) ....................20

Retail Servs. Inc. v. Freebies Publ'g,
364 F.3d 535 (4th Cir. 2004) ....................13

In re Reynolds,
229 U.S.P.Q. 776 (TTAB 1986) ....................22

In re Richards-Wilcox Mfg. Co.,
181 U.S.P.Q. 735 (Comm'r of Patents 1974)....................24

Ross-Simons of Warwick, Inc. v. Bacarat, Inc.,
102 F.3d 12 (1st Cir. 1996)....................37

S.S. Kresge Co. v. United Factory Outlet, Inc.,
598 F.2d 694 (1st Cir. 1979)....................13, 14, 15

Sunbeam Corp. v. Conair Corp.,
220 U.S.P.Q. 748 (TTAB 1983) ....................22

TeleRep Caribe Inc. v. Zambrano,
146 F. Supp. 2d 134 (D.P.R. 2001)....................21

The American Automobile Assn. v. AAA Automobile Club of Queens, Inc., 1999 WL. 97918 (E.D.N.Y. 1999) ........ 30

The Beacon Mutual Ins. v. OneBeacon Ins. Co., 376 F. Supp. 2d 251 (D.R.I. 2005) ........ 13, 18, 20, 22, 24, 29

The Murphy Door Bed Co., Inc. v. Inter. Sleep Systems, Inc., 874 F.2d 95 (2nd Cir. 1989) ........ 14, 16

Time, Inc. v. Petersen Publ'g Co. L.L.C., 173 F.3d 113 (2nd Cir. 1999) ........ 21

Tough Traveler, Ltd. v. Outbound Prods., 60 F.3d 964 (2d Cir. 1995) ........ 34

Trustco Bank Nat'l Ass'n v. Glens Falls Nat'l Bank and Trust Co., N.A., 903 F. Supp. 335 (N.D.N.Y. 1995) ........ 42

Uncas Mft'g v. Clark & Coombs Co., 200 F. Supp. 831 (D.R.I. 1962) ........ 23

Uno's Pizza, Inc. v. Pizzeria Uno Corp., 722 F. Supp. 971 (W.D.N.Y. 1989) ........ 42

Virginia Tech. Foundation Inc. v. Family Group Ltd., 666 F. Supp. 856 (W.D. Va. 1987) ........ 45

WCVB-TV v. Boston Athletic Assn., 926 F.2d 42 (1st Cir. 1999) ........ 30, 31

Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36 (1st Cir. 2005) ........ 38

Statutes

15 U.S.C. § 1052(f) ........ 10, 11, 12

15 U.S.C. § 1056 ........ 10

15 U.S.C. § 1057(e) ........ 23

15 U.S.C. § 1064 ........ 13

15 U.S.C. § 1065 ........ 21

15 U.S.C. § 1114 ........ 12

15 U.S.C. § 1115(b) ........ 21

15 U.S.C. § 1119 ........ 24

15 U.S.C. § 1125(a) ........ 12

15 U.S.C. § 1127 ........ 13, 24

Rules

37 C.F.R. § 2.173(a)....................................................................23

Fed. R. Civ. P. 65 (c) ....................................................................45

Other Authority

J. McCarthy, McCarthy On Trademarks And Unfair Competition, §§ 31:41, 31:42 (2002) ........33

Trademark Manual of Examining Procedure § 1213....................................................................10, 23

# I. INTRODUCTION.

Most people have played one or more of the children's card games *Go Fish*, *Snap*, *Old Maid*, *Memory* (also known as *Concentration*) or *Crazy Eights*, when young. Of those, *Memory* involved a simple game that tested memory and observation skills. One took a standard deck of 52 playing cards and spread them face down. The first player turned over two cards, hoping for a matching number or face card pair. If they did not match, they were returned to the table face down. Everyone tried to remember the faces of the over-turned cards and where they were. The next player then turned over two cards to try to find a pair. The game continued until all pairs were found. That simple card game known as *Memory* was played for years *before* Hasbro started marketing a card-matching game it called "Memory", and long before it claimed trademark rights in a stylized design mark comprising that name.

Hasbro now accuses MGA of trademark infringement because in 2005 MGA launched a Spider-Man & Friends "Memory Match-Up" game. Although Hasbro has two trademark registrations for the word "Memory" for its game—(1) a 1967 logo containing the *single* word "memory" in a particular stylized design (*see* **APPENDIX 1** [hereafter "**APP.**"] hereto), and (2) a 2004 word mark consisting only of the *single* word "memory")—they are *expressly limited* to equipment for a *card*-matching game (the 1967 design registration), and a *card*-matching game (the 2004 registration). Therefore, Hasbro's marks cannot be infringed by MGA's game name, which is a *composite* phrase—"Memory Match-Up" (now "3-D Memory Match-Up")—and is *not* a card-matching game and does *not* use cards at all, but, rather, contains 10 three-dimensional, molded plastic Marvel comic book superhero characters who can be separated into two parts—a head and torso half and a feet and legs half.

The name of MGA's game describes what players do—namely, use their memory to try to match up items. The 20 halves of the Marvel characters are placed on the game's carrying case, which opens into a playing surface; 20 cups are placed over each half, hiding the game pieces. Players then try to match up each character's different halves by lifting two cups at a time. When the matching halves are found, they are snapped together to create a whole character. As with the classic card-matching memory game that pre-dates Hasbro's first game of that name, memory and observation skills are required.

Hasbro has taken the generic word "memory" and tried to turn it into Hasbro's exclusive property, so that only it can use the word in connection with *any* game. That appropriation is akin to Hasbro or another party claiming exclusive rights to use the *Go Fish*, *Snap*, *Crazy Eights*, or *Old Maid* names by selling card games under those old, generic names for children's card games. Once generic, a name cannot properly be a trademark. However, even if Hasbro thought that its use of "Memory" created trademark rights (as registered as a design and more recently as a word), it has neither used the name exclusively *nor* policed its rights. Furthermore, Hasbro's design mark, which is purportedly "incontestable", cannot cover MGA's use, even if it truly is incontestable (and not abandoned, as MGA contends). A design mark's incontestability status extends *only* to the design that is the subject of the registration *and* to the exact goods covered by the registration. MGA uses neither.

Hasbro also takes offense at text on an MGA web page that described MGA's Spider-Man & Friends game as a 3-D version of the "classic memory matching game," which Hasbro asserts was a clear reference to Hasbro's game. It is not. MGA's text referred to the 52-card matching memory game described above that children all over have played for ages.

The marketplace is full of *hundreds* of match-up games, modeled after the age-old "memory" card game, that bear or are marketed with the term "memory". Why, then, did Hasbro ignore them and attack MGA's use?[1] The reason became clear in Hasbro's moving papers. MGA obtained a non-exclusive license from Marvel to use the "Spider-Man & Friends" characters in mid-2005 on various products. In early 2006, Hasbro *also* obtained a non-exclusive Marvel license to use the same characters. Hasbro now wants to force MGA's product out of the market, so Hasbro can have the only Spider-Man & Friends game. It is trying to use the trademark laws to accomplish this under the pretext that MGA's descriptive product name infringes Hasbro's rights. MGA has a legitimate right to market its "Memory Match-Up" game, and Hasbro should not be permitted to enjoin that right.

---

[1] In Hasbro's most recent SEC 10-K filing (*http://sec.gov/Archives/edgar/data/46080/000095013506 001133/0000950135-06-001133.txt*), it identifies 22 "core" Hasbro games. "Memory" is not listed as one of them, nor anywhere else in its filing.

## II. FACTUAL BACKGROUND.

### A. The Classic Card-Matching Memory Game.

Hasbro did not invent the card-matching memory game. It has been around since long before Hasbro started selling a so-called "Memory" card-matching game in 1966. (*See* the encyclopedia, dictionary, and other reference sources in **APP. 9** hereto; Ex. 1) The children's card games *Go Fish*, *Snap*, *Old Maid*, *War*, *I Doubt It*, *Crazy Eights*, or *Memory* (also called *Concentration*) have long been popular, and remain so today. (**APP. 4**) As noted, *Memory* involved a simple game that tested one's memory and observation skills using a standard deck of 52 playing cards in which players take turns attempting to match pairs of number or face cards they turn over, two at a time, until all card pairs are found. (**APP. 9**; Ex. 1)

### B. MGA's Spider-Man & Friends "3-D Memory Match-Up" Three-Dimensional, Molded Plastic, Superhero Character Game.

"Spider-Man & Friends" are superhero characters Marvel licensed to MGA in June 2005 on a non-exclusive basis for certain product categories. MGA came up with the idea of doing a three-dimensional version of the memory game that would give children the tactile sense of playing with small figures, instead of cards. (Caspi Decl. ¶¶ 4, 7, 9, 10; Werner Decl. ¶¶ 3-5; Keossian Decl. ¶¶ 3-4; Lumabao Decl. ¶¶ 3-5, Ex. B) MGA's idea became the Spider-Man & Friends 3-D, molded plastic game it called "Memory Match-Up", and now calls "3-D Memory Match-Up".[2] The product's name is purely descriptive of what it is—a 3-D game that tests one's memory to match up parts of different characters. There are *no cards* involved; it is *not* a card matching game. The game comes in a plastic carrying case, which doubles as the game-play surface. Its 10 molded plastic characters come in two different halves that snap together (a top half and a bottom half). The figures are disassembled, placed on the game board, and 20 plastic cups are placed over each "half" to hide them from view. Players take turns picking up two cups at a time to try to find the matching top and bottom halves of a character. If a player finds two correct halves, she assembles them and tries to find other matching halves. (*Id.*; **APP. 13**)

---

[2] MGA used the name "Memory Match-Up" until recently. After Hasbro complained about MGA's use of "memory," MGA searched for other uses of "memory" with matching games. As shown in detail below, it found many, but none that were three-dimensional matching games like MGA's. In order to further distinguish its game from all these other uses, most for card-matching games, and to further describe the nature of its product, MGA recently made a "running change" to its product name, now called "3-D Memory Match-Up". (**APP. 6.**)

Marvel imposes very strict guidelines concerning character appearance, packaging, copy, colors, and layout through a *Style Guide* all licensees must follow. Almost everything on MGA's packaging, including the layout, art, typographic font, colors and character modeling, is required by Marvel's *Style Guide*. (Caspi Decl. ¶ 12; Werner Decl. ¶¶ 10-13; Keossian Decl. ¶¶ 5-8, 12, 14; Zimmer ¶¶ 4-7; Lumabao Decl. ¶ 10) After ensuring that MGA met those standards, Marvel approved MGA's product for sale. (Werner Decl. ¶¶ 7-13; Keossian Decl. ¶ 14; Zimmer ¶¶ 5-7; Lumabao Decl. ¶ 10) MGA's "Memory Match-Up" game first appeared on store shelves in December 2005, and on MGA's website on February 10, 2006. It is sold at large national retailers like Wal-Mart and Target, as well as smaller retailers. (Lumabao Decl. ¶¶ 11-14, 17)

Due to the nature of the game (featuring Marvel comic book superhero characters and requiring sufficient motor and conceptual development to assemble different halves of 3-D characters), it is primarily targeted to older children, but also is designed to appeal to older fans, including parents, of Marvel's "Spider-Man & Friends" characters. MGA has not advertised the game, except in a promotional manner on its website's Products page for the game and on the game packaging itself. (Lumabao Decl. ¶ 16; **APP. 13**)

### C. Hasbro's Card-Matching Memory Games And Purported Trademark.

Hasbro asserts two trademarks: (1) a 1967 U.S. registration (No. 834,282) for the single word "Memory" in a particular design, for use *only* with "*equipment comprising cards with many matching pairs of designs for playing a matching card game*" (REQUEST FOR JUDICIAL NOTICE ("**RJN**") Ex. 9; **APP. 1**); and (2) a 2004 U.S. registration (No. 2,894,970) for the word "Memory" for use *only* with "*card matching games*" (RJN, Ex. 10). Thus, Hasbro's only "Memory"-related registrations are expressly limited to *card-matching games*.[3]

Hasbro asserts that its 1967 design registration is incontestable, but that design is no longer in use and has not been in use since at least 1987. (Ex. 9; **APP. 2**) *None* of Hasbro's games it has shown this Court, or found by MGA in the marketplace or on Hasbro's website,[4] use the 1967 design. (Raygor Decl. ¶ 2a. *Cf.* **APP. 1, 3**) In fact, when Hasbro renewed its

[3] In case there were any doubt as to what Hasbro claims to own, it refers to its game as a *card*-matching game 13 times in its moving memorandum, and 8 times in its COMPLAINT.

[4] *http://www.hasbro.com/default.cfm?page=ps_results& prevpage=default&keyword=memory.*

registration in 1987, it submitted a specimen showing a *materially altered* design (**APP. 2**), in a *different* font than shown in the registration, thereby *conceding* that the registered design was no longer in use.[5] The stylized design Hasbro uses on products now (**APP. 3**) is considerably different than *both* the 1967 and 1987 stylized designs (**APP. 1, 2**). Consequently, the 1967 registration is inapplicable, and its alleged incontestability has no bearing on this action.

Hasbro's "Memory" game is a *two*-dimensional *card*-matching game, like the age-old game children have played long before Hasbro started selling its game. In Hasbro's game, the first of multiple players places the cards face-down, and turns over two to see if there is a match between two identical cards. If no match is made, the cards are returned to a face-down position, with players all trying to remember what was on them. The next player turns over two cards and, testing his or her memory, tries to find a match. The game continues until all matching pairs are found. Hasbro calls this the "Memory" game. That is akin to Hasbro calling a blackjack card game "Blackjack" or "21", a poker game "Poker", or an *Old Maid* children's card game "Old Maid". These are all old, generic names for these games; they cannot function as trademarks, no matter how much money one pours into marketing them and no matter how long one uses them.[6]

### D. Hasbro's Efforts To Interfere With MGA's Marvel License.

MGA's June 2005 *non-exclusive* license from Marvel gave it the right to create and distribute Marvel character products. Six months *after* MGA got its license and *after MGA's "Memory Match-Up" game first appeared at retailers* in December 2005, Hasbro also secured a *non-exclusive* license from Marvel for Spider-Man & Friends covering certain categories, including games.[7] Hasbro says that it now plans to offer a Spider-Man & Friends-themed "Memory" game. (Hasbro's Stark Decl., Ex. 6) Because Hasbro, too, will have to follow

---

[5] The incontestability status attached in 1972 and covered the 1967 design only. (RJN, Ex. 9)

[6] In an apparent concession to the genericness of its alleged "Memory" mark, Hasbro has started to add the word "Brand" between "Memory" and "Game" on packaging. If "Memory" were truly distinctive by itself, Hasbro would not need to add "Game" and "Brand" to "Memory". By adding those elements, it concedes that "memory" is generic for this type of game. While the *design* aspects of the "Memory" design logo Hasbro uses today may, arguably, be a "brand" identifier, the word itself is not and cannot be. It is akin to aspirin pain reliever, rather than Charmin (brand) toilet tissue.

[7] (Hasbro's Stark Decl. ¶14; Oakes Decl. ¶3; Hasbro's SEC 10-Q and 10-K filings, at http://sec.gov/Archives/edgar/data/46080/000004608006000039/marvelagree.htm; http://sec.gov/Archives/edgar/data/46080/000004608006000039/licenseagreeamend.htm; http://sec.gov/Archives/edgar/data/46080/000095013506001133/0000950135-06-001133.txt.)

Marvel's *Style Guide* in creating its game, Hasbro's game will look similar in many respects to MGA's. (Caspi ¶ 12; Werner ¶¶ 12-13; Oakes ¶¶ 5-6) Both companies have a non-exclusive license, and Marvel clearly intended the two different types of games to co-exist. *And they can*, just as Hasbro co-exists with *other* users of "Memory" for card-matching games that use the same licensed characters! By way of example, **APP. 5** shows a Hasbro *Dora the Explorer*-themed "Memory" card-matching game co-existing with a *Dora the Explorer*-themed "Memory Match" card-matching game from Cardinal Industries. The packaging looks similar, presumably because both licensees follow the same *Dora* style guidelines imposed by the *Dora* licensor, Viacom. Yet Hasbro co-exists with it, and apparently has not sued Cardinal.

As shown in detail below, the marketplace is full of *hundreds* of match-up games, based on the age-old "memory game" (played with a deck of cards), that bear or are marketed in connection with the word "memory". (Ex. 2-4, 7) Yet, Hasbro ignores them and attacks MGA's use, but only after Hasbro obtained its own license to the Marvel characters, which are very popular and the subject of numerous films, games, and toys. (Ex. 8) Only after seeing the success of MGA's game in the marketplace (Lumabai Decl. ¶¶ 18-19),[8] did Hasbro decide to try to turn its non-exclusive license into an exclusive one. With its motion, Hasbro is trying to use the trademark laws to force MGA's Spider-Man & Friends product out of the market, so Hasbro can introduce its Spider-Man & Friends game, all under the pretext that MGA's descriptive name "Memory Match-Up" (now "3-D Memory Match-Up") infringes Hasbro's rights.

**E. <u>Hasbro's Misstatements To The USPTO.</u>**

Hasbro misstated the facts to the USPTO during the prosecution of both of its registrations. *First*, it failed to disclose that it is operating under a license from Ravensburger and, in submitting a specimen in connection with its 2004 registration, failed to include a specimen showing the part of Hasbro's packaging that disclosed that license. (**APP. 10**; RJN, Ex. 10) *Second*, Hasbro's SVP, Barry Nagler, submitted a declaration to the USPTO (**APP. 11**) where he stated, under oath, that "he believes [Hasbro] to be the owner of the trademark/service mark sought to be registered", and that "*to the best of his knowledge and belief no other person,*

[8] Hasbro sent its demand to MGA in April 2006 right after national sales data was released showing that MGA's game had enjoyed a sharp spike in sales in March. (Lumabao Decl. ¶ 19)

*firm, corporation, or association has the right to use the mark in commerce*". In light of the statements on Hasbro's packaging about the Ravensburger license *and* the overwhelming evidence (detailed below) of third-party use of "memory" with card-matching games predating Hasbro's first use, *both* statements appear to be false.

### F. Hasbro's Knowledge Of MGA's Use, And Hasbro's Unreasonable Delay.

Hasbro learned of MGA's use of the word "memory" no later than Summer 2005, yet did not object to such use until almost a year later on April 19, 2006. (Lumabai Decl. ¶¶ 11-14) It then waited until May 26 to file suit, and until June 29 to seek an injunction.

In Summer 2005, MGA's game was displayed to store buyers in so-called "plan-o-grams," where the product was disclosed to Hasbro sales persons acting as games "category managers" for at least two of the major U.S. retailers. (*Id.*) "Plan-o-grams" are set up while major retailers are evaluating products and deciding whether to buy them, and consist of displays of how the products, including Hasbro's and MGA's, will be displayed in stores. Hasbro never objected to MGA's game, which clearly bore the word "memory" in those displays, and which would have been seen by Hasbro personnel in the summer and fall of 2005, long before the December 2005 initial sales of the product to the public and certainly before the product was bought by retail store "buyers". (Lumabao Decl. ¶¶ 11-14)

MGA's "Memory Match-Up" game first appeared on Target store shelves in December 2005, presumably adjacent to Hasbro's products. (Hasbro's Stark Decl. ¶ 24; Lumabao Decl. ¶ 11) Hasbro kept silent. MGA's game has been listed on MGA's website's "Products" page since February 10, 2006. Again Hasbro kept silent. Hasbro did not file suit until May 26, 2006—five months after the product was being sold in the same stores Hasbro's games have been sold, and almost a year after the product was seen by Hasbro games category managers at retail chains. Hasbro then delayed filing this MOTION for another month.

### G. Extensive Third-Party Use Of "Memory" And "Memory Game".

There is such widespread use of "memory" in connection with card-matching and related games by the public and third parties that it is inconceivable that Hasbro can credibly assert to this Court that it owns the exclusive right to use the word in connection with games, and that it has been assiduously policing and enforcing that alleged right.

A Google search for the word "memory" yields *933,000,000* results; for "memory" and "game" *143,000,000* results; for "memory game" as a phrase *1,340,000* results; and for "memory game" plus "match" *332,000* results. (Ex. 6.47 through 6.50)

"Memory" games are routinely found in reference books (*e.g.*, dictionaries, card- or game-related treatises, and encyclopedias) under entries referring to the common, classic memory game where players match pairs of cards. (**APP. 9**; Ex. 1) These references have no relation to Hasbro at all. In fact, several *predate* Hasbro's own alleged 1966 "first-use" date, making it clear that games under the name "memory" existed long before Hasbro launched its generically titled game. (Ex. 1.1, 1.2) The following are samples of such reference materials:

- 1956: THE NEW COMPLETE HOYLE–THE OFFICIAL RULES OF ALL POPULAR GAMES OF SKILL AND CHANCE book identifies "CONCENTRATION (**MEMORY**, PELMANISM)" as a generic type of game under "Juvenile Games" and states that "[a]s its various names suggest, this game is an excellent exercise for the development of visual **memory**".
- 1964: THE NEW COMPLETE HOYLE book identifies "CONCENTRATION (**MEMORY**, PELMANISM)" in the same manner.
- 1968: OFFICIAL RULES OF CARD GAMES book identifies "Concentration (**Memory**)" as a type of children's and family game.
- "Concentration/**Memory**–Card Game Rules" (*About.com* website).
- "Concentration or **Memory** is a card game of the Rummy family . . . ." (*Wikipedia.org*).
- "Concentration, based on the children's **memory** game" (*Reference.com* website).
- THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987, unabridged): "**con·cen·tra·tion** . . . . 7. Also called **memory**. *Cards*: A game in which all 52 cards are spread face down on the table and each player in turn exposes two cards at a time and replaces them face down if they do not constitute a pair." "**mem·or·y** . . . . 13. *Cards*: concentration (def. 7)." (Ex.1; **APP. 9**)

Numerous media sources, books, and other materials refer to using a standard 52-card deck of cards to play the "memory game," without referring to Hasbro, its picture cards, *or* its game. (Ex. 1; **APP. 8**) In fact, several of the references occurred before Hasbro alleges it first used its mark in 1966. The following are examples of pre-1966 references:

- 1956: THE NEW COMPLETE HOYLE book (Under the heading "Concentration (**Memory**, Pelmanism)": "A pack of 52 cards" is used for the classic memory game.
- 1964: THE NEW COMPLETE HOYLE book (same). (Ex.1.1, 1.2; **APP. 8**)

There are many media references to non-Hasbro "memory game" references in Internet sites and newspaper/periodical articles. (*See* Raygor Decl., Ex. 6.15-6.42, 6.46, 6.50) In 1971, NBC aired a television game show called "Memory Game," also known as "Joe Garagioloa's Memory Game." (Raygor Decl., Ex. 6.2, 6.51) Numerous stores or game directories have a generic category of games called "memory games," including the following:

- "**Memory** Games" category, All Star Puzzles website (*www.allstarpuzzles.com*)
- "**Memory** & Matching" category, Oompa Toys website (*www.oompa.com*)

- "**Memory** Match" category of games, CRpuzzles website (*www.crpuzzles.com*)
- "Matching & **Memory**" category, Amazon.com website (*www.amazon.com*)
- "Matching & **Memory**" category, ToysRUs.com website (*www.toysrus.com*)
- "**Memory** & Matching" category, MSN Shopping website (*shopping.msn.com*)
- "Learning + **Memory**" category, Target (*target.com*)

(Ex. 3.6, 3.6, 3.9, 3.60, 4.15, 4.72)

"Memory" has been extremely widely used in connection with card-matching "memory games" played on the Internet, computers and DVDs that are not affiliated with Hasbro. (Ex. 4) There are many card-matching games that use the word "memory" in their titles or to describe the game and that one can buy, many of which MGA has purchased since receiving Hasbro's complaint. None appear to be affiliated with Hasbro. (Ex. 2-3) "Memory" is widely used in connection with adult content card-matching memory games, *not* affiliated with Hasbro. (Ex. 7)

There are numerous trademark applications and registrations for marks containing the word "memory," with which Hasbro is apparently co-existing without complaint, including 46 registrations and pending applications containing the word "memory" or "memories" in Class 28 (toys and sporting goods).[9] (Ex. 5) The following are particularly pertinent U.S. references:

- **MATCHIN', MIXIN' MEMORY FUN!**: Registered by Mattel *on July 11, 2006* in Class 28 (the same as Hasbro) for "*card games*, equipment sold as a unit for playing *a memory game*". Mattel is using it on a children's card-matching memory game featuring the Koala Brothers characters. The USPTO issued this registration, *which was not opposed by Hasbro*, after finding that it was not likely to cause confusion with any marks that were already registered (which would include Hasbro's two registrations in the same class and also for card games). (Ex. 5.12)
- **MEMORY LANE**: Registered in September 2005 in Class 16 for arts and crafts kits to entertain people with diminished memory. The USPTO issued this registration, *which was not opposed by Hasbro*, after finding that it was not likely to cause confusion with any marks already registered (which would include Hasbro's). (Ex. 5.14)
- **MAKING MEMORIES TOGETHER**: Registered in January 2001 in Class 28 (the same as Hasbro) for use with playing board *games*. *Hasbro did not oppose the registration.* (Ex. 5.16)
- **MEMORY MATCHING MONKEYS**: Registered in December 2005 in Class 28 (the same as Hasbro) for a matching game with a magnetic *game* board and pieces. *Hasbro never objected to this registration and now co-exists with it, presumably without confusion.* (Ex. 5.13)
- **MEMORY MATCH**: Registered by AOL in December 2002 in Class 41 for online *games*. AOL is using it for a series of *online versions of the classic card-matching memory game*.

---

[9] Of those, applications to register PAW PRINT **MEMORY** BEARS, EMOTION **MEMORY**, THANKS FOR THE **MEMORY**, FRAME A **MEMORY**, **MEMORY** GRIP, **MEMORY** BEARS, MUSCLE **MEMORY**, THANKS FOR THE **MEMORY**, **MEMORY** MADNESS, **MEMORY** MATCH, **MEMORY**MAN, COLOR-ME **MEMORY** CRAYON, DYNAMIC **MEMORY**, MOVIE **MEMORY**, **MEMORY** MANIA, **MEMORY** DOLLS, **MEMORY**-GEL, SWING **MEMORY**, **MEMORY** LOK, **MEMORY** BANK, **MEMORY** FOAM BY CECILE, **MEMORY** PUTT, SWEET **MEMORY**, **MEMORY** BALLS, BIBLE **MEMORY** BUGS, BIBLE **MEMORY** BUDDY, BIBLE **MEMORY** BUDDIES, and **MEMORY** LANE were filed *before* Hasbro applied to register the unitary word **MEMORY** (which ultimately issued as Reg. No. 2,894,970) and proceeded to registration. Applications to register **MEMORY** MATCHING MONKEYS, **MATCHIN'**, MIXIN' **MEMORY** FUN!, were all filed *after* Hasbro applied to register its purported mark and all proceeded to registration. (Ex. 5)

*Hasbro never objected to this registration and now co-exists with it, presumably without confusion.* (Ex. 5.25)

In the preceding examples, the USPTO examined its records—which necessarily included Hasbro's two registrations—and determined that these uses could co-exist with Hasbro's, *even for card-matching games* and *even in the same Hasbro registration class* (Class 28), *without confusion*. Despite Hasbro's contention that it monitors and pursues third-party game-related uses of "memory" (Hasbro's Vanasse Decl. ¶¶ 6-7), including "monitoring trademark applications in the [USPTO]," Hasbro did *not* oppose *any* of these applications, allowed all to go to registration, and now co-exists with them, even though they are *all* for games or entertainment. If Hasbro decided it can co-exist with ***Memory** Match*, ***Memory** Matching Monkeys*, ***Memory** Lane*, *Making **Memories** Together*, and *Matchin', Mixin' **Memory** Fun!* for card-matching games, other games and entertainment, it certainly can *also* co-exist with MGA's use of the composite phrase *Memory Match-Up* (now *3-D Memory Match-Up*).

"Memory" has repeatedly been treated as descriptive by the USPTO.[10] Several applicants of "memory"-related marks have disclaimed exclusive use of the word "memory," except as part of a composite mark, because the word was deemed merely descriptive.[11] Many applicants have had to make a Section 2(f) [15 U.S.C. § 1052(f)] showing of secondary meaning before they could register on the Principal Register because "memory" is descriptive.[12] Several applicants have sought registration on the Supplemental Register because "memory" is descriptive.[13]

### H. Hasbro Previously Successfully Argued To The USPTO That Its Use Of "Memory" Could Co-Exist With "Memory Lane" For A Card Game.

In light of the overwhelming evidence of third-party use of the word "memory" in connection with games, and in particular with card-matching games, it is surprising that Hasbro has elected to go after MGA's use—*particularly when Hasbro has already admitted to the USPTO that it can co-exist with a composite name akin to that being used by MGA.* (Ex. 9)

---

[10] A disclaimer can be used where a portion of a mark is descriptive to make clear no claim is being made to that unregistrable component of the mark. 15 U.S.C. § 1056; TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1213.

[11] There are 274 live and dead applications and registrations for "memory"-related marks, where "memory" was disclaimed. (Ex. 5.7, 5.8, 5.21, 5.25, 5.27, 5.38, 5.39, 5.40, 5.44-5.49, 5.57; pertinent results in **APP. 7**)

[12] There are 21 live and dead applications and registrations for "memory"-related marks that were required to make a Section 2(f) showing.

[13] There are 47 live and dead applications and registrations for "memory"-related marks for the Supplemental Register. (Ex. 5.9, 5.10)

In 1966, Hasbro (through its predecessor Milton Bradley which Hasbro has acquired) applied to register its stylized "Memory" design mark in Class 28 for a "card game with many pairs of designs on the cards having identical backs, wherein the players try to locate matching cards to make the most pairs". (RJN, Ex. 9 at p. 6, 9) The Examiner *rejected* the application, stating: (1) Hasbro's unitary "Memory" application was likely to cause confusion with a pre-existing registration for the composite mark "Memory Lane" for "apparatus for playing *a card game*"; and (2) the specimen of use Hasbro submitted (**APP. 1**, a box for a card-matching memory game that stated "memory card matching game" and showed the playing cards) showed the word "Memory" *was merely descriptive*. (Ex. 9 at p. 13) The Examiner stated: "The specimens in this case show the type [*sic*] game involved to be ***a memory card matching game***." (*Id.*) The Examiner, therefore, recognized the genericness or mere descriptiveness of "Memory" for "a memory card matching game". (*Id.*) The Examiner then stated:

> "For such goods where the memory of the player is relied upon to locate matching cards the trademark, 'MEMORY', is held to be *merely descriptive* . . . and not subject to registration . . . . Applicant is advised that an identification of goods directed to a game is not acceptable because *it appears that the identifiable goods which bear the mark comprise the parts with which the game is played*."

(*Id.*) The Examiner required Hasbro to change its description of goods to: "equipment comprising cards with many matching pairs of designs for playing a matching card game", which Hasbro did. (*Id.*) Hasbro also came back and said the following:

> "Applicant's mark *MEMORY is urged **not** to so resemble the cited mark MEMORY LANE as to be likely to cause confusion, or to cause mistake, or to deceive*. The cited registration ***differs** in appearance, sound and meaning from Applicant's mark*; it is submitted that *these differences are **significant*** and dictate that *the ordinary purchaser will **not be confused, deceived or mistaken** when he purchases the products of the parties*." (Emphasis added.)

In other words, Hasbro expressly told the Trademark Office that its unitary "Memory" mark for *equipment for a card-matching game* could co-exist—*without confusion*—with the composite "Memory Lane" mark for *apparatus for playing a card game* because they looked and sounded different, and meant something different, presumably because of the addition of the word "Lane" in the pre-existing registration. (*Id.*)

This is no different here. Hasbro's unitary "Memory" mark can co-exist with MGA's composite "Memory Match-Up" or "3-D Memory Match-Up"— one used for a card-matching

game and the other for a three-dimensional character matching game. Hasbro persuasively argued this to the USPTO, and should now be estopped from taking a contrary position here.

## III. LEGAL STANDARD FOR A PRELIMINARY INJUNCTION.

"The granting of a preliminary injunction is an exercise of a very far reaching power, never to be indulged in except in a case clearly demanding it. The burden is on the plaintiff to establish a clear right to temporary injunctive relief." *Flex-Let Corp. v. Curran*, 111 F. Supp. 536, 537 (D.R.I. 1953). *See also Berlent v. Focus Features, LLC*, 2006 WL 1594478, *2 (S.D.N.Y. 2006). This Circuit weighs four factors in deciding whether to grant the order: (1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined, contrasted with the hardship to the movant if not enjoined; and (4) the effect (if any) of the court's ruling on the public interest. The party seeking the preliminary injunction bears the burden of establishing that these factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006). "None of these criteria should be slighted." *Garnier v. Andin Int'l*, 844 F. Supp. 89, 98 (D.R.I. 1994). "A failure . . . to meet any [of these] requires a denial of the motion." *Figueroa v. Wall*, 2006 WL 898166, at *2 (D.R.I. 2006).

## IV. HASBRO IS NOT LIKELY TO PREVAIL ON THE MERITS.

Hasbro alleges two claims: (1) federal trademark infringement [15 U.S.C. §§ 1114, 1125(a)]; and (2) common law trademark infringement and unfair competition. "'The *sine qua non* of [the] four-part [injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of curiosity.'" *Esso*, 445 F.3d at 18. To succeed, Hasbro must show ownership of a protected mark, and use of the same or a confusingly similar mark by another in commerce likely to cause confusion as to the source of goods. *Bay State Savings Bank v. Baystate Financial Services, LLC*, 338 F. Supp. 2d 181, 187 (D. Mass. 2004). Because Hasbro cannot succeed on the merits of any claim, it cannot obtain injunctive relief.

### A. Hasbro's Alleged "Memory" Mark is Invalid.

A prerequisite to a federal infringement claim is a valid trademark, which Hasbro lacks. To be protectable, a trademark must either be inherently distinctive or have acquired secondary

meaning if descriptive. *The Beacon Mutual Ins. v. OneBeacon Ins. Co.*, 376 F. Supp. 2d 251, 255 (D.R.I. 2005) (on remand). Generic words are never protectable. *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979). Even with a federal registration, a mark is not protectable if it is generic or merely descriptive without secondary meaning. *Bay State Savings Bank*, 338 F. Supp. 2d at 188.

Hasbro's use of "Memory" is not protectable because the word is generic for the type of card-matching game it references. As a result, both Hasbro's registrations fail. And, if not generic, Hasbro's alleged "Memory" mark is merely descriptive, at best, and Hasbro has not acquired sufficient secondary meaning to warrant protection. Again, both registrations therefore are invalid. Hasbro has abandoned use of its 1967 stylized "Memory" mark, so its registration is invalid for this reason also. Without a protectable mark, Hasbro's claims fail.

### 1. Hasbro's Alleged "Memory" Mark Is Generic.

#### a. Legal standard for genericness.

The word "Memory" for card games is generic for card-matching memory games of the sort sold by Hasbro. Not even the alleged incontestability of Hasbro's 1967 stylized "Memory" registration can give trademark significance to a generic term. *See* 15 U.S.C. §§ 1064, 1127; *S.S. Kresge Co.*, 598 F.2d at 696. No amount of secondary meaning can convert a generic term into a trademark. *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 547 (4th Cir. 2004). "Public policy demands that generic terms be free for all to use and not susceptible to appropriation by one company. Allowing a trademark in a generic term is like granting a company a monopoly." *National Nonwovens, Inc. v. Cons. Prods. Enterprs., Inc.*, 397 F. Supp. 2d 245, 254 (D. Mass. 2005).

"Generic terms are those which refer to a genus of which a particular product is a species, without distinguishing its source of origin." *S.S. Kresge*, 598 F.2d at 696. The generic name of a product answers "What are you?," while a trademark answers "Who are you? Where do you come from?" *National Nonwovens*, 397 F. Supp. 2d at 252. To prove a term generic, one must show that to "a substantial majority of the public," the mark refers to a genus of product, rather than any specific product or brand. *The Murphy Door Bed Co., Inc. v. Inter. Sleep Systems, Inc.*, 874 F.2d 95, 101 (2nd Cir. 1989). Genericness occurs in two ways: either a seller takes an

existing generic term and claims to hold exclusive rights in it as a trademark; or a seller establishes trademark rights in a term and a majority of the relevant public appropriates the term as the general name for a type of product, as opposed to as a brand or source identifier. *National Nonwovens*, 397 F. Supp. 2d at 254; *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001). *Both* circumstances apply here.

**b. <u>Hasbro's 1966 adoption of the generic term "memory"</u>.**

Hasbro's alleged mark has always been generic for card-matching games where players match images. "Memory" is a generic game name, just as poker, blackjack (aka "21"), rummy, and go fish are for *those* games. (Caspi Decl. ¶ 12; Ex. C; Ex. 1, 2.9, 3.1; **APP. 4, 8, 9**) A generic term may be a noun that references a product, such as "cola" for a soft drink,[14] or an adjective that designates a characteristic of a type of product (*i.e.*, what it is, not how it is), such as "Light Beer" and "Lite Beer" for a type of beer light in body/taste with a low alcohol/calorie content.[15] With this form of genericness, the seller *never* had trademark rights, and genericness is shown simply by examining the term itself. *Horizon Mills Corp.*, 161 F. Supp. 2d at 213.

Although unnecessary, other evidence showing genericness includes examples of generic use: (1) by the plaintiff or others in the same business; (2) in books or magazines; (3) in government documents; (4) on the Internet; or (5) in dictionaries. *National Nonwovens*, 397 F. Supp. 2d at 253; *S.S. Kresge*, 598 F.2d at 695-96 ("Mart" generic despite stores' long-time use of "The Mart"; evidence based on "[a] survey of well-known dictionaries reveals that the term 'mart' is generic since it is another word for store or market, and over thirty federally registered trade names and trademarks included the word mart;" "owner" failed to show "that the term in this case has any meaning [to] consuming public other than store or market").

Hasbro's purported "Memory" mark was generic when allegedly adopted in 1966. Even before Hasbro's asserted first use in 1966, several books were published that identified "Memory" as a generic type of children's game. (Section II.G., above) Thus, Hasbro

---

[14] *Dixi-Cola Labs. v. Coca-Cola Co.*, 117 F.2d 352 (4th Cir. 1941); *In re Cooperative Produttori Latte E Fontina Valle D'Acosta*, 230 U.S.P.Q. 131 (TTAB 1986) ("fontina" for cheese); *In re Computer Store, Inc.*, 211 U.S.P.Q. 72 (TTAB 1981) ("The Computer Store" for computer sales services).

[15] *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977); *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437 (C.C.P.A. 1960) ("matchbox" for small toy car); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2nd Cir. 1976) ("safari" for type of clothing worn on a safari).

appropriated the common name for the game and then tried to convert it into a trademark in order to claim exclusive rights to use it for any game and preclude its use by others, whether as a unitary or composite mark. That is impermissible. *S. S. Kresge*, 598 F.2d at 696.

### c. Extensive use of "memory" and "memory games" by the public and in reference materials.

In addition to the pre-1966 evidence of "memory games" under that name, lots of other evidence shows the common and generic use of "memory". The public repeatedly refers to the card-matching game using a standard 52-card deck of playing cards as the "memory game". (Section II.G., above) Numerous store directories have categories of games called "memory games," which shows that "memory" refers to what a product is, rather than where it is from. (*Id.*) The fact that the public appropriated the term "memory" as the common name of a type of game is demonstrated by references to the card-matching game called "memory" in dictionaries, encyclopedias, and other reference materials as a type of game, *not* as a source-identifier. (*Id.*)

All these uses clearly show that consumers or the public are *not* referring to Hasbro, its game, *or* its picture cards when referring to a "memory game," and do *not* associate "memory" with Hasbro's game. In fact, it is difficult to find anyone referring to a "memory game" as Hasbro's game anywhere, despite Hasbro's long marketing of a game under that name.[16] The reason is obvious—the public does not view Hasbro's use as trademark use. Moreover, several of these references existed *well before* Hasbro's first use of its alleged mark, substantiating MGA's contention that the "memory game" name has been around and in the public's lexicon since long before Hasbro sought to appropriate that common term. (Ex. 1.1, 1.2; **APP. 9**)

### d. Hasbro's alleged "Memory" mark and registrations have become generic through failure to police.

Even if Hasbro's "Memory" mark was not generic when adopted, it has become so because it has been appropriated by the public and used to identify a general type of matching

[16] The best Hasbro could do in its motion, after 40 years of marketing, was cite to two news articles mentioning its game. But Hasbro grossly overstates them. Paragraph 11 of Hasbro's Stark Declaration refers to a 2000 *Newsday* article and states that *the newspaper* named Hasbro's Pokemon edition of the game its "favorite" toy. The actual article attached as Exh. 5 to his declaration shows that two 9-year-old boys went to a Hasbro toy fair showroom where, of the Hasbro toys there, the boys chose the "Memory" game as one of *their* favorites. Mr. Stark then says that the *Ft. Worth Star-Telegram* in 2001 selected Hasbro's Monsters, Inc. edition of the game as "hot" for the holiday season. Again, the actual article tells a different story. The paper talked to the staff of a single website and to a single store at a mall to "find out which games are hot this season." The newspaper then chose eight games. All it did was then grade them (it gave Hasbro's game a B+).

game. *See Horizon Mills Corp.*, 161 F. Supp. 2d at 214. Such appropriation takes place when the "owner" fails to police its mark, resulting in widespread use by others, and the public is unable to call the product by another name. *Id.* Examples of genericized marks include "aspirin," cellophane," "escalator," "thermos" and "murphy bed".[17]

When evaluating genericness, courts consider: (1) PTO and TTAB decisions related to the mark at issue; (2) dictionary definitions; (3) media usage such as newspaper or magazine articles; (4) the alleged owner's efforts at policing the mark; and (5) consumer surveys. *Horizon Mills Corp.*, 161 F. Supp. 2d at 214; *Murphy Door*, 874 F.2d at 101 (dictionary definitions and media references reflect the general public's perception of a mark's meaning and implication). To the extent dictionaries and the media use a term to refer to a type of product (*e.g.*, murphy bed for a bed that folds into a wall), this has been deemed sufficient to establish genericide, despite the owner's policing efforts, *even* in situations where no competitors used the term for their own products. *Murphy Door*, 874 F.2d at 101.

As shown above, numerous reference materials use "memory game" to refer to the classic card-matching game, and they are *not* referring to Hasbro in doing so. And, as shown by the overwhelming number of third-party users of the word in connection with games, Hasbro has utterly failed to police its purported mark. (Section II.G., above) Many third parties use "Memory" *in* the name of their games, while others use "memory" or "memory game" to *describe* their games. (*Id.*) While Hasbro's declaration from its Director of Intellectual Property says Hasbro polices infringers that enter the market, monitors trademark applications, and files lawsuits, he points to only one (unidentified) lawsuit and one current opposition proceeding. (Hasbro's Vanasse Decl. ¶¶ 6-7) *Hasbro bears the burden of proof on this motion.* It should not be permitted to try to bolster its paltry "enforcement" claims in supplemental papers to which MGA would not have an opportunity to respond. Regardless of that declaration, it is clear from *all* the "Memory"-related trademark registrations that have issued for card-related games (Section II.G., above), and *all* the third-party uses MGA has found, that Hasbro has been sitting on its policing hands and has been content to let the public use the term "memory", in apparent

[17] *Bayer v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921); *Dupont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2d Cir. 1936); *Haughton Elevator Co. v. Seeberger*, 85 U.S.P.Q. 80 (Comm'r of Patents 1950); *King-Seeley Thermos Co. v. Alladin Indus., Inc.*, 321 F.2d 577 (2d Cir. 1963); *Murphy Door*, 874 F.2d at 101.

recognition of the fact that the term is, indeed, generic for a card-matching game. It now goes after MGA solely because it views MGA as an unwanted competitor in the Marvel character line.

The egregiousness of Hasbro's failure to police is further shown by the widespread use of "memory" in connection with adult-oriented memory games with nudity and pornographic content. (Section II.G., above; Ex. 1) Of all the third-party uses that Hasbro, as a seller of toys for children, should police if it really was enforcing its rights, would be uses of "memory" in relation to adult, pornographic content. It clearly has not done so, as substantiated by numerous easily-found hard-core, adult-oriented sites disclosed by a simple Google search. Hasbro has made *de minimis* and woefully deficient efforts to police its purported rights.

Thus, the evidence demonstrates that "memory" is the generic term for card-matching memory games, whether when adopted *or* through Hasbro's failure to police. That renders Hasbro's alleged mark unprotectable and invalid, whether as registered in 1967 or in 2004.[18]

### 2. <u>Hasbro's Alleged Mark Is Descriptive, Without Secondary Meaning.</u>

#### a. <u>"Memory" describes the nature, use and characteristics of a card-matching "memory game".</u>

"Memory" describes the nature, use and characteristics of a card-matching "memory game", particularly when used together with the word "game", as Hasbro does. Therefore, even if Hasbro's alleged mark is *not* found to be generic, it is merely descriptive without secondary meaning, especially given widespread use of the word to refer to a particular type of game. Descriptive marks without secondary meaning cannot be enforced as trademarks. *The Beacon*, 376 F. Supp. 2d at 255. A term is descriptive if it "'conveys an immediate idea of the ingredients, qualities or characteristics of the goods.'" *Id.* at 256; *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993) (a descriptive term "may point to a product's intended purpose, its function or intended use, its size, or its merit").

Here, "memory" describes the nature, use, or characteristics of the game. While Hasbro uses the word on a game that requires players to use their ***memories*** to match up cards, it goes to

[18] The only conceivable trademark-related claim that Hasbro could have would derive from the "pinched 'Memory' design" it consistently uses for the word "Memory" on packaging. Perhaps it has developed secondary meaning in that design, but any such *common law rights* would be separate from and not attach to the word itself, which remains generic, and MGA uses nothing like Hasbro's "pinched 'Memory' design." If Hasbro started marketing a "21" game called "Blackjack", it could not acquire rights in the word "blackjack" alone, which is generic, but if it used, say, a unique pirate-themed design for the word, it could conceivably protect that particular design.

great lengths to avoid saying that "Memory" describes a characteristic of its game, arguing at page 16 of its memorandum that "[memory] does not describe any of the characteristics of the game; rather, it merely suggests an element of skill useful in the game (a good recollection)." Of course, "recollection" is just a synonym for "memory". Linguistic gymnastics aside, the nature of the game is a memory skills game: players use their memory to play, and a characteristic of the game is relying on one's memory to identify matching cards. *Hasbro's own packaging and instructions for its game confirm that "memory" is merely descriptive*—Hasbro expressly refers to using one's memory or remembering certain information in playing the game:

- "This is excellent practice for developing concentration and ***memory*** skills" (from *My Little Pony* "Memory" game and *Winnie the Pooh* "Memory" game instructions).
- ". . . just some of the toys featured in this ***memory*** skills game" (from *Toy Story* "Memory" game).
- "Your First ***Memory***" (from "Original" "Memory" game).
- "Can you ***remember*** what's hiding where" (from "Original" "Memory" game).
- "Can you ***remember*** which Pony's where" (from *My Little Pony* "Memory" game).
- "Can you ***remember*** which Toy is where" (from *Toy Story* "Memory" game).
- "Can you ***remember***" (from *Winnie the Pooh* "Memory" game).
- "All players should try to ***remember*** which cards were turned over for future matches" (from *My Little Pony* "Memory" game instruction sheet). **(APP. 12)**

Even the USPTO agreed that "memory" is descriptive for a card-matching game when it concluded that the game in Hasbro's 1967 registration was a "memory card matching game" and that the proposed mark "Memory" was merely descriptive of the game because the "memory of the player is relied upon to locate matching cards." (RJN, Ex. 9; Section II.H., above)

**b. <u>Descriptive third-party use of "Memory" for games.</u>**

Extensive third-party use of "memory," especially when used with similar products, shows that "memory", alone, is descriptive as applied to games. (Section IIG, above.) *See The Beacon*, 376 F. Supp. 2d at 256; *Labrador Software, Inc. v. Lycos, Inc.*, 32 F. Supp. 2d 31, 33 (D. Mass. 1999) (injunction denied because marks were descriptive without secondary meaning); *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1008 (D. Mass. 1988) ("In determining whether a particular word has a descriptive or suggestive significance as applied to a field of merchandise or service, it is proper to take notice of the extent to which it has been used in trademarks by others in the same field").

There is widespread third-party use of "memory" as the name of physical games and on-line interactive or computer games (Section II.G., above), as the name of categories of games, to

describe qualities or features of a game, in dictionaries and reference books, and in various media sources. (*Id.*) There are numerous U.S. trademark applications and registrations for "memory"-related marks. (*Id.*) Descriptiveness has been conceded by third-party applicants and registrants of "Memory"-related marks, who have "disclaimed" exclusive rights to the word "memory". (Fn. 10, above) Thus, the evidence confirms that "memory" is descriptive, at best.

c. **Hasbro cannot establish secondary meaning.**

There is no secondary meaning arising from Hasbro's use of "memory" in connection with games, other than card games, particularly given the widespread, uncontrolled, descriptive use by others of the term in names for and descriptions of products in the marketplace. This widespread use includes uses of "memory" as the name for, or in descriptions of, games, ***including card games***, with which Hasbro's use is co-existing without apparent confusion, or even an objection from Hasbro. (Section II.G., above)

"[S]econdary meaning occurs when 'the primary significance . . . in the minds of the consuming public is not the product but the producer.'" *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 42 (1st Cir. 1998). It is difficult to establish. *See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 181 (1st Cir. 1993).[19] Extensive third-party use makes it less likely that purchasers would be confused and believe the mark came from a particular single source. *Gruner + Jahr*, 991 F.2d at 1078. The widespread third-party use of "Memory"-related names precludes a secondary meaning finding. (Section II.G., above)

To evaluate secondary meaning, courts consider: (1) the length and manner of the mark's use; (2) the nature and extent of advertising and promotion of the mark; (3) efforts made in the direction of promoting a conscious connection between the name and a specific product; and (4) market surveys, if any.[20] *The Beacon*, 376 F. Supp. 2d at 256. Hasbro's alleged mark was adopted in the context of substantial pre-existing, current, common and generic use of "memory"

---

[19] "[S]econdary meaning cannot be recognized where, despite a degree of association between the mark and the producer, the original meaning remains dominant; so long as the mark remains descriptive in its primary significance, subsidiary connotations cannot justify trademark treatment." *Boston Beer*, 9 F.3d at 182.

[20] The last factor (surveys) should not be considered here because Hasbro has not offered one, nor has MGA had an opportunity to conduct one given the expedited nature of the motion. Hasbro vaguely refers to an undisclosed survey in its papers. [MOTION at 17.] Due process mandates that Hasbro cannot rely on a survey without providing it to MGA to evaluate, and having it tested by *Daubert* and other standards. If Hasbro intends to withhold the survey until reply to foreclose MGA from evaluating it, MGA will ask that it be stricken and not considered.

as the name of a card-matching memory game, and has co-existed for 40 years since then with extensive third-party use. (Section II.G., above)

As to advertising and promotion, *Hasbro has failed to show any details* regarding where or how often the products are advertised, or the commercial impression of the advertising or what it means to consumers. *In re Redken Labs., Inc.*, 170 U.S.P.Q. 526, 529 (TTAB 1971). Simply spending money will not suffice—the advertising must be sufficient to educate the public to associate the proposed mark with a single source, which Hasbro has not shown it has done. *See In re Boston Beer Co. L.P.*, 198 F.3d 1370 (Fed. Cir. 1999); *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357 (2d Cir. 1983); *In Re Redken*, 170 U.S.P.Q. at 529. Because MGA has rebutted the presumption of validity of Hasbro's mark, Hasbro bears the burden of proving secondary meaning. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 118 (1st Cir. 2006); *Colt Defense LLC v. Bushmaster Firearms, Inc.*, 2005 WL 2293909, *20 (D. Me. 2005). Hasbro however *fails its burden of proof on this motion* when it offers no admissible evidence on the nature and extent of the advertising it has done that is directed only at its "Memory" games, and not at other products, brands or company equity, or as part of multi-product or "co-op" advertising.

As to efforts made to promote a conscious connection between the name and a specific product, in light of the widespread third-party use of "memory" in connection with card-matching games and other items, Hasbro has not made any showing supporting this factor. The few, meager attempts to police its mark that Hasbro references do nothing to counteract the conclusion that there is *no* single source identified by use of the word "memory" alone, and it is *not* Hasbro *or* its game. (Section II.G., above) Consequently, all of the secondary meaning factors show that Hasbro has not established (and cannot establish) secondary meaning for the purported mark in the minds of consumers.

Hasbro's reliance on *TeleRep Caribe Inc. v. Zambrano*, 146 F. Supp. 2d 134 (D.P.R. 2001), to argue that secondary meaning can be inferred from proof of intentional copying is misplaced, as that case merely held that intentional copying is *one* of several factors that can be used to prove secondary meaning, not the only factor. *Id.* at 140. Moreover, Hasbro has *no* evidence of intentional copying. (Section IV.B.5., below) MGA did *not* intentionally copy

Hasbro's use in coming up with its composite "Memory Match-Up" name (Caspi Decl. ¶¶ 8, 13; Werner Decl. ¶ 14; Keossian Decl. ¶¶ 9-12, 15; Zimmer Decl. ¶¶ 8-9; Lumabao Decl. ¶¶ 7, 15) or its website products page description (Anderson Decl. ¶¶ 3-4; Lumabao Decl. ¶ 15), or otherwise. Thus, secondary meaning has not been shown, and Hasbro's alleged mark is, at best, merely descriptive and unprotectable.

**d. The "incontestability" of the stylized registration is invalid.**

Hasbro owns two federal registrations, the 1967 registration for a stylized form of "Memory" (which, as noted above in Section IIC, has not been in use since before 1987)[21] for "*equipment comprising cards with many matching pairs of designs for playing a matching card game*", and a 2004 registration for the word "Memory" for "*card matching games.*" Only the stylized registration has purported incontestability status under 15 U.S.C. § 1065. But MGA does *not* use that stylized form, nor does its game include cards at all. The incontestability of Hasbro's 1967 registration does not extend beyond the goods described in the registration or to the word "Memory" separate from the stylized version that was registered. 15 U.S.C. § 1115(b).[22] *Consequently, Hasbro's stylized registration is not incontestable beyond the stylized design or beyond cards.* Because MGA's game uses neither the stylized version nor cards, MGA can challenge the distinctiveness of "memory". Because MGA has rebutted the presumption of validity of Hasbro's marks, Hasbro bears the burden to prove the validity of it mark. *See Borinquen Biscuit Corp.*, 443 F.3d at 118; *Colt Defense LLC*, 2005 WL 2293909, at *20.

**e. Hasbro's alleged mark is not suggestive.**

Hasbro contends that its use of "Memory" is suggestive. It is not, and the Trademark Examiner also said it was not and, instead, was descriptive. (RJN, Ex. 9) "Suggestive marks 'require imagination, thought and perception to reach a conclusion as to the nature of goods.'" *The Beacon*, 376 F. Supp. 2d at 256. In that case, this Court cited to examples of marks held

---

[21] Hasbro has not shown any such use in its papers, a matter for which it bears the burden of proof on this motion.

[22] *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 312 (S.D.N.Y. 2004) (incontestability for fragrances does not extend distinctiveness to clothing; "the presumption of distinctiveness [arising from incontestability] applies only to the trademark as a whole, and does not extend to its components"); *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 119 (2nd Cir. 1999) (court correctly distinguished between no longer used registered stylized mark and current unregistered stylized mark; citing *Grunar + Jahr* for making clear that trademark rights in the stylized appearance of a word are distinct from the word itself).

descriptive or generic, but not suggestive.[23] *Id.* As evidence that the mark was descriptive, not suggestive, this Court considered examples of widespread third-party use of "Beacon" and the plaintiff's efforts to "capitalize[] upon the descriptive significance of its mark." *Id.* Hasbro's use of the word "memory" for a game where a player uses his memory (or as Hasbro sometimes calls it his "recall" or "recollection") to match cards does not require any stretch of imagination to reach a conclusion about the product—it is a card-matching memory game. (**APP. 12**) The Examiner in Hasbro's 1967 registration said that "The specimens in this case show the type [*sic*] game involved to be *a memory card matching game*", and therefore the term was merely descriptive. (RJN, Ex. 9) And Hasbro *itself* refers to the use of one's "memory" in playing the game both in its instruction sheets and on its packaging. (**APP. 12**)

Hasbro never even uses just "Memory". (Section IVA 2a, above.) Instead, it always uses the term "Game" immediately adjoining "Memory", thereby ensuring that the term is purely generic or descriptive, without secondary meaning. (**APP. 3**)

3. **Hasbro Has Abandoned Its Mark By Failing to Police It.**

Even if Hasbro had trademark rights, it has abandoned whatever rights it might have had by a virtually total failure to police the mark. "To establish the defense of abandonment, it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc.*, 219 F.3d 104, 110 (2d Cir. 2000); *Uncas Mft'g v. Clark & Coombs Co.*, 200 F. Supp. 831, 834 (D.R.I. 1962). The latter form of abandonment does not require subjective intent to abandon the mark. *Id.* at 835.

Abandonment requires a showing of insufficient policing of the trademark (*either* from lack of effort *or* effectiveness) and genericide. *Hermes*, 219 F.3d at 110. Evidence used to establish abandonment for failure to police includes: "(1) proof of widespread use by

---

[23] Examples of marks found descriptive, not suggestive, include: LOTSA SUDS for dish washing liquid; MITEY FAST for auto maintenance; PENTOMINO for dominos with five squares; PRO STYLE for hair dryers; QUIK-PRINT for printing and duplication services; RICH LIGHTS for cigarettes; TWENTY FOUR HOUR FITNESS for fitness facilities; WORLD BOOK for encyclopedias. *See In re Reynolds*, 229 U.S.P.Q. 776 (TTAB 1986); *In re Miteyfast Service Centers, Inc.*, 223 U.S.P.Q. 342 (TTAB 1984); *Golomb v. Wadsworth*, 592 F.2d 1184 (CCPA 1979); *Sunbeam Corp. v. Conair Corp.*, 220 U.S.P.Q. 748 (TTAB 1983); *In re Quik-Print Copy Shops, Inc.*, 616 F.2d 523 (CCPA 1980); *Phillip Morris, Inc. v. Brown & Williamson Tobacco Corp.*, 230 U.S.P.Q. 172 (TTAB 1986); *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 277 F. Supp. 2d 356 (S.D.N.Y. 2003); *Field Enterprises Educational Corp. v. Cove Industries, Inc.*, 297 F. Supp. 989 (E.D.N.Y. 1969).

competitors that has not been contested by the seller; (2) generic use by the seller himself; (3) dictionary definitions; (4) media usage, such as newspaper or magazine articles; and (5) consumer surveys." *Horizon Mills Corp.*, 161 F. Supp. 2d at 214. Failure to follow through on threats of suit in a cease and desist letter or to object to use of the mark by other companies in the industry is proof of abandonment of a mark. *Uncas Mft'g. Co.*, 200 F. Supp. at 833-35.

*Almost all of these factors are present here.* Extensive third-party use has gone on without challenge; dictionaries and other reference books include entries for "memory" about the card-matching game not related to Hasbro; there has been extensive media usage of "memory" and "memory game"; Hasbro has generically used the term in connection with its products. Hasbro's almost total failure to police its mark, shown by widespread use of "memory," shows that it has been abandoned. Hasbro bears the burden of showing vigorous policing, but its showing is paltry, at best, in light of the widespread use to which no objection has seemingly been made. Having the burden of proof, Hasbro was obligated to establish its efforts in its moving papers. It did not. It cannot now file supplemental papers to bolster its showing.

**4. Hasbro Abandoned Use Of The Stylized "Memory" Registration.**

Hasbro abandoned its 1967 registration through lack of commercial use, which it concedes. (Ex. 9, **APP. 2**) A trademark is abandoned by such lack of use. *Uncas Mfg.*, 200 F. Supp. at 834-35. Hasbro provides no evidence of current or recent use of that design. Its 1987 renewal made a material change to the design, thereby admitting no continuing use of the mark and abandoning it.[24] (Ex. 9; **APP. 1, 2**) Since then, Hasbro has further changed the font (**APP. 3**). Hasbro cannot rely on the 1967 registration to protect its current mark because it creates a different commercial impression. Changing the font of Hasbro's stylized mark, or deleting a font altogether in the 1967 registration, would constitute a material change in the registration, which would preclude Hasbro from being able to amend its registration to assert rights in the current font *or* to the word alone *without* any stylized font at all.[25] Finally, three consecutive years of

[24] A mark cannot be amended in a registration where it will "alter materially the character of the mark," because the new version must convey essentially the same commercial impression and have the essence of the original mark. 15 U.S.C. § 1057(e); 37 C.F.R. § 2.173(a); TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1609.02(a).

[25] *See In re Richards-Wilcox Mfg. Co.*, 181 U.S.P.Q. 735 (Comm'r of Patents 1974) (change from FYER-WALL (stylized with design) to word mark was a material change); *In re CTB Inc.*, 52 U.S.P.Q.2d 1471 (TTAB 1999) (change from TURBO (stylized with design) to word mark alone found to be material change); *In re Dillard Dep't*

nonuse (far less than the admitted at least 19 years of nonuse) (Ex. 9; **APP. 2**) is *prima facie* evidence of abandonment. 15 U.S.C. § 1127. Absent any continuing use of the 1967 version of the stylized mark, the registration has been abandoned and should no longer be a part of this case. For the foregoing reasons, Hasbro's registrations should be cancelled [15 U.S.C. § 1119].

### B. Hasbro Did Not Meet Its Burden To Prove Likelihood of Confusion.[26]

"A plaintiff is not entitled to a preliminary injunction on a trademark infringement claim unless it can persuade the district court that it is likely to be able to demonstrate consumer confusion." *I.P. Lund Trading*, 163 F.3d at 43. "A plaintiff must prove that there exists 'a substantial likelihood that the public will be confused as to the source' of the relevant goods or services." *The Beacon*, 376 F. Supp. 2d at 259; *Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27, 29 (1st Cir. 1982). This requires a "likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care. " *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing*, 103 F.3d 196, 201 (1st Cir. 1996). Given the multitude of third-party uses, Hasbro cannot satisfy this burden.

Eight factors are considered when determining likelihood of confusion: (1) similarity of the marks; (2) similarity of the goods; (3) relationship between the parties' channels of trade; (4) relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting its mark; and (8) strength of plaintiff's mark. *Pignons S. A. v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981). None is is determinative; each must be considered. *Astra Pharmaceutical Prods. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983). There is no likelihood of confusion here.

#### 1. The Purported Marks Are Not Similar.

While both names used by the parties include the generic or descriptive term "memory," MGA's uses the composite phrase " Memory Match-Up" (now "3-D Memory Match-Up"), which is very different from Hasbro's purported unitary "Memory" mark:

---

*Stores Inc.*, 33 U.S.P.Q.2d 1052 (Comm'r of Patents 1993) (change from INVESTMENTS (stylized with design) to different font with design found to be material change).

[26] Hasbro has a history of trying to improperly expand the power and reach of its trademarks through implausible likelihood of confusion arguments. *See Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 122 (D. Mass. 1999)(pointing out that Hasbro's assertions regarding the similarity of the goods at issues was " extraordinary stretch").

MEMORY
GAME

MEMORY MATCH-UP → 3-D MEMORY MATCH-UP

MGA's product name is a multi-word composite with "memory" merely one word in the name, while Hasbro uses just the unitary "memory". MGA's product is prominently branded with the "Spider-Man & Friends" logo and characters. **(APP. 13)** The font and format are different. Hasbro's use of "Memory" is in a particular "pinched 'Memory' design". MGA uses capital letters, in the font Marvel's *Style Guide* required. (Ex. C; Caspi Decl. ¶¶ 10-12; Werner Decl. ¶¶ 7-13; Keossian Decl. ¶¶ 5-15; Zimmer Decl. ¶ 4; Lumabao Decl. ¶¶ 8, 10; Oakes Decl. ¶ 5) Hasbro uses a different typographic font and all sorts of colors, which change game-by-game. **(APP. 3)** MGA uses yellow letters on a red rounded square, required by Marvel. The best that can be said is that both companies use capital letters. Adding "3-D", as MGA recently did, makes MGA's composite "3-D Memory Match-Up" name even *more* descriptive.

"[S]imilarity is determined on the basis of the designation's total effect . . . and infringement 'does not exist, though the marks be identical and the goods very similar, when the evidence indicates no [likelihood of confusion].'" *Int'l Ass'n of Machinists*, 103 F.3d at 203-04. *See also Astra Pharmaceuticals*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487; *Hasbro, Inc.*, 66 F. Supp. 2d at 122 (finding no infringement despite defendant's use of mark identical to that used for Hasbro's "Clue" game).

Also, Hasbro's "Memory" product name takes up about ⅓ of the upper portion of the box front, while the "Memory Match-Up" portion of MGA's product is very small and positioned on the lower portion of the packaging front, away from the large "Spider-Man & Friends" logo, which weighs *against* confusion. **(APP. 5, 13)** *Gruner + Jahr*, 991 F. 2d at 1078 (no confusing similarity between magazine titles containing the word "parents" because logos had different typefaces, defendant's use was accompanied with "Ladies' Home Journal" above its "Parent's

Digest" title, and defendant's use of "Parents" took up half as much space on cover as plaintiff's "Parents" title). Moreover, a large segment of the MGA game's target demographic is too young to read and will simply be drawn to the Marvel characters on the case. (Lumabao Decl. ¶ 16)

Both parties' products show the parties' house marks (*i.e.*, MGA and MB [for Hasbro's Milton Bradley], respectively) on the packaging. (**APP. 13-15**) It is well-established that "in certain circumstances otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." *Int'l Ass'n of Machinists*, 103 F.3d at 204; *Hasbro, Inc.*, 66 F. Supp. 2d at 122.[27]

MGA's game also does not look the same on store shelves compared to other manufacturers' memory games. MGA created a hard-plastic, red molded carrying case for its product that also doubles as the game-playing surface. A look at any games aisle at a large toy retailer will reveal a homogeneous look to games, which are largely cardboard boxes, which retailers like to be of uniform size in order to maximize their shelf space. In contrast, MGA's packaging stands out and is very distinctive. (*See* Hasbro's Wiggins Decl. Ex. 1; Ex. A to MGA's June 20, 2006 COUNTERCLAIM; **APP. 14**; Caspi Decl. ¶¶ 10-11; Lumabao Decl.¶ 16)

Hasbro improperly relies on *Morningside Group Ltd. v. Morningside Capital Group, LLC*, 182 F.3d 133, 140 (2d Cir. 1999), for the proposition that only one word of composite marks needs to be in common to create similarity. Hasbro (through Milton Bradley) previously conceded that the addition of another word to "memory" serves to distinguish "memory", even for the same category of goods! As noted above (Section IVA.), during prosecution of the 1967 registration, after the Examiner rejected the application based on a likelihood of confusion with a 1965 registration for **MEMORY LANE** for "apparatus for playing ***a card game***," Milton Bradley argued that, because its mark was a single word:

> ". . . the cited registration ***differs** in appearance, sound and meaning from Applicant's mark* [and] *these differences are **significant** and dictate that the ordinary purchaser will **not be confused, deceived or mistaken** when he purchases the products of the parties*." (Emphasis added.)

[27] *See also Astra Pharmaceuticals*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487.

Thus, Hasbro admitted that the word "Memory", if combined with another word, has a significantly different commercial impression than just the word "Memory" such that they can co-exist, even if used with the same goods (which is not even the case with MGA's game).

**2. <u>The Goods Are Dissimilar</u>.**

The products are strikingly different. MGA's game involves matching up ***different*** top and bottom halves of three-dimensional, molded plastic Spider-Man & Friends characters hidden beneath small plastic cups. MGA's game is *not* a card matching game. Hasbro's game, on the other hand, involves flipping over two-dimensional, flat, paper cards to match identical images shown on the cards. MGA's game is harder to play than Hasbro's game. Matching different three-dimensional halves of superhero characters is more difficult than simply matching identical images on flat cards, and tests cognitive recognition of patterns, colors, gender, *and* memory.

Even where both parties sell the same types of goods, there is no likelihood of confusion if the products appear strikingly different. In *Pignons*, 657 F.2d at 487-88, the First Circuit found no confusing similarity despite the fact that both products were single lens reflex cameras because the products' appearances were so different that "one could not be mistaken for the other." *Id.* at 488. MGA's product has a hard red plastic case intended for easy portability and that houses the 3-D superhero characters and plastic cups and serves as the game board, while Hasbro's game is sold in a flatter, standard thin cardboard box. (Caspi Decl. ¶¶ 10-11; Lumabao Decl. ¶ 16) The packaging for MGA's game follows the Marvel *Style Guide* with respect to color schemes, fonts, placement of text and overall look, including incorporation of superhero character art. (Ex. C; Caspi ¶ 12; Werner ¶¶ 7, 10-13; Keossian ¶¶ 5-13; Zimmer ¶¶ 4-7; Lumabao ¶ 10; Oakes ¶¶ 3-7) *See Pignons*, 657 F.2d at 487 (two marks not confusingly similar in part because each party used distinctive packaging).

In summary, the first two factors weigh against a likelihood of confusion finding.

| HASBRO'S GAME | MGA'S GAME |
|---|---|
| Uses the unitary word MEMORY | Previously used the composite phrase MEMORY MATCH-UP; now 3-D MEMORY MATCH-UP |
| MEMORY is in a distinctive "pinched" design | 3-D MEMORY MATCH-UP is in block letters |
| MEMORY is consistently in a particular font | 3-D MEMORY MATCH-UP is in a *different* font (Helvetica Rounded Black), required by Marvel |
| MEMORY is presented in many different colors on the various games | Uses yellow lettering in a red box, the colors for which are required by Marvel |
| MEMORY is the age-old name for the card-matching game | 3-D MEMORY MATCH-UP describes a 3-D game that requires testing your memory to match items |

| | |
|---|---|
| A two-dimensional paper card-matching game | A three-dimensional, molded plastic matching game |
| Its registrations are limited to card-matching game | Not a card game |
| The players match identical pairs of items | The players match up different halves of a sculpture |
| Sold in a cardboard box | Sold in a hard-plastic, sculpted carrying case |

### 3. Channels of Trade, Advertising, And The Class Of Prospective Purchasers.

These three factors are typically addressed together. *Int'l Ass'n of Machinists*, 103 F.3d at 204. Some overlap of trade and advertising channels does not necessarily indicate a likelihood of confusion. *Hasbro, Inc.*, 66 F. Supp. 2d at 123. In *Pignons*, 657 F.2d at 488-89, the First Circuit determined that these factors weighed *against* likelihood of confusion despite the fact that the parties sold their products in some of the same stores and advertised their products in some of the same magazines. The products were also sold in different stores, and the advertising campaigns for the two products stressed different attributes. *Id.*

Similarly, MGA and Hasbro do not sell their products at all the same stores. And even where they are sold together, MGA's packaging is distinctive. It includes an in-use photograph showing children playing the game; Hasbro does not. MGA has a hard plastic, molded carrying case with rounded edges; Hasbro uses a standard, thin rectangular cardboard box. MGA's game uses three-dimensional superhero characters, stressed on its packaging; Hasbro's uses cards. MGA's on-product advertising serves to reduce confusion, rather than add to it. (Ex. C; Caspi Decl. ¶¶ 10-12; Werner Decl. ¶¶ 7, 10-13; Keossian Decl. ¶¶ 4-13; Zimmer Decl. ¶¶ 3, 5-8; Lumabao Decl. ¶¶ 3, 10, 16; **APP. 14**)

Hasbro relies heavily on the argument that the parties' products allegedly have been sold next to each other on the shelves of a Target store. Even if true, this simply shows the descriptiveness of the word "memory", with stores placing memory games together. Apart from placement in stores being alphabetical or grouped by subject matter, MGA has also found third-party card-matching memory games in close proximity to Hasbro's "Memory" games and MGA's game at Target and other stores. (**APP. 15**)

"In considering whether the class of prospective purchasers will confuse the two products, 'a court called upon to assay the likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark.'" *Hasbro, Inc.*, 66 F. Supp. 2d at 123. As these two sets of products are both age-rated for children 3 and up, parents (and not children) are the potential purchasers and will shop with care. *See*

*Original Appalachian Artworks, Inc. v. Blue Box Factory Ltd.*, 577 F. Supp. 625, 632 (S.D.N.Y. 1983) (parents rather than children buy Cabbage Patch Kids dolls and will shop with care). In addition, the different play pattern depicted on MGA's product will likely make some parents choose one over the other, after evaluating both, if concerned about the skill level required.

*Considered together, these factors weigh against confusion.*

**4. <u>There Is No Actual Confusion Evidence.</u>**

Hasbro admits lack of actual confusion; and MGA has experienced none. (MOTION at 12; Howard Decl. ¶¶ 3-6) "[A]bsent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that this is little likelihood of confusion." *Pignons*, 657 F.2d at 490. Hasbro's and MGA's games have co-existed, sometimes even at the same stores, for at least 7½ months without confusion. This confirms that there is *no* actual confusion, and weighs against finding likelihood of confusion.

**5. <u>MGA Had No Bad Intent It Adopting "Memory Match-Up"</u>.**

Hasbro's argument that MGA acted with bad intent is misplaced. As the creator of the product attests, he never heard of Hasbro's game or purported "Memory" mark. He and others involved in the game's development simply thought of the classic card-matching memory game they played as children with a standard deck of cards, or something similar. They developed MGA's product without reference to Hasbro's game. The individual who came up with the concept grew up in Israel where he had played a matching game called "memory game". (Caspi Decl. ¶¶ 4-10; Ex. A-B. *See also* Werner Decl. ¶¶ 8, 14; Keossian Decl. ¶¶ 9-16; Zimmer Decl. ¶¶ 8-9; Lumabao Decl. ¶¶ 3-4, 7, 15; Anderson Decl. ¶¶ 3-4; Howard Decl. ¶ 6)

Regardless, even if MGA knew of Hasbro's mark, "[t]he fact that [defendants] knew of the existence of the game does not in any sense mean that they intended for their company to infringe upon or benefit from Hasbro's mark." *Hasbro, Inc.*, 66 F. Supp. 2d at 125; *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 574 (D. Colo. 1997, *aff'd* 185 F.3d 1084 (10th Cir. 1999) (continuing to use logo after receiving notice of alleged infringement is not evidence of bad faith if there is a good faith belief that continuing use is non-infringing).

Evidence of a reasonable trademark search and plausible conclusion by defendant that use would not infringe indicates no bad intent. *The Beacon*, 376 F. Supp. 2d at 264.[28] (Khare Decl. ¶¶ 3-7)

MGA's creation of a unique product, different from the other cardboard game boxes, also signifies a lack of bad intent. (Section IV.B.2., above) *See Pignons*, 657 F.2d at 491 (defendant's unique packaging and promotional materials belied an intent to deceive, palm-off, or benefit from plaintiff's good will). While Hasbro relies on alleged copying by MGA for an inference of bad faith, Hasbro ignores the fact that *Hasbro has no evidence of any copying nor evidence that any such alleged copying was intentional, both* of which are required to obtain the rebuttable presumption of likely confusion. (MOTION at 12-14; *WCVB-TV v. Boston Athletic Assn.*, 926 F.2d 42, 45 (1st Cir. 1999).)

Hasbro also argues that MGA's continued sales after Hasbro's complaint shows bad faith. However, Hasbro ignores the fact that MGA responded to Hasbro, explaining in great detail why there was no infringement. Also, although not required but in an effort to address Hasbro's concerns, MGA removed from packaging the "™" used near its product name and some text about "the classic memory game" from its website. More recently, to further distinguish its product from all of the other "memory"-related names in the marketplace, MGA added "3-D" to "Memory Match-Up". (**APP. 6**) This will further distance the product name from Hasbro's unitary "Memory" name. Such conduct by MGA demonstrates good faith. *See The American Automobile Assn. v. AAA Automobile Club of Queens*, 1999 WL 97918, at *7 (E.D.N.Y. 1999).

*This factor weighs against a likelihood of confusion.*

### 6. Hasbro's Mark, If A Mark At All, Is Diluted By Existing In A Crowded Field Of Similar Such Uses.

The crowded field of marks and terms with the word "memory" in them shows the weakness of Hasbro's mark. (Section II.G., above) As such, Hasbro's purported unitary

[28] Counsel for MGA identified many uses of the term "memory" in connection with toys and games, including "memory"-related marks registered at the USPTO, prior to the "Memory Match-Up" name being selected, including Hasbro's two registrations, but noted that they were limited to card-matching games or equipment for such games and were for the single word, "Memory", only. He found no uses for products similar to what MGA was going to do. MGA cannot presently proceed with disclosing any attorney-client communications with its attorney *or* his conclusions, without an agreement or order that limits the scope of the necessary privilege waiver that would result therefrom. MGA is presently discussing with Hasbro's counsel a stipulation that would define the scope of that waiver, and failing agreement being reached, will file a motion asking the Court to define that scope. Unless and until the scope of the proposed waiver is defined, MGA will preserve the attorney-client privilege and cannot disclose the substance of those communications and opinions.

"Memory" marks are weak. The distinctiveness and strength of its use of the word "memory" is severely diluted because the marketplace is so crowded with other uses of the word in the titles and descriptions of products, including many card-matching memory games. It appears that all of these uses co-exist with Hasbro's, without confusion, or Hasbro would have cleared the market of them. Because so many registrations exist for the identical mark "Memory" across different and even similar industries, Hasbro cannot monopolize the word beyond its own narrow use—card games—and even protection for that use is questionable. The word "memory" is subject to pre-existing dilution and contemporaneous uses in the marketplace. (*Id.*) Accordingly, this factor weighs against a likelihood of confusion.

Hasbro's own papers (Hasbro's Wiggins Decl. Ex. 1) show that the games are sold side-by-side at Target. If they have been sold side-by-side since December 2005 at Target, and MGA's game has been on MGA's website since February 10, 2006, and Hasbro polices competing games (Hasbro's Vanasse Decl. ¶ 6), and Hasbro, presumably, monitors what its competitors are selling, yet neither Hasbro nor MGA has encountered any instances of actual confusion (Section IV.B.4., above), how can Hasbro credibly argue irreparable harm or confusion? Clearly, Hasbro has not been effectively policing its alleged rights, with the result that there is now such widespread third-party use of the word "memory" for matching games that there is no possibility of a likelihood of confusion.

*On balance, there is no likelihood of confusion, and Hasbro's claims must fail.*

### C. MGA's Defenses Preclude Hasbro's Claims.

Even if there was a likelihood of confusion, MGA's defenses bar Hasbro's claims.

#### 1. Use Of "Memory" Within "Memory Match-Up" Is Fair Use.

MGA descriptively uses "memory" in "Memory Match-Up" to refer to a game wherein a player uses his or her ***memory*** to ***match up*** halves of superhero characters. (Section IV A2, above.) "[F]air use [is] established if mark descriptive, not used in trademark sense, and used in good faith." *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir. 1991). MGA meets all three requirements. Hasbro hangs its hat on MGA's former placement of "™" next to "Memory Match-Up". (MOTION p. 8.) Apart from the fact that "Memory Match-Up" could, as a composite mark, ultimately be viewed as entitled to protection were MGA to ever prove secondary

meaning, Hasbro ignores the fact that MGA promptly removed the symbol from product packaging after Hasbro raised it with MGA. (ANSWER AND COUNTERCLAIM, Ex. G) MGA's placement of "TM" on its packaging followed by its prompt removal of such symbol does not create an infringing use where one did not exist before. MGA's good faith is further shown by its prominent display of the Marvel-branded "Spider-Man & Friends" logo and MGA's own MGA house mark on the game packaging. (**APP. 13**) *Cosmetically Sealed Inds., Inc. v. Cheesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2nd Cir. 1997) (good faith demonstrated where "the source of defendants' product is clearly identified by the prominent display of defendant's own trademarks."). Thus, MGA's use of "memory" is a fair use, which bars liability.

2. **Hasbro Made Misrepresentations In USPTO Filings.**

Hasbro and its predecessor made misrepresentations to the USPTO. (Section II.E., above) Such conduct in procuring a trademark registration warrants cancellation if there are knowing, false misstatements in the plaintiff's applications for registration, regarding facts material to the decision to grant the registration. *Orient Express Trading Co., Ltd. v. Fed. Dept. Stores, Inc.*, 842 F.2d 650, 653 (2nd Cir. 1988). Hasbro's statements or omissions were made with knowledge and intent to induce the USPTO to allow the registrations, and the USPTO relied on them in allowing the registrations, which damages the public by having unprotected marks improperly registered. Hasbro's actions warrant cancellation of the registrations and, as a form of unclean hands, precludes injunctive relief.

3. **Hasbro's Requested Injunctive Relief Is Barred By Laches.**

Laches bars an injunction and an infringement action where the plaintiff unreasonably delayed seeking relief, as that constitutes implied or passive consent to the defendant's conduct. *Profitness Physical Ther. v. Pro-Fit Orthopedic*, 314 F.3d 62, 68 (2nd Cir. 2002). Hasbro's inexcusable delay warrants denial of injunctive relief. (Section V.A.1., above) "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy relief and cannot complain of the delay involved pending any final relief . . . after a trial on all the issues." *Helena Rubinstein, Inc. v. Frances Denney, Inc.*, 286 F. Supp. 132, 134 (S.D.N.Y. 1968); *Le Cordon Blue, S.A. v. BPC Publ., Ltd.*, 327 F. Supp. 267 (S.D.N.Y. 1971) (13-week delay barred preliminary injunction where defendant spent over $1 million during that time); *Programmed Tax Sys., Inc. v. Raytheon*

*Co.*, 419 F. Supp. 1251 (S.D.N.Y. 1976) (4-month delay evidenced lack of irreparable injury; used as separate ground to deny injunction). Because of delay, Hasbro's claims are barred.

#### 4. Hasbro's Acquiescence Warrants Denial Of Its MOTION.

Hasbro complains about MGA's color scheme, font, and placement of text on its packaging, yet ignores the fact that these all follow the Marvel *Style Guide*, with which both MGA and Hasbro must comply under their respective contractual relationships with Marvel. *Hasbro cannot complain of conduct MGA is required to follow that Hasbro is also now required to follow*. (Caspi. Decl. ¶ 12; Werner Decl. ¶¶ 7-13; Keossian Decl. ¶¶ 5-14; Zimmer Decl. ¶¶ 4-7; Oakes Decl. ¶¶ 3-7) Hasbro entered into its non-exclusive license with Marvel knowing full well that Marvel requires its licensees, including MGA, Hasbro and third parties, to follow its *Style Guide*. Hasbro failed to dispute its need as a licensee to comply with Marvel's *Style Guide*, which constitutes waiver, estoppel, and acquiescence in the applicability of the *Style Guide* to Hasbro *and* to MGA in their respective non-exclusive areas of exploitation. Estoppel by acquiescence bars injunctive relief where the plaintiff, by affirmative word or deed, conveys its implied consent to the action of another. *See* J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, §§ 31:41, 31:42 (2002). Hasbro's claims are barred.

### D. Hasbro's Other Infringement And Unfair Competition Claims Fail.

The same likelihood of confusion standard under the LANHAM ACT applies to Rhode Island common law trademark infringement and unfair competition. *Beacon Mutual Ins. v. OneBeacon Ins. Group*, 376 F.3d 8, 14-15 (1st Cir. 2004). Because Hasbro's LANHAM ACT claims fail, its common law claims fail as well.

## V. HASBRO HAS NOT ESTABLISHED IRREPARABLE HARM.

Hasbro failed to meet its burden of proving irreparable injury if MGA is not enjoined. To obtain an injunction, the movant "is required to show probable future irreparable injury." *Flex-Let*, 111 F. Supp. at 537. "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "[N]o matter how strong the likelihood of success, some irreparable harm in the absence of an injunction *must be proven*." *Biogen Idec Ma, Inc. v. Trustees of Columbia U.*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (emphasis

added). Even if Hasbro was likely to succeed on the merits (which it is not), an injunction must be denied because Hasbro has not satisfied its burden to *prove* irreparable harm.

**A. Hasbro Is Not Entitled To A Presumption Of Harm.**

Hasbro cannot credibly assert irreparable injury after allowing such extensive third-party use of "memory" in connection with games to continue unchecked. In such an environment, MGA's use has only a very minor incremental impact, if any at all. Hasbro's attempt to bar MGA from using "memory" is just what it seems—anti-competitive.

Hasbro must provide evidence of *certain and imminent* irreparable injury absent an injunction. (Section III., above.) *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 26 (1st Cir. 1989), noted that a finding of irreparable harm is *not* automatic upon a finding of likelihood of confusion. The presumption arising from showing likely success in an infringement action is *rebuttable,* and "falls when opposing evidence is offered." *Clonus Assoc. v. Dreamworks LLC*, 417 F. Supp. 2d 248, 251 (S.D.N.Y. 2005) (citation omitted). Evidence of delay, *de minimis* harm, or failure to police the trademark, *all of which MGA has shown*, rebuts that presumption and alone constitutes grounds for denying injunctive relief. Assuming irreparable harm without considering negating factors is reversible error.[29]

**1. Hasbro's Delay Cancels Any Presumption Of Harm.**

Hasbro's unnecessary delay of *almost a year* in seeking an injunction from first disclosure of MGA's product and 7½ months from the product appearing in the same stores as Hasbro's product (Section II.F., above) negates any presumption of irreparable harm and constitutes independent grounds for denying relief. *See Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996). Delay like Hasbro's has been found to clearly rebut the presumption of harm and return the burden of proof to the movant to clearly establish irreparable harm. *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N.A.*, 270 F. Supp. 2d 432, 439 (S.D.N.Y. 2003) (4-month delay rebutted presumption); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345,

---

[29] *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (vacating injunction because court adopted the general presumption of irreparable injury without considering plaintiff's delay); *Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 100 (2nd Cir. 1992) (reversing injunction because the court gave insufficient weight to delay in seeking relief); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2nd Cir. 1985) (reversing and vacating injunction because court's perfunctory comment that "[h]aving determined that the plaintiffs are likely to succeed on the merits given the likelihood of confusion, irreparable harm 'almost inevitably follows'" provided insufficient consideration to the factor of irreparable harm).

350 (S.D.N.Y. 2000) (18-week delay overcame presumption); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419-20 (S.D.N.Y. 1998) (unexcused 4½ month delay); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 311 (E.D. Pa. 1993) (50-day delay).

### 2. Failure To Police Negates Irreparable Harm.

Hasbro's history of indifference to third-party manufacturers of "memory games," particularly those involving adult content, contradicts its claim of irreparable harm. (Section II.G., above) *Garnier*, 844 F. Supp. at 99 ("total indifference to the manufacture and sale by others of an infringement" signified no irreparable harm).

### 3. Any Injury Will Be *De Minimis* And Compensable.

Hasbro provides no evidence suggesting it will suffer injury sufficient to warrant the drastic relief of an injunction and recall. The presumption of irreparable harm may be rebutted if "the plaintiff's damages appear to be trivial." *Clonus Assoc.*, 417 F. Supp. 2d at 251. Conclusory allegations of harm, such as those provided by Hasbro, do not warrant a presumption of irreparable injury. *See id.* at 254. MGA's addition to the marketplace cannot be argued to have caused more than minimal harm, if any, given all the third parties Hasbro has allowed to use the term "memory" for card-matching games *for years* without objection. (Section II.G., above; Exs. 2, 3; **APPS. 4, 5**) Hasbro has *not* alleged that MGA's product is of inferior quality such that MGA's product could damage Hasbro's reputation. *See Christopher Norman Chocolates*, 270 F. Supp. 2d at 435. Finally, there is *no* evidence that MGA's game is a substitute for Hasbro's games. MGA's game is different than Hasbro's games in many material respects. (Sections II.B-C., above) For fans of the Marvel properties and because of the low cost of the games, the purchase of one type of game over a Spiderman & Friends game, is *not* likely to preclude the purchase of another. Marvel clearly believed both products could co-exist when it entered into *non*-exclusive licenses with both parties that included "game products" as a category. (Oakes Decl. ¶¶ 3, 4) Under these circumstances, Hasbro will not suffer anything but negligible, if not speculative, harm from MGA's use of "memory." *See Clonus*, 417 F. Supp. 2d at 256.

## B. Hasbro Will Not Suffer Irreparable Injury.

"If a defendant successfully rebuts the presumption [of harm], the burden of proof reverts to the plaintiff to *prove* irreparable harm." *Berlent*, 2006 WL 1594478, at *2 (emphasis added).

"'Irreparable harm' is proven if, absent an injunction, the plaintiff 'will suffer[] *substantial* injury that is not accurately measurable or adequately compensable by money damages.'" *Biogen*, 332 F. Supp. 2d at 296 (emphasis added). Since Hasbro has not proved and cannot prove irreparable harm, its MOTION should be denied.

**1. Hasbro Is Not Likely To Succeed On Its Claims.**

Without likely success on its claims, Hasbro cannot suffer irreparable injury. (Section IV, above) *See Public Serv. Co. of N.H. v. West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987).

**2. Delay In Seeking Relief Controverts Irreparable Harm.**

Irreparable harm is incompatible with Hasbro's long delay in seeking relief. (Section II.F., above) Such delay is regularly interpreted as an inference of non-infringement.

> "The Second Circuit has said: 'The cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark . . . cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of commercial competition. In these cases, it appeared that the trademark . . . owners were well aware of their rights and had concluded that they were not violated.'" *Fritz*, 944 F. Supp. at 98.

Such is the case here. After learning of MGA's game as of at least December 2005, when it hit store shelves, if not earlier in 2005 when the game was disclosed in retailer plan-o-grams, Hasbro chose to do nothing. (Lumabao Decl. ¶¶ 11, 17) It was only after the success of the game became known that Hasbro objected to MGA's use of "Memory" in its name. (Lumabao Decl. ¶ 19) Indeed, Hasbro's primary complaint appears to be that MGA beat Hasbro to the market with a Spiderman & Friends-themed game and that MGA's game is taking away future sales from Hasbro. (MOTION at 4) Notably, Hasbro did not even obtain its license with Marvel until January 2006—*after* MGA's game entered store shelves. (Oakes Decl. ¶ 4; MOTION at 3) This contempt for competition, along with Hasbro's long-time co-existence with many third-party uses of "memory," suggests that this injunction is not intended to protect Hasbro's trademarks from irreparable injury but, instead, is an attempt to immobilize competition while Hasbro's own Spiderman & Friends game is introduced into the market. This does not amount to irreparable harm, but rather constitutes an attempt to abuse the injunction process.

### 3. Mere Allegations Do Not Constitute Irreparable Injury.

#### a. Speculative assertions of harm are insufficient.

Hasbro's conclusory, speculative, and unsupported allegations of harm will not satisfy its burden to show imminent and certain irreparable injury. *Public Serv. Co. of N.H.*, 835 F.2d at 383; *Figueroa*, 2006 WL 898166, at *2; *Charlesbank Equity Fund II*, 370 F.3d at 162. *See also Biogen*, 332 F. Supp. 2d at 296 ("'[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.'").

Hasbro predicts the harm it allegedly will suffer *without* any supporting evidence. (MOTION at 5.) For instance, it claims that MGA's use of "memory" will make inventors shy away from working with Hasbro, will cause a sudden influx of infringing and competing "memory games," and that third parties will not want to provide Hasbro with licenses for themed "memory games," *or* purchase licenses from Hasbro. (*Id.*) Given the admitted lack of evidence of actual confusion among retailers since the game was introduced *or* among consumers since its launch eight months ago (*id.* at 12-13), and given the overwhelming presence of other "memory" users in the marketplace, Hasbro's claims that the harm is "real and immediate" must be rejected, particularly when not supported by facts or evidence. *See Biogen*, 332 F. Supp. 2d at 296.

Hasbro's predicted lost sales from MGA's product are too speculative to constitute irreparable injury, given its failure to provide *any* evidence to show any past or future lost sales. Indeed, even if it was infringing, sales of MGA's game certainly would not preclude sales of Hasbro's current or future "Memory" games. The purchase of one low-cost item is not likely to preclude the purchase of another, even if they are similar. *Clonus*, 417 F. Supp. 2d at 256. MGA's game is sufficiently distinct from Hasbro's "Memory" game, including any future Spiderman & Friends card-matching memory game, that consumers who enjoy "memory games" *or* Spiderman & Friends may actually purchase *both* products. (Sections II.B.-C., above)

#### b. Damages can address any harm to Hasbro.

Whatever incremental damage is allegedly created by adding one more "memory" user to a crowded field of hundreds of such users can certainly be compensated by a monetary award. By not raising it in its MOTION, Hasbro concedes that its marks and goodwill have not been devalued.

c. **Injunctions should not be used to suppress lawful competition.**

Hasbro is improperly attempting to enjoin MGA from fully exploiting its Marvel license, and from lawfully competing. Much of what Hasbro complains about is the natural consequence of open competition—loss of sales to a competing product, impact on retailer relationships when one product is less desirable, and the inevitable influx of additional competing products. Hasbro may not like the turn the "memory game" market has taken, but being outdone by competition does not constitute actionable irreparable injury.

## VI. THE BALANCE OF HARDSHIPS WEIGHS AGAINST AN INJUNCTION.

To obtain a preliminary injunction, Hasbro must establish that its hardship without injunction is greater than MGA's hardship with an injunction, which Hasbro failed to do. *Esso Standard Oil Co.*, 445 F.3d at 18; *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005).

### A. Hasbro Will Suffer Little Or No Hardship Absent An Injunction.

Because of the deficiencies in Hasbro's claims, its delay, and lack of irreparable injury, Hasbro will suffer little or no harm upon denial of an injunction. (Sections II.F., IV., V.) *See also Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.*, 869 F. Supp. 176, 186 (S.D.N.Y. 1994); *Kadant, Inc. v. Seely Machine, Inc.*, 244 F. Supp. 2d 19, 38-39 (N.D.N.Y. 2003) (where injury to defendant from injunction more concrete than alleged injury to plaintiff absent injunction, the balance favors no injunction); *Arthur Guinness & Sons, PLC v. Sterling Pub. Co., Inc.*, 732 F.2d 1095, 1101 (2d Cir. 1984); *Mego Corp. v. Mattel, Inc.*, 203 U.S.P.Q. 377 (S.D.N.Y. 1978) (delay caused balance of hardships to tip in defendant's favor).

### B. MGA Will Suffer Severe Hardship If An Injunction Issues.

#### 1. An Injunction Would Damage MGA's Business Relationships.

A preliminary injunction would substantially damage MGA's reputation and goodwill, as well as its business and contractual relationships with retailers and Marvel, warranting denial of Hasbro's MOTION. (Caspi Decl. ¶ 14; Contreras Decl.; Daniels Decl.) *See Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 689 (W.D. Ark. 1981) (denying injunction because of potential damage to reputation and goodwill). If an injunction would damage a defendant's customer relations or force a breach of contract, it should be denied. *See Lever Bros. Co. v. Mattel, Inc.*, 609 F. Supp. 1395 (S.D.N.Y. 1985); *Litton Sys., Inc. v. Sundstrand Corp.*,

750 F.2d 952, 960 (Fed. Cir. 1984) (denying injunction because of interference with customer relationships and potential contractual liability). The extraordinary relief requested by Hasbro would have all of those consequences, and more. An injunction would:

(1) Force MGA to recall product from over 2,000 stores, leaving behind empty shelf space.

(2) Force MGA to breach supply contracts with retailers pending trial and while it creates, manufactures, and ships the re-named and re-labeled product.

(3) Force MGA to destroy all existing packaging and game parts presently bearing the name (over 116,000 "Memory Match-Up" games have been sold and delivered to retailers as of July 2006), or, if permitted, sticker over the existing uses, or, if stickering is not permitted, come up with a new name, packaging and labeling.

(4) Impair MGA's relationship with Marvel. This injury would be particularly damaging given the Marvel characters' increased popularity and during the run-up to next summer's launch of the next *Spiderman* movie, *Spiderman 3*.

(5) Still require MGA to pay royalties to Marvel, even if the product cannot be sold, or force MGA to breach its contract with Marvel.

(6) Impair MGA's relationships with buyers who bought the game, who may refuse to accept a substitute product, or, if they buy other MGA product, might refuse to buy more.

(7) Force MGA to incur expedited international air freight costs if any retailer demands immediate replacement, in order not to disrupt its sales or shelf space layouts.

(8) Impair MGA's ability to get future products on its buyers' shelves. Retail shelf space is very limited, and there are numerous products competing for it. The major retailers' shelves are already largely stocked with Hasbro/Milton Bradley games, the largest provider of games in the U.S. Therefore, kicking MGA's Memory Match-Up game out of that space would likely foreclose MGA from getting the space back until some indeterminate time in the future. In the meantime, retail buyers would likely turn to someone else—and in all likelihood MGA's competitor Hasbro—to fill it.

(9) Force MGA's game to lose its retail space (and possible sales) for the upcoming 2006 holiday season, when most toy and game products are sold.

(10) Potentially disrupt whatever promotional efforts MGA's product retailers have already developed for the upcoming holiday season.

(11) Adversely affect MGA's ability to further develop business relationships with game buyers, thereby creating lasting injury to MGA's sales efforts in the future.

(12) Force MGA to divert personnel and resources from other projects and, instead, devote them to this redesign, retooling, recall, and restocking project, with ongoing negative consequences on other projects that are *not* the subject of this action.

(Caspi Decl. ¶ 14; Lumabao Decl. ¶ 17; Contreras Decl., Daniels Decl.; Ex. 8)

It also must be noted that no recall will be perfect. Once MGA's games leave Hong Kong or China (where they are manufactured), the buyers own them and they are not in MGA's possession or control. Any recall or re-packaging could therefore only be done *if* those buyers permit MGA to do so. (Contreras Decl. ¶ 5) If they do, MGA would have to hire and pay temporary employees all over the country to go into the thousands of stores that carry MGA's games to effectuate the recall, repackaging, and restocking. (Daniels Decl.; Lumabao Decl. ¶ 17)

And all this would be forced on MGA because Hasbro appropriated the generic name for a classic children's card game, convinced the USPTO to give it registrations that Hasbro believes give it trademark rights, and sat on those rights while it knew MGA was marketing its game. After having, through inaction or indifference, ignored the hundreds of others using the word "memory" in connection with card-matching games (Exs. 2, 3), Hasbro only went after MGA, which has a competing Marvel character license, once the Memory Match-Up game (which is *not* even a card game) showed resonance with consumers. (Lumabao Decl. ¶ 19)

### 2. **<u>The Cost Of An Injunction Could Be Hundreds Of Thousands Of Dollars Due, In Part, To Hasbro's Delay.</u>**

MGA's cost to comply with an injunction and recall order could exceed hundreds of thousands of dollars, even though the cost increased significantly because of Hasbro's delay and even though Hasbro would suffer no quantifiable harm if an injunction is denied. Where a defendant's hardships are multiplied by a plaintiff's undue delay, an injunction should be denied. *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 212 (S.D.N.Y. 1999), *aff'd* 191 F.3d 208 (2d Cir. 1999) (injunction denied; 5-month delay; and substantial hardship because defendant had produced $3.4 million of allegedly infringing product and contracted with advertisers for

television and print promotions and with retail customers for shipment and shelf space). While Hasbro sat on its hands, MGA produced and shipped over 116,000 games, and obtained shelf space in over 2,000 stores across the country. It plans to sell the game to many more stores. The cost of an injunction to MGA now far surpasses what it would have been last summer when Hasbro would have first learned of MGA's use of "memory" in connection with its game. (Caspi Decl. ¶ 14; Lumabao Decl. ¶¶ 11-15, 17; Contreras Decl., Daniels Decl.)

The cost of hiring an outside company to effectuate the recall of MGA's game from over 2,000 stores (as required by retailers) could exceed hundreds of thousands of dollars. (Lumabao Decl. ¶ 17; Daniels Decl.) Costs could also include the loss of existing inventory that would not be available for shipment if an injunction issued.[30] (Lumabao [¶ 17] Decl.) At the retail price Hasbro noted in its moving papers (Wiggins Decl., $7.99), an injunction would result in hundreds of thousands of dollars in lost sales, plus thousands of dollars more in nonrefundable royalties MGA would still have to pay Marvel. MGA also could face potential liability for resulting breach of contract claims by Marvel and retailers. (Contreras Decl.; Daniels Decl.)

MGA would further suffer damages due to lost production, development, and sales costs already incurred for its game. Where a defendant has invested considerable time and money in creating and marketing the allegedly infringing product, it will suffer great hardship if thereafter enjoined. *See Uno's Pizza, Inc. v. Pizzeria Uno Corp.*, 722 F. Supp. 971, 976 (W.D.N.Y. 1989); *Grondin v. Rossington*, 690 F. Supp. 200, 209 (S.D.N.Y. 1988).

The cost and logistical challenges from an injunction would be overwhelming and detrimental to MGA. (Caspi Decl. ¶ 14; Lumabao Decl. ¶ 17; Contreras Decl., Daniels Decl.) Conversely, absent an injunction, Hasbro will be free to continue using *its* marks and will suffer little to no harm. *See, e.g., Trustco Bank Nat'l Ass'n v. Glens Falls Nat'l Bank and Trust Co., N.A.*, 903 F. Supp. 335, 344 (N.D.N.Y. 1995). Such inequity, particularly in light of all the other users of "Memory" for games in the same market with Hasbro, mandates denial of an injunction.

[30] MGA may not simply be able to ship currently existing units of its game with new packaging because the cost of re-packaging current units could well exceed the profit margin on the products, such that it would actually lose money by selling repackaged products. (Daniels Decl. ¶ 6)

3. **An Injunction Would Cause MGA To Lose Out On The Current Popularity Of Comic Book-Related Products.**

MGA's "Spider-Man & Friends" game is being sold during an increasingly popular time for comic book-related merchandise. (Contreras Decl. ¶ 8) Many successful superhero movies have been and will be released. (Ex. 8) MGA would have to stop shipping its Marvel-licensed game and pull units off shelves, resulting in substantial lost sales, which cannot be replaced, now and during the upcoming holiday sales season. (Contrares Decl.; Daniels Decl.)

C. **The Severe Potential Injury to MGA Requires Hasbro To Make A Very Strong Showing Of Likely Success on the Merits, Which It Cannot Do.**

Where the harm likely to be suffered by the defendant substantially outweighs any injury threatened by its conduct, the plaintiff must make an exceedingly strong showing of likely success on the merits, which Hasbro failed to do here. *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997). (Sections VI.A.-B., above)

## VII. THE PUBLIC INTEREST WOULD NOT BE SERVED IF AN INJUNCTION WERE TO ISSUE.

An injunction should not issue where it would adversely affect the public interest. *Bayshore Group Ltd. v. Bay Shore Seafood Brokers*, 762 F. Supp. 404, 415 (D. Mass. 1991). Public interest disfavors injunctions if plaintiff has failed to establish a likelihood of success. *Bionx Implants, Inc. v. Innovative Devices, Inc.*, 45 F. Supp. 2d 75, 79 (D. Mass. 1999). Competition that does not infringe plaintiff's intellectual property should not be enjoined. *Hewlett-Packard Co. v. Genrad, Inc.*, 882 F. Supp. 1141, 1154 (D. Mass. 1995). Hasbro is using this injunction to impede competition while it introduces its own Spiderman & Friends-themed "Memory" game. (Lumabao Decl. ¶ 19) This is squarely against the public's interest.

Lawful competition results in lower prices and greater incentives for companies to create a variety of quality products. "The public has an interest in product availability." *Hewlett-Packard Co.*, 882 F. Supp. at 1154. Product variety is especially important when the products provide valuable learning tools for young children, such as the memory enhancing and visual matching games sold by MGA and Hasbro. (*See* Exs. 2.3, 3.4, 4.49, 6.1) Because MGA's game requires the player to find and match non-identical items, she develops a higher skill level than with traditional memory games. (Caspi Decl. ¶¶ 10, 11; Werner Decl. ¶ 5; Lumabao Decl. ¶ 7)

Therefore, it is in the public's interest to have access to MGA's game, which can continue to challenge and develop a child who perhaps has already mastered the typical memory game.

## VIII. EQUITY WEIGHS AGAINST A PRELIMINARY INJUNCTION.

For all of the equitable reasons set forth above (acquiescence, waiver, laches, estoppel, unclean hands (*see* Section IV.C., above), Hasbro's motion must be denied.

## IX. A PRELIMINARY INJUNCTION WOULD REQUIRE A LARGE BOND.

A bond is mandatory for an injunction, and must adequately cover damages for a wrongfully issued injunction. *See Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6, 10 (1st Cir. 1991); *Buddy Systems, Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167-68 (9th Cir. 1976); FED. R. CIV. P. 65(c). Because of Hasbro's unnecessary delay in seeking injunctive relief, MGA's product has been on the shelves for almost eight months. (Lumabao Decl. ¶¶ 11, 17) It has committed large sums to creating and packaging thousands of units that are either currently in stores or are ready to be shipped. (Lumabao Decl. ¶ 17) An injunction at this late date would require the removal of the thousands of units in stores, and result in lost sales while Hasbro awaits final judgment. (Caspi Decl. ¶ 14; Lumabao Decl. ¶ 17; Contreras Decl.; Daniels Decl.) Recall would also result in the breach of numerous contracts and badly damage relations with retailers and Marvel as licensor. (Sections VI.B., above) MGA's monetary damages from an injunction would total hundreds of thousands of dollars, if not more. (Section IV.B., above) Any bond should reflect and provide security for these projected losses. *Mead Johnson & Co*, 201 F.3d at 888 ("When setting the amount of security, district courts should err on the high side.").

## X. CONCLUSION.

For the foregoing reasons, MGA requests that this Court deny Hasbro's MOTION, and requests that this Court order Hasbro to reimburse MGA for the attorneys' fees and costs it has had to incur in responding to this baseless motion. Pursuant to LOCAL RULE 7(e), MGA hereby requests oral argument on the MOTION FOR PRELIMINARY INJUNCTION AND RECALL, and estimates that it will need one hour for argument.

Dated: July 17, 2006

Defendant and Counterclaimant,
MGA ENTERTAINMENT, INC.
By its attorneys,

BROOKS R. MAGRATTEN, R.I. Bar ID #3585
GEORGE E. LIEBERMAN, R.I. Bar ID #3860
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
Telephone: (401) 421-3060
Facsimile: (401) 272-6803
E-mail: bmagratten@vetterandwhite.com
glieberman@vetterandwhite.com

KENT R. RAYGOR, *pro hac vice* application under submission
SHEPPARD MULLIN RICHTER & HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
Telephone: (310) 228-3700
Facsimile: (310) 228-3701
E-mail: kraygor@sheppardmullin.com

400023746.5

CERTIFICATE OF SERVICE

The undersigned certifies that today (July 17, 2006) I had caused to be served the within Defendant/Counterclaimant MGA Entertainment Inc.'s Memorandum of Points and Authorities in Opposition to Motion for Preliminary Injunction and Recall Filed by Plaintiff/Counterclaim-Defendant Hasbro, Inc. upon below listed counsel as stated:

Kim J. Landsman, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York New York 10036-6710
(by e-mail and U.S. mail)

**(BY OVERNIGHT MAIL)**

Jeffrey K. Techentin, Esq.
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345
(by hand)

**(BY HAND-DELIVERY)**