UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

HASBRO, INC.,

Plaintiff,

v.

MGA ENTERTAINMENT, INC.,

Defendant.

MGA ENTERTAINMENT, INC.,

Counterclaimant,

v.

HASBRO, INC.,

Counterclaim-defendant.

**C.A. No. 06-262 S**

**DECLARATION AND PRELIMINARY EXPERT REPORT OF BARRY SHAPIRO IN SUPPORT OF MGA ENTERTAINMENT, INC.'S OPPOSITION TO HASBRO'S MOTION FOR A PRELIMINARY INJUNCTION AND RECALL ORDER**

Evidentiary Hearing
Date: Monday, October 23, 2006
Time: Commencing at 9:00 a.m.
Place: Courtroom of the Hon. William E. Smith

# DECLARATION AND PRELIMINARY EXPERT REPORT OF BARRY SHAPIRO

I, Barry Shapiro, state as follows:

1. I have nearly 40 years of experience within the toy industry. My job functions within the toy industry have ranged from leading new product departments, to managing toy companies, both publicly traded and privately held. Some of the leading toy companies that I have managed include Lakeside Games, Just Toys Inc., Toymax Enterprises and WHAM-O Mfg. Co. I am currently self-employed and work as a consultant and also as the President and CEO of Global Sourcing Group in Minnetonka, Minnesota.

2. As a toy industry professional, I was elected to serve on the Toy Industry Association ("TIA") Board of Directors for numerous terms. As a TIA Board Member, I served in several positions including Chairman of the Trade Show Committee for 5 years. In that capacity, I wrote and then presented the recommendation that the TIA Board establish a fall mass market toy show. My recommendation was followed and the Mass Market Fall Toy Show was created. In developing the show, I had the opportunity to work with toy manufacturers and retailers to create a marketplace that best addressed the timing and format needs of "Big Box" retailers (i.e., Wal-Mart, Target, Toys "R" Us, K-Mart). At the show, buyers from those large retailers requiring longer lead times and large product volumes, meet with manufacturers to work on the following season's products.

3. I have been asked by Sheppard, Mullin, Richter & Hampton LLP, attorneys for MGA Entertainment, Inc., to provide an opinion as to the matters set forth below. In providing this opinion, I have relied on the documents, games, websites, and charts provided to me by MGA's counsel and that are attached to this report and entitled "MGA ENTERTAINMENT 'A' EXHIBITS—DICTIONARIES, BOOKS, AND OTHER REFERENCE MATERIALS" and "MGA ENTERTAINMENT 'B' EXHIBITS—PURCHASED PHYSICAL GAMES", and the descriptions of the games and websites identified in them.

4. I am being compensated for my work on this matter at my standard fee of $250 per hour.

5. Before being contacted by MGA's counsel regarding this case, I was generally aware of the old, classic children's game where players spread playing cards out face down and then take turns turning over two cards at a time to try to find matching pairs. If matches are not found, the players try to remember where the cards were so they can try to make matches on future turns. As a child, we called the game concentration or memory. I then began to perform online research to further educate myself about card-matching games. I began my research by first entering the term "memory" (not in quotes) in a Google search engine. That search returned numerous hits for things like memory cards for cameras and computers. I then refined my search and typed in the words "memory game" (not in quotes), and was surprised to find, within just a few minutes of first starting a search, many references to online card-matching or image-matching games I could play online, all called memory games in one form or another. These games had the same game play I described above and that I had played as a child.

6. In my first search (using "memory game") (not in quotes), I did not see a reference to Hasbro's Memory game until page 7 of the search results. I wanted to see how that search compared with searches for other Hasbro games. I typed in "Monopoly" (not in quotes) and the very first entry on the first page of the search results took me to a website for the Hasbro Monopoly game. And 9 of the first 10 websites that were listed referred to the Hasbro product. I then did the same type of search for the Hasbro game "Clue" (not in quotes). The second and third websites that were listed dealt with the Hasbro game. I then performed a similar search for the Hasbro game "Sorry" (not in quotes). Here, the forth and tenth search results directly related to Hasbro's Sorry game. As stated above, by contrast, searching for "memory game" (not in quotes) did not turn up a reference to Hasbro's game until the seventh page of results.

7. MGA's counsel then told me the names of different memory games that they had found being sold at various stores in the Los Angeles market. I then visited three Target, one Wal-Mart, one Toys "R" Us and one Borders stores in the Minneapolis area over the next two days. I was able to find the following games and books at these stores in just two half days with limited effort:

**Target:**

MEMORY game, by Hasbro;

MEMORY MATCH-UP, by MGA;

SOUNDS OF THE SEASHORE, THE MAGICAL MATCHING AND MEMORY GAME, by Cranium;

BILINGUAL MEMORY MATE game, by Leap Frog;

a four-pack of games, one of which is the BILINGUAL MEMORY MATE game, by Leap Frog;

DORA THE EXPLORER GAME HOUSE, which includes a deck of cards called MEMORY MATCH, by Cardinal;

I SPY MEMORY GAME, by Briarpatch;

THOMAS & FRIENDS ALL ABOARD! CARD GAME, which includes the THOMAS MEMORY GAME, by Briarpatch

**Wal-Mart:**

MEMORY game, by Hasbro;

MEMORY MATCH-UP by MGA;

DORA THE EXPLORER GAME HOUSE, which includes a deck of cards called MEMORY MATCH, by Cardinal;

GO DIEGO GO GAME HOUSE, which includes a deck of cards called MEMORY MATCH, by Cardinal;

I SPY MEMORY GAME, by Briarpatch;

THOMAS & FRIENDS ALL ABOARD! CARD GAME, which includes the THOMAS MEMORY GAME, by Briarpatch;

BILINGUAL MEMORY MATE game, by Leap Frog

**Toys "R" Us:**

MEMORY game, by Hasbro;

SOUNDS OF THE SEASHORE, THE MAGICAL MATCHING AND MEMORY GAME, by Cranium;

DORA THE EXPLORER GAME HOUSE, which includes a deck of cards called MEMORY MATCH, by Cardinal

**Borders:**

MEMORY game, by Hasbro;

I SPY MEMORY GAME, by Briarpatch;

I SPY MEMORY GAME TRAVEL EDITION, by Briarpatch;

OFFICIAL RULES OF CARD GAMES book, by United States Playing Card Company;

ACCORDING TO HOYLE: OFFICIAL RULES OF MORE THAN 200 POPULAR GAMES OF SKILL AND CHANCE WITH EXPERT ADVICE ON WINNING PLAY book, by Richard Frey;

CARD GAMES: AN ESSENTIAL GUIDE TO THE MOST POPULAR AND ENTERTAINING GAMES book, by Diagram Group;

HOYLE'S RULES OF GAME book, by Albert Morehead;

THE EVERYTHING CARD GAMES BOOK: A COMPLETE GUIDE TO OVER 50 GAMES TO PLEASE ANY CROWD, by Nikki Katz;

CRAZY GAMES ULTIMATE TRAVEL GAMES book, by Micol Ostow;

ENCYCLOPEDIA OF CARD GAME book, by Scarnes

These games were all located in toy and game sections in the case of Target, Wal-Mart and Toys "R" Us, and in the children's section in the case of Borders. It only took me a few minutes to find these games in those stores, and the various memory games found at a particular store were found within feet of each other.

8. In my capacity as Chairman of the Trade Show Committee for the TIA, and as a toy industry veteran, I have had the opportunity to work extensively with buyers and merchandise managers at large volume retailers, such as Target, Wal-Mart and Toys "R" Us. Through my years of interaction, I have developed an in-depth knowledge of how these retailers purchase, organize and present merchandise to consumers.

9. Today, these larger retailers start working on the products they will carry 12 to 15 months in advance. After selecting the products, they then create store, aisle, and shelf layouts for the products that will be sold in the next year (these layouts are called "Plan-o-grams"). The layouts are broken out by department, and by categories of products within each department. For certain categories of products, such as with toys and games, the store layout will indicate the number of facings of each product, which shelf the product will be on, and where on that shelf the product will go. ("Facings" refers to the number of appearances of a particular product at the front of a shelf a consumer will see in the store. Additional copies of the game that the consumer sees at the front of the shelf will be stacked behind the front-facing game.) The store layout will vary somewhat depending on the store size and the fixturing available in each store. For the mass retailers, like those identified above, this allows the retailers to attain some amount of uniformity across their stores across the U.S. and assists them

in determining how much product to buy to fill those shelves at all those stores, and how the display in those stores will best be displayed to consumers in order to maximize the usage of the square footage available. These Plan-o-grams are created to provide the consumer with a similar shopping experience in whatever city he or she may reside. Because of this planned uniformity, from a consumer standpoint a store in New York will be very similar to a store in Los Angeles and elsewhere and will have virtually the same products located in similar locations in all of these stores. One should note that there are some regional, seasonal, and selling space variations among a particular mass retailer's stores. For example, there will be more space devoted to winter gear in Target stores in the Northern states in the winter than in the South, some Target stores will be larger than others, and therefore have more space they can devote to games, and some items (such as professional sports team items that might only be popular in a particular city) might be more popular in certain regions of the country than others. By and large, however, for products such as the MGA and Hasbro games that are the subject of this report, the "big box" retailers will be expected to buy them for sale through the vast majority of their stores, as they are not likely prone to seasonal or regional variations, and are likely only subject to some variation based on the size of the game section in a particular store.

10. Product selection and product pricing are central to each retail buyer's responsibilities. Although the process varies by retailer, the primary goal is to maximize top line sales and bottom line profits and to keep inventory at a minimum. Today, retail shelf space is at a premium, and most buyers attempt to achieve their goals by measuring retail velocity over the counter, while minimizing the number of products that they carry. In some categories, the good, better, best selection method is used to select products. In the games section, buyers may use the

following factors in deciding to buy and then display product: what license is the product associated with?, what is the game play?, is there anything unique about the product?, what is its packaging?, who is the target audience?, and other such factors. One primary goal is to avoid buying product the sales of which could cannibalize the sales of other products that are too similar in the same section, and to create the opportunity for incremental sales increases. Essentially, this means that a buyer would be reluctant to carry products that the buyer believes are so similar as to directly compete for the same consumer dollars, thereby reducing dollars generated per square foot of retail space.

11. I have had the opportunity to personally view MGA's Spider-Man & Friends 3-D Memory Match-Up game in MGA's counsel's office, as well as a collection of Hasbro's Memory card-matching games and many other manufacturers' memory games. I also have viewed, as indicated above, many websites showing such games. There are many, many such card-matching games in the marketplace. It is my opinion that MGA's Spider-Man and Friends 3-D Memory Match-Up game is different than Hasbro's assortment of Memory card-matching games to such an extent that a retail buyer would consider MGA's item a product capable of providing incremental sales volume, rather than cannibalizing sales volume from other various memory games available in stores. My opinion is based on a number of factors including, but not limited to, the following:

a. The MGA game contains plastic, three-dimensional figures and cups, where the Hasbro game uses cardboard cards. This necessitates a "small parts" warning label on the front of the MGA package that the Hasbro game does not have.

Based on what I have seen and my experience in the toy industry, the three-dimensional aspect of the MGA game is quite unique for this type of game and would be considered by a retail buyer as something quite different than the traditional game where one just flips over cards.

b. The Hasbro game often states, "Find the most pairs of matching cards . . .," and requires the player to match identical pictures printed on cards. The MGA packaging, on the other hand, states, "Find the matching hero piece to win . . . ." The MGA packaging shows the game play in action, while the Hasbro game's package does not. Also, the MGA game requires the player to match up different parts of a figure to make a whole figure, which the child can also handle and play with, while the Hasbro game requires simply finding the same two images, and the cards don't really provide any secondary play characteristics.

c. The MGA game comes in a striking-looking molded plastic storage container on which the game is also played when it is folded out, and has a printed cardboard sleeve around it, while the Hasbro game comes in a standard cardboard box. As seen on store shelves, Hasbro's game looks like most other shrink-wrapped cardboard boxes on the game section shelves, while MGA's game looks very different from almost anything else on the shelves.

d. Hasbro calls its product a "game" on its package, but MGA does not use the word on its package.

e. The MGA game's instruction sheet lists a variation in the game play that says that after a match you remove characters from the game base, but place the cups back in position. The players then have to remember both where the characters are and also which "cups" are empty. You cannot do that with Hasbro's Memory game or any of the free online games.

f. The overall commercial impression is very different. The word "Memory" on Hasbro's package is by far the largest, most prominent feature on the packaging. In contrast, on MGA's package, the first thing the eye is drawn to is the well-known "Spider-Man & Friends" logo, and then the superhero characters themselves. In some respects, the small lettering "3-D Memory Match-Up" is almost an afterthought. And, of course, the overall impression of the phrase "3-D Memory Match-Up" provides a very different impression than just the single word "Memory" on Hasbro's package. In fact, in some respects, the MGA game is closer to many of the other games using "memory" that are in the marketplace than Hasbro's because many other manufacturers are using something like "memory match" or "memory matching" as either the name of or to describe their games, as does MGA.

g. Hasbro's Memory game has the highly distinctive and recognizable MB/Milton Bradley logo prominently displayed on multiple sides of the product, and also often includes Hasbro logos. MGA's product, however, only has two small MGA

logos on the product, which in no way could be confused with any of the Milton Bradley or Hasbro logos.

12. To assist the retail buyers in organizing and making purchasing decisions, and in creating a retail shelf presentation or Plan-o-gram, some of the major retailers, like Wal-Mart, utilize persons called "Category Managers." A Category Manager is typically a senior sales person from one of the leading suppliers, such as Hasbro, within a particular category and, although employed by that supplier, will work with the retail buyer directly in assisting with the purchase of not only his employer's products, but also of competitors' products. I have been advised that MGA has never acted as a category manager within the games category, but that a Hasbro employee acts as the Games Category Manager for Wal-Mart. So, in that position, that Category Manager will assist Wal-Mart in deciding what product to buy and then sell in Wal-Mart stores all across the country. It is the retailer, however, and not the Category Manager, who decides what to buy and where to place the product on the shelves in its stores. Therefore, to the extent that a particular retailer, say Wal-Mart, decides to buy several different memory games, it is Wal-Mart that decides where to place those different products in its game section and on which shelves. Once Wal-Mart decides exactly which products it will buy and where it wants them on its shelves, it then indicates that on its Plan-o-gram, which is then distributed to all of its stores nationwide as a guide in how to stock the shelves once the product arrives.

13. When I was in charge of WHAM-O, we engaged in intensive efforts to police our trademark rights the entire time I was there. One of WHAM-O's primary products was the FRISBEE®-brand flying disc. The product was exceedingly popular, and the trademark

FRISBEE® quickly became in danger of being used generically for a flying disc. So we sent many, many "cease and desist" letters to other manufacturers, newspapers and other publications in our effort to police the marketplace and enforce our trademark rights, and were successful in preserving our trademark rights. And this was done in an era when it was much tougher to find infringers than it is today, when just a few minutes on the Internet can turn up hundreds of potential infringers. It therefore really surprises me that there are so many card-matching games in the marketplace and online that are called memory games, and it appears that Hasbro has done little, if anything, to enforce its rights. I am informed that Hasbro has produced in discovery in this lawsuit evidence that shows that it has only engaged in less than 20 enforcement efforts in the entire 40 years that Hasbro and Milton Bradley have been selling their "Memory" game. At WHAM-O, at the height of the popularity of FRISBEE®, we probably sent out that number of enforcement letters in a month or two for the FRISBEE® mark.

14. Because of the great number of card-matching games that are in stores and online, and the numerous references I have seen to such games specifically called "memory" in dictionaries, encyclopedias and books that I have reviewed (the "A" chart in paragraph 3 of this report), and in light of the differences between the Hasbro and MGA games I outlined above, it is my opinion that it is not credible for Hasbro to assert that consumers for such games will be confused about who is offering these two different games or that they are somehow related.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October __, 2006 at Minnetonka, Minnesota.

______________________________
Barry Shapiro

FRISBEE® quickly became in danger of being used generically for a flying disc. So we sent many, many "cease and desist" letters to other manufacturers, newspapers and other publications in our effort to police the marketplace and enforce our trademark rights, and were successful in preserving our trademark rights. And this was done in an era when it was much tougher to find infringers than it is today, when just a few minutes on the Internet can turn up hundreds of potential infringers. It therefore really surprises me that there are so many card-matching games in the marketplace and online that are called memory games, and it appears that Hasbro has done little, if anything, to enforce its rights. I am informed that Hasbro has produced in discovery in this lawsuit evidence that shows that it has only engaged in less than 20 enforcement efforts in the entire 40 years that Hasbro and Milton Bradley have been selling their "Memory" game. At WHAM-O, at the height of the popularity of FRISBEE®, we probably sent out that number of enforcement letters in a month or two for the FRISBEE® mark.

14. Because of the great number of card-matching games that are in stores and online, and the numerous references I have seen to such games specifically called "memory" in dictionaries, encyclopedias and books that I have reviewed (the "A" chart in paragraph 3 of this report), and in light of the differences between the Hasbro and MGA games I outlined above, it is my opinion that it is not credible for Hasbro to assert that consumers for such games will be confused about who is offering these two different games or that they are somehow related.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October __, 2006 at Minnetonka, Minnesota.

Barry Shapiro



Oct 19 06 08:31p Shapiro 952-545-0141 p.1

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the within **DECLARATION AND PRELIMINARY EXPERT REPORT OF BARRY SHAPIRO IN SUPPORT OF MGA ENTERTAINMENT, INC.'S OPPOSITION TO HASBRO'S MOTION FOR A PRELIMINARY INJUNCTION AND RECALL ORDER** on October 20, 2006 (Eastern Time). The **DECLARATION AND PRELIMINARY EXPERT REPORT OF BARRY SHAPIRO IN SUPPORT OF MGA ENTERTAINMENT, INC.'S OPPOSITION TO HASBRO'S MOTION FOR A PRELIMINARY INJUNCTION AND RECALL ORDER** is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the below-listed counsel of record has been effectuated by electronic means.

Michael Sant'Ambrogio, Esq.
Kim J. Landsman, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Jeffrey K. Techentin, Esq.,
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

Janene P. Bassett