UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MGA ENTERTAINMENT, INC.,<br><br>Defendant. | |
| MGA ENTERTAINMENT, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>HASBRO, INC.,<br><br>Counterclaim-defendant. | **C.A. No. 06-262 S** |

**DEFENDANT/COUNTERCLAIMANT MGA ENTERTAINMENT, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING MOTION FOR PRELIMINARY INJUNCTION AND RECALL FILED BY PLAINTIFF/COUNTERCLAIM-DEFENDANT HASBRO, INC.**

# TABLE OF CONTENTS

Page

I. FINDINGS OF FACT ......1

A. Procedural Background. ......1

B. Hasbro's Claims. ......2

C. The Classic Card-Matching Memory Game. ......2

D. MGA's Spider-Man & Friends "3-D Memory Match-Up" Three-Dimensional, Molded Plastic, Marvel Superhero Character Game. ......4

E. Hasbro's Card-Matching Memory Games And Purported Trademark. ......7

F. Hasbro's Efforts To Interfere With MGA's Marvel License. ......9

G. Despite Side-by-Side Sales Since December 2005, No Instances Of Actual Confusion Have Arisen. ......11

H. MGA's Lack Of Knowledge Of Alleged Protectability Of Hasbro's Game And Purported Exclusive Rights To MEMORY Mark. ......12

I. Parents Are The Relevant Consumer For The Parties' Games, Particularly If Names Alone Are Being Considered. ......13

J. Hasbro's Concession Of Non-infringement By Third-Party Uses Of "Memory". ......13

K. The Record is Replete With Examples Of Hasbro's Own Generic Use Of "Memory" And "Memory Game". ......18

1. Hasbro's Own Expert. ......18

2. On Games. ......18

3. On Its Website. ......19

4. In Its Patents. ......19

5. In Trademarks. ......20

L. Extensive Third-Party Use Of "Memory" And "Memory Game". ......20

1. Books, Dictionaries and Reference Materials Using "Memory" And "Memory Game". ......20

2. Third-Party Games' Use Of "Memory" And "Memory Game". ......22

3. Internet And Computer Use Of "Memory" And "Memory Game". ..........25

4. Categories Of "Memory" And "Memory Game".....................................26

5. Governmental Use Of "Memory" And "Memory Game"..........................26

6. Patents With "Memory" And "Memory Game". .....................................26

7. Trademarks with "Memory" And "Memory Game"..................................27

M. Hasbro's Defective Survey And Survey Expert Evidence. ...................................30

N. Hasbro's Misstatements To The USPTO. ..........................................................31

O. Hasbro's Knowledge Of MGA's Use And Hasbro's Unreasonable Delay. ............32

P. Harm To The Parties. ..........................................................................................33

1. Harm To MGA From Injunctive Relief. ..................................................33

2. Any Injunction Would Require A Large Bond, But Hasbro Has Not Proffered One, Thereby Further Injuring MGA. ................................34

3. Lack Of Harm To Hasbro From Maintaining The Status Quo. .................35

II. CONCLUSIONS OF LAW. ..........................................................................................36

A. Preliminary Injunction Standard. ..........................................................................36

B. Hasbro Is Not Likely To Prevail On The Merits. .................................................37

1. Hasbro Is Not Likely To Prevail On The Merits Because It Has Failed To Establish That It Owns A Valid, Protectable Mark. ..................38

a. Hasbro's alleged mark is invalid because it is, at best, descriptive, without secondary meaning. ......................................40

(1) "Memory" describes the nature, use and characteristics of a card-matching "memory game". .........40

(2) Descriptive third-party use of "Memory" for matching games. .............................................................41

(3) Hasbro has not established that its use of the descriptive term "memory" has acquired secondary meaning. ................................................................42

b. Hasbro's 1967 registration of a particular stylized design of the word "Memory" is invalid. .....................................................45

c. Hasbro's alleged "Memory" mark is invalid because it is generic. ....47

(1) Legal standard for genericness. ....47

(2) Hasbro's 1966 adoption of the generic term "memory" for card games. ....50

(3) Extensive generic use of "memory" and "memory games" by the public and in reference materials. ....52

(4) Hasbro's alleged "Memory" mark and registrations have become generic, if they were not already generic, because of Hasbro's failure to police its alleged, claimed rights against similar uses by others. ....53

2. Hasbro Is Not Likely To Prevail On The Merits Because It Did Not Meet Its Burden Of Proving Likelihood Of Confusion. ....56

a. The purported marks are not similar. ....57

b. The goods are dissimilar. ....59

c. The channels of trade, advertising and class of prospective purchasers. ....60

d. There is no actual confusion evidence. ....61

e. There is no evidence of any bad intent on MGA's part in adopting "Memory Match-Up" or "3-D Memory Match-Up". ....62

f. The strength of Hasbro's purported mark is diminished because it exists in a crowded field of many similar uses. ....64

3. Hasbro's Common Law Infringement And Unfair Competition Claims Also Fail. ....65

C. Hasbro Has Not Met Its Burden Of Establishing That It Will Be Irreparably Injured If A Preliminary Injunction Does Not Issue. ....65

1. Hasbro Is Not Entitled To A Presumption Of Irreparable Injury. ....66

a. Hasbro's delay negates any presumption of irreparable injury. ....67

b. Hasbro's failure to police negates any finding of a presumption of irreparable injury. ....68

c. Any alleged injury will be *de minimis* and compensable. ............68

2. Having Failed To Establish Entitlement To A Presumption Of Irreparable Injury, Hasbro Also Failed To Prove Any Irreparable Injury. ............69

a. Hasbro cannot suffer irreparable injury because it is not likely to succeed on its claims. ............70

b. Speculative assertions of harm are insufficient. ............70

3. Damages Can Address Any Harm To Hasbro. ............71

D. The Balance Of Hardships Weighs Against An Injunction. ............71

1. Hasbro Will Suffer Little Or No Hardship Absent An Injunction. ............71

2. MGA, On The Other Hand, Will Suffer Severe Hardship If An Injunction Issues. ............72

a. An injunction would damage MGA's business relationships. ............72

b. The cost of an injunction could be hundreds of thousands of dollars due, in part, to Hasbro's delay. ............72

c. An injunction would cause MGA to lose out on the current popularity of comic book-related products. ............74

3. The Severe Potential Injury to MGA Requires Hasbro To Make A Very Strong Showing Of Likely Success on the Merits, Which It Cannot Do. ............74

4. The Substantial Harm That MGA Would Suffer If A Preliminary Injunction Is Ordered Would Be Greatly Increased Due To Hasbro's Failure To Even Proffer Posting A Very Large Bond. ............74

E. The Public Interest Would Not Be Served If An Injunction Were To Issue. ............75

F. MGA's Other Defenses Also Mandate Denial Of The Injunction. ............76

1. MGA's Use Of The Word "Memory" Within The Phrase "3-D Memory Match-Up" Is A Fair Use. ............76

2. Hasbro Engaged In Unclean Hands In Misrepresentations In Its USPTO Filings. ............77

G. Conclusion. ............78

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,
447 F. Supp. 2d 266 (S.D.N.Y. 2006)....65

Abercrombie & Fitch Co. v. Hunting World, Inc.,
537 F.2d 4 (2d Cir. 1976)....41, 50, 52

American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,
494 F.2d 3 (5th Cir. 1974)....43

Arthur Guinness & Sons, PLC v. Sterling Pub. Co., Inc.,
732 F.2d 1095 (2nd Cir. 1984)....72

Astra Pharm. Prods., Inc. v. Beckman Instruments,
220 U.S.P.Q. (BNA) 609 (D. Mass. 1983)....63

Astra Pharmaceutical Prods. v. Beckman Instruments, Inc.,
718 F.2d 1201 (1st Cir. 1983)....57, 58

Bay State Savings Bank v. Baystate Financial Services, LLC,
338 F. Supp. 2d 181 (D. Mass. 2004)....39

Bayer v. United Drug Co.,
272 F. 505 (S.D.N.Y. 1921)....54

Bayshore Group Ltd. v. Bay Shore Seafood Brokers,
762 F. Supp. 404 (D. Mass. 1991)....76

Beacon Mutual Ins. v. OneBeacon Ins. Group,
376 F.3d 8 (1st Cir. 2004)....66

Berlent v. Focus Features, LLC,
No. 06 Civ. 2834, 2006 2006 WL 1594478 (S.D.N.Y. June 8, 2006)....38, 70

Biogen Idec Ma, Inc. v. Trustees of Columbia U.,
332 F. Supp. 2d 286 (D. Mass. 2004)....66, 71

Bionx Implants, Inc. v. Innovative Devices, Inc.,
45 F. Supp. 2d 75 (D. Mass. 1999)....76

Borinquen Biscuit Corp. v. M.V. Trading Corp.,
443 F.3d 112 (1st Cir. 2006)....44

Boston Athletic Assn. v. Sullivan,
867 F.2d 22 (1st Cir. 1989)....67

In re Boston Beer Co. L.P.,
198 F.3d 1370 (Fed. Cir. 1999)....45

Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.,
9 F.3d 175 (1st Cir. 1993)....43, 44

Bourne Co. v. Tower Records, Inc.,
976 F.2d 99 (2nd Cir. 1992)....................67

Buddy Systems, Inc. v. Exer-Genie, Inc.,
545 F.2d 1164 (9th Cir. 1976)....................75

CES Publishing Corp. v. St. Regis Publications, Inc.,
531 F.2d 11 (2d Cir. 1975)....................51

In re CTB Inc.,
52 U.S.P.Q. 2d (BNA) 1471 (T.T.A.B. 1999)....................47

Calamari Fisheries, Inc. v. The Village Catch, Inc.,
698 F. Supp. 994 (D. Mass. 1988)....................42

Charlesbank Equity Fund II v. Blinds To Go, Inc.,
370 F.3d 151 (1st Cir. 2004)....................66, 71

Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N.A.,
270 F. Supp. 2d 432 (S.D.N.Y. 2003)....................68, 70

Citibank, N.A. v. Citytrust,
756 F.2d 273 (2nd Cir. 1985)....................67

Clonus Assoc. v. Dreamworks LLC,
417 F. Supp. 2d 248 (S.D.N.Y. 2005)....................67, 69, 70

Colt Defense LLC v. Bushmaster Firearms, Inc.,
No. Civ.04-240-P-S, 2005 WL 2293909 (D. Me. Sept. 20, 2005)....................44

Commerce Natl Ins. Ser. v. Commerce Ins. Agcy.,
214 F.3d 432 (3rd Cir. 2000)....................39

In re Computer Store, Inc.,
211 U.S.P.Q. (BNA) 72 (T.T.A.B. 1981)....................52

In re Cooperative Produttori Latte E Fontina Valle D'Acosta,
230 U.S.P.Q. (BNA) 131 (T.T.A.B. 1986)....................52

In re Dillard Dep't Stores Inc.,
33 U.S.P.Q. 2d (BNA) 1052 (Comm'r of Patents 1993)....................47

Dixi-Cola Labs. v. Coca-Cola Co.,
117 F.2d 352 (4th Cir. 1941)....................52

Dupont Cellophane Co. v. Waxed Products Co.,
85 F.2d 75 (2nd Cir. 1936)....................54

Esso Standard Oil Co. v. Monroig-Zayas,
445 F.3d 13 (1st Cir. 2006)....................38, 72

Figueroa v. Wall,
No. C.A.05 415 T, 2006 WL 898166 (D.R.I. Mar. 14, 2006)....................38, 71

Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,
626 F.2d 193 (1st Cir. 1980).....57

Flex-Let Corp. v. Curran, ,
111 F. Supp. 536 (D.R.I. 1953).....37, 66

Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.,
533 F. Supp. 685 (W.D. Ark. 1981).....73

Fritz v. Arthur D. Little, Inc.,
944 F. Supp. 95 (D. Mass. 1996).....68

Garnier v. Andin Int'l,
844 F. Supp. 89 (D.R.I. 1994).....38, 69

Gidatex, S.r.L. v. Campaniello Imports, Ltd.,
13 F. Supp. 2d 417 (S.D.N.Y. 1998).....68

Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.,
869 F. Supp. 176 (S.D.N.Y. 1994).....72

Grondin v. Rossington,
690 F. Supp. 200 (S.D.N.Y. 1988).....74

Gruner + Jahr USA Pub. v. Meredith Corp.,
991 F.2d 1072 (2nd Cir. 1993).....41, 44, 59

Harley-Davidson, Inc. v. Grottanelli,
164 F.3d 806 (2nd Cir. 1999).....50

Hasbro, Inc. v. Clue Computing, Inc.,
66 F. Supp. 2d 117 (D. Mass 1999).....58, 61, 62, 63

Haughton Elevator Co. v. Seeberger,
85 U.S.P.Q. (BNA) 80 (Comm'r of Patents 1950).....54

Helena Rubinstein, Inc. v. Frances Denney, Inc.,
286 F. Supp. 132 (S.D.N.Y. 1968).....68

Hewlett- Packard Co. v. Genrad, Inc.,
882 F. Supp. 1141 (D. Mass. 1995).....76

Horizon Mills Corp. v. QVC, Inc.,
161 F. Supp. 2d 208 (S.D.N.Y. 2001).....49, 51, 52, 54

I.P. Lund Trading ApS v. Kohler Co.,
163 F.3d 27 (1st Cir. 1998).....40, 43, 57

ImOn, Inc. v. ImaginOn, Inc.,
90 F. Supp. 2d 345 (S.D.N.Y. 2000).....68

Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing,
103 F.3d 196 (1st Cir. 1996).....57, 58, 61

Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc.,
925 F.2d 6 (1st Cir. 1991) .....75

J. Kohnstam, Ltd. v. Louis Marx & Co.,
280 F.2d 437 (C.C.P.A. 1960) .....52

Kadant, Inc. v. Seely Machine, Inc.,
244 F. Supp. 2d 19 (N.D.N.Y. 2003) .....72

King of the Mountain Sports, Inc. v. Chrysler Corp.,
968 F. Supp. 568, 574 (D. Colo. 1997), *aff'd* 185 F.3d 1084 (10th Cir. 1999) .....63

King-Seeley Thermos Co. v. Alladin Indus., Inc.,
321 F.2d 577 (2d Cir. 1963) .....54

Labrador Software, Inc. v. Lycos, Inc.,
32 F. Supp. 2d 31 (D. Mass. 1999) .....42

Le Cordon Blue, S.A. v. BPC Publ., Ltd.,
327 F. Supp. 267 (S.D.N.Y. 1971) .....68

Leathersmith of London, Ltd. v. Alleyn,
695 F.2d 27 (1st Cir. 1982) .....57

Lever Bros. Co. v. Mattel, Inc.,
609 F. Supp. 1395 (S.D.N.Y. 1985) .....73

Litton Sys., Inc. v. Sundstrand Corp.,
750 F.2d 952 (Fed. Cir. 1984) .....73

M2 Software, Inc. v. Madacy Ent't,
421 F.3d 1073 (9th Cir. 2005) .....58

MacDonald v. Chicago Park Dist.,
132 F.3d 355 (7th Cir. 1997) .....75

Mattel, Inc. v. Azrak-Hamway Int'l, Inc.,
724 F.2d 357 (2nd Cir. 1983) .....45

Mead Johnson & Co. v. Abbott Labs.,
201 F.3d 883 (7th Cir. 2000) .....76

Mego Corp. v. Mattel, Inc.,
203 U.S.P.Q. (BNA) 377 (S.D.N.Y. 1978) .....72

Miller Brewing Co. v. Falstaff Brewing Corp.,
655 F.2d 5 (1st Cir. 1981) .....49, 50

Miller Brewing Co. v. G. Heileman Brewing Co.,
561 F.2d 75 (7th Cir. 1977) .....52

Nabisco, Inc. v. PF Brands, Inc.,
50 F. Supp. 2d 188 (S.D.N.Y. 1999) .....73

National Nonwovens, Inc. v. Cons. Prods. Enterprs., Inc.,
397 F. Supp. 2d 245 (D. Mass. 2005) ....48, 49, 51, 52

Orient Express Trading Co., Ltd. v. Fed. Dept. Stores, Inc.,
842 F.2d 650 (2nd Cir. 1988)....78

Original Appalachian Artworks, Inc. v. Blue Box Factory Ltd.,
577 F. Supp. 625 (S.D.N.Y. 1983) ....62

Orson, Inc. v. Miramax Film Corp.,
836 F. Supp. 309 (E.D. Pa. 1993) (50-day delay)....68

Paco Sport, Ltd. v. Paco Rabanne Parfums,
86 F. Supp. 2d 305 (S.D.N.Y. 2004)....47

Pignons S. A. v. Polaroid Corp.,
657 F.2d 482 (1st Cir. 1981)....57, 58, 60, 61, 62, 64

Profitness Physical Ther. v. Pro-Fit Orthopedic,
314 F.3d 62 (2nd Cir. 2002)....68

Programmed Tax Sys., Inc. v. Raytheon Co.,
419 F. Supp. 1251 (S.D.N.Y. 1976)....68

Public Serv. Co. of N.H. v. West Newbury,
835 F.2d 380 (1st Cir. 1987) ....71

Railroad Salvage Of Conn., v. Railroad Salvage,
561 F. Supp. 1014 (D.R.I. 1983)....39

In re Redken,
170 U.S.P.Q. (BNA) 526 (TTAB 1971) ....45

Retail Servs. Inc. v. Freebies Publ'g,
364 F.3d 535 (4th Cir. 2004) ....49

In re Richards-Wilcox Mfg. Co.,
181 U.S.P.Q. (BNA) 735 (Comm'r of Patents 1974)....47

S.S. Kresge Co. v. United Factory Outlet, Inc.,
598 F.2d 694 (1st Cir. 1979)....40, 48, 51, 52, 53

Sally Beauty Co., Inc. v. Beautyco, Inc.,
304 F.3d 964 (10th Cir. 2002) ....58

Singer Mfg. Co. v. Briley,
207 F.2d 519 (5th Cir. 1953) ....49, 50

Stop & Shop Supermarket Co. v. Big Y Foods, Inc.,
943 F. Supp. 120 (D. Mass. 1996) ....58

The American Automobile Assn. v. AAA Automobile Club of Queens,
No. 97 CV 1180 SJ, 1999 WL 97918 (E.D.N.Y. Feb. 8, 1999) ....65

The Beacon Mutual Ins. v. OneBeacon Ins. Co.,
376 F. Supp. 2d 251 (D.R.I. 2005)....................................39, 40, 41, 42, 43, 44, 57, 61, 62, 63

The Murphy Door Bed Co., Inc. v. Inter. Sleep Systems, Inc.,
874 F.2d 95 (2nd Cir. 1989)..........................................................................49, 52, 54

Time, Inc. v. Petersen Publ'g Co. L.L.C.,
173 F.3d 113 (2d Cir. 1999)..........................................................................48

Tough Traveler, Ltd. v. Outbound Prods.,
60 F.3d 964 (2nd Cir. 1995)..........................................................................67

Trustco Bank Nat'l Ass'n v. Glens Falls Nat'l Bank and Trust Co., N.A.,
903 F. Supp. 335 (N.D.N.Y. 1995)..........................................................................74

Two Pesos, Inc. v. Taco Cabana, Inc.,
505 U.S. 763, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992)..........................................39

Uncas Mfg. Co. v. Clark & Coombs Co.,
200 F. Supp. 831 (D.R.I. 1962)..........................................................................47

Uno's Pizza, Inc. v. Pizzeria Uno Corp.,
722 F. Supp. 971 (W.D.N.Y. 1989)..........................................................................74

WCVB-TV v. Boston Athletic Assn.,
926 F.2d 42 (1st Cir. 1999)..........................................................................64, 77

Wine and Spirits Retailers, Inc. v. Rhode Island,
418 F.3d 36 (1st Cir. 2005)..........................................................................72

## Statutes

15 U.S.C. § 1056..........................................................................30

15 U.S.C. § 1057(e)..........................................................................47

15 U.S.C. § 1064..........................................................................51

15 U.S.C. § 1114..........................................................................1

15 U.S.C. § 1115(b)..........................................................................47

15 U.S.C. § 1117(a)..........................................................................78

15 U.S.C. § 1125(a)..........................................................................1

15 U.S.C. § 1127..........................................................................47, 51

28 U.S.C. § 1927..........................................................................78

## Rules

37 C.F.R. § 2.173(a)........................................................................................................47

Fed. R. Evid. 201 ..............................................................................................20, 21, 28, 30

Fed. R. Evid. 1006 ..............................................................................................................20, 21

## Other

Trademark Manual of Examining Procedure § 1213..............................................................30, 47

# I. FINDINGS OF FACT.[1]

## A. Procedural Background.

1. On May 26, 2006, Plaintiff and Counterclaim-Defendant Hasbro, Inc. ("**Hasbro**") filed its COMPLAINT against Defendant and Counterclaimant MGA Entertainment, Inc. ("**MGA**"), alleging two claims: (1) federal trademark infringement [15 U.S.C. §§ 1114, 1125(a)]; and (2) common law trademark infringement and unfair competition. [Docket No. 1.]

2. On June 20, 2006, MGA counterclaimed, seeking declaratory relief of non-infringement, invalidity and unenforceability of Hasbro's purported mark, and cancellation of Hasbro's registrations. [Docket No. 6.]

3. On June 29, 2006, Hasbro filed its MOTION FOR A PRELIMINARY INJUNCTION, RECALL, AND FOR EXPEDITED DISCOVERY ("**Motion**"), [Docket No. 13] which MGA opposed. [Docket No. 24.]

4. On October 23, 24 and 25, November 16 and 17, and December 12, 2006, the Court held an evidentiary hearing on the Motion. [*See* Docket.]

---

[1] References to "DX" and "PX" are to Defendant and Counterclaimant MGA's and Plaintiff and Counterclaim-Defendant Hasbro's Exhibits, respectively.

Testimony from the evidentiary hearing is identified by the witness testifying, volume of the transcript, and the page and line numbers (*e.g.*, Disner Testimony, Vol. 5 at 5:6, which is the testimony of Dr. Disner in Volume 5 of the hearing transcript at page 5, line 6).

Citations to declarations submitted in support of MGA's OPPOSITION to preliminary injunction are identified as "[name] Opp. Decl." followed by the corresponding Docket number and filing date. Citations to exhibits submitted in support of MGA's OPPOSITION to preliminary injunction are identified as "Opp. Ex. No." followed by the corresponding Docket number and filing date.

References to "App." refer to APPENDICES 1-11, which are graphic images submitted by MGA to illustrate some of the relevant evidence submitted to this Court.

References to "Depo. Desig." are to MGA's deposition designations, which were submitted to the Court on November 17, 2006, along with both parties' deposition designations, objections thereto, counter-designations, and objections thereto. See Argument, Hearing Transcript,Vol. 6 at 93:20-94:14.

**B. Hasbro's Claims.**

5. Hasbro accuses MGA of trademark infringement because in 2005 MGA launched a Spider-Man & Friends "Memory Match-Up" game. Although Hasbro has two trademark registrations for the word "Memory" for its game—(1) a 1967 logo containing the *single* word "memory" in a particular stylized design, and (2) a 2004 word mark consisting only of the *single* word "memory"—they are *expressly limited* to equipment for a *card*-matching game (the 1967 design registration), and a *card*-matching game (the 2004 registration). [*See* Section (I)E, *infra*.]

6. MGA's game, the name of which is a *composite* phrase—"3-D Memory Match-Up" (formerly "Memory Match-Up")—is *not* a card-matching game and it does *not* use cards at all, but, rather, contains 10 three-dimensional, molded plastic Marvel comic book superhero characters who can be separated into two parts—a head and torso half and a feet and legs half. [*See* Section (I)D, *infra*.]

7. Hasbro also takes offense at text that had appeared on an MGA web page at one time that described MGA's Spider-Man & Friends game as a 3-D version of the "Classic Memory Matching Game," which Hasbro asserts was a clear reference to Hasbro's game. MGA denies this, stating that MGA's text referred to the traditional card-matching game using a 52-card deck described below, *see* Paragraph 8, *infra*, that children all over have played for ages. [Anderson Opp. Decl., Docket No. 28, filed July 17, 2006.]

**C. The Classic Card-Matching Memory Game.**

8. Many people have played one or more of the children's card games *Go Fish*, *Snap*, *Old Maid*, *Memory* (also known as *Concentration*) or *Crazy Eights*, when young. Of those, *Memory* involved a simple game that tested memory and observation skills, using a standard deck of 52 playing cards which were spread out face down. The first player turned over

two cards, hoping for a matching number or face card pair. If they did not match, they were returned to the table face down. Everyone tried to remember the faces of the over-turned cards and where they were. The next player then turned over two cards to try to find a pair. The game continued until all pairs were found. That simple card game known as *Memory* was played for years *before* Hasbro, in 1966, started marketing a card-matching game it called "Memory", and long before it, in 1966, claimed trademark rights in a stylized design mark comprising that name.

9. This card game is defined in books about card and children's games and in dictionaries, both before 1966 and up to the present, including in books by admitted authorities in the area. [*See* Section (I)L.1., *infra*.] Hasbro did not invent the card-matching memory game.[2] It has been around since long before Hasbro started selling a so-called "Memory" card-matching game in 1966. Hasbro's own witnesses admitted that use of "memory cards" in a game predates Hasbro's first use in 1966. Hasbro's expert admits that Concentration or Memory are good memory exercises. [Whitehill Testimony, Vol. 2 at 55:1-3, 76:15-77:18, 80:21-81:1, 86:21-87:25, 92:2-101:7, 101:21-102:11, 104:8-107:5; Taft Testimony, Vol. 3 at 94:9-100:18, 102:7-15; Werner Testimony, Vol. III at 187:2-11; Shapiro Testimony, Vol. 4 at 41:7-42:4; Keossian Testimony, Vol. 5 at 126:10-19; Lumabao Testimony, Vol. 5 at 179:21-180:8; Disner Testimony, Vol. 5 at 19:3-6, 19:19-20:1, 20:11-25, 24:6; Exhibits DX Z.7, DX A.1-DX A.43, DX BB.2, DX FF, and DX GG.]

---

[2] Hasbro's reliance on a book by Scarne [PX 127A] that did not have "memory" in it is misplaced, as it is *not* a card game book for children's games. Consistent with this, another book by Scarne [DX A.5] that *does* have children's games in it includes the "memory" game. [Whitehill Testimony, Vol. 2 at 82:25-88:16.] In fact, "memory" is also included in the book by Parlett [PX 128], which Hasbro cited. [Whitehill Testimony, Vol. 2 at 89:10-92:1.]

**D. MGA's Spider-Man & Friends "3-D Memory Match-Up" Three-Dimensional, Molded Plastic, Marvel Superhero Character Game.**

10. MGA came up with the idea of doing a three-dimensional version of the memory game that would give children the tactile sense of playing with small figures, instead of cards. The idea for this game was based on memory games that MGA's chief designer, Mr. Caspi, played as a child in Israel. [Werner Testimony, Vol. 3 at 180:12-184:12; Lumabao Testimony, Vol. 5 at 181:11-182:6; Caspi Testimony, Vol. 4 at 145:4-9; DX L.1(physical sample of MGA's SPIDER-MAN & FRIENDS—MAKE A HERO MATCH 3-D MEMORY MATCH UP game).]

11. MGA's idea became the Spider-Man & Friends 3-D, molded plastic game it formerly called "Memory Match-Up", and now calls "3-D Memory Match-Up".[3] The product's name is purely descriptive of what it is—a 3-D game that tests one's memory to match up two parts of different 3-D characters. [Werner Testimony, Vol. 3 at 180:12-184:12; Caspi Testimony, Vol. 4 at 153:17-21, 166:3-10; Lumabao Testimony, Vol. 5 at 201:18-202:9; DX L.1.] Initially, a ™ symbol next to the "UP" in the composite "MEMORY MATCH-UP" name on the earlier units was placed on the packaging in Hong Kong, and MGA employees involved in the creation of the product did not notice it. [Keossian Testimony, Vol. 5 at 151:17-152:3; Lumabao Testimony, Vol. 6 at 41:9-42:8.] As soon as Hasbro complained about it, MGA removed it. [Keossian Testimony, Vol. 5, 151:17-21.] MGA did so in good faith without acknowledging any liability for its prior inclusion of ™, given that it seemed to be a minor concession to preclude litigation. [DX LL.19].

[3] MGA used the name "Memory Match-Up" until relatively recently. After Hasbro complained about MGA's use of "memory," MGA searched to confirm that there were numerous third-party uses of "memory" with matching games. As shown in detail below, it found many, but *no* three-dimensional matching games like MGA's. In order to further distinguish its game from all these other uses, most for card-matching games, and to further describe the nature of its product, MGA made a "running change" to its product name, now called "3-D Memory Match-Up". [DX L.1]

12. "Spider-Man & Friends" are younger versions of adult superhero characters Marvel licensed to MGA in June 2005 on a non-exclusive basis for certain product categories. The Spider-Man & Friends name, logo, images and licensed characters dominate the MGA game and its packaging. [Apps. 6 and 9B hereto; Keossian Testimony, Vol. 5 at 123:19-125:23, 129:8-134:20, 136:6-13, 136:21-23; Shapiro Testimony, Vol. 4 at 72:7-73:10, 75:5-77:20; Caspi Testimony, Vol. 4 at 150:18-151:1; Lumabao Testimony, Vol. 5 at 176:16-25, 182:4-6.]

13. There are *no cards* involved in the MGA game; it is *not* a card-matching game. The unique game comes in an eye-catching red plastic carrying case, which doubles as the game-play surface. Its 10 molded plastic characters come in two different halves that snap together (a top half and a bottom half). The top and bottom halves of the figures are placed on the game board, and 20 plastic cups are placed over each "half" to hide them from view. Players take turns picking up two cups at a time to try to find a top half that matches up with a bottom half of a character. Upon finding two halves that go together, the player assembles them and tries to find other matching halves. [Apps. 6 and 9B hereto; Werner Testimony, Vol. 3 at 180:12-185:8, 187:19-24; Shapiro Testimony, Vol. 4 at 73:11-75:4, 116:14-18; Caspi Testimony, Vol. 4 at 151:8-22, 154:1-12; Keossian Testimony, Vol. 5 at 135:24-136:13, 136:21-23; Lumabao Testimony, Vol. 5 at 178:5-179:15, 181:11-182:6; DX L.1.] Another version of the game can be played by replacing the cups on the board once matching character halves have been found and removed, so players also have to remember where now-empty cups are located on the game-play surface. This type of advanced game-play is not possible with Hasbro's two-dimensional card-matching game. [Shapiro Testimony, Vol. 4 at 74:10-75:4.]

14. MGA's distinctive packaging includes its house mark, in-use photos showing children playing the game, and copy and graphics emphasizing the three-dimensional

nature of the game. [Apps. 6 and 9B hereto; DX L.1, DX L.2 (physical samples of MGA's game).]

15. In order to promote brand consistency, Marvel imposes very strict guidelines concerning character appearance, packaging, copy, colors and layout through a *Style Guide* all licensees must follow. Almost everything on MGA's packaging, including the layout, art, typographic font, colors and character modeling, is required by Marvel's *Style Guide*. [Keossian Testimony, Vol. 5 at 125:3-23, 127:19-130:13, 131:4-134:20; Caspi Decl. ¶ 12; Werner Decl. ¶¶ 10-13; Zimmer ¶¶ 4-7; Lumabao Decl. ¶ 10; DX X.48, DX X.54, DX X.55 (Marvel Style Guide and docs), L.1.]

16. After ensuring that MGA met those standards, Marvel approved MGA's product for sale. [Lumabao Testimony, Vol. 5 at 186:5-197:22, 199:6-15, 200:13-201:17; DX DX X.33, DX X.42, DX NN.1 (Marvel approval forms).] MGA's "Memory Match-Up" game first appeared on store shelves in December 2005, and on MGA's website on February 10, 2006. [Lumabao Testimony, Vol. 5 at 177:1-7.] It is sold at large national retailers like Wal-Mart and Target, as well as smaller retailers. [Lumabao Testimony, Vol. 5 at 177:10-22.]

17. Due to the nature of the game (featuring Marvel comic book superhero characters and requiring sufficient motor and conceptual development to assemble different halves of 3-D characters), it is primarily targeted to older children, but also is designed to appeal to fans, including parents, of Marvel's "Spider-Man & Friends" characters. [Werner Testimony, Vol. 3 at 187:12-18.]

18. MGA has not advertised the game, except in a promotional manner on its website's Products page for the game and on the game packaging itself. [Lumabao Testimony, Vol. 6 at 9:14-10:3, 13:9-14.]

### E. Hasbro's Card-Matching Memory Games And Purported Trademark.

19. Hasbro asserts two trademarks: (1) a 1967 U.S. Patent and Trademark Office ("**USPTO**") registration (No. 834,282) for the single word "Memory" in a particular stylized design, for use *only* with "*equipment comprising cards with many matching pairs of designs for playing a matching card game*" [PX 5]; and (2) a 2004 USPTO registration (No. 2,894,970) for the word "Memory" for use *only* with "*card matching games*." [PX 6] Thus, Hasbro's only "Memory"-related registrations are expressly limited to *card-matching games*.[4] Since 1993, the only version of a game called "Memory" that Hasbro has sold is a card-matching game. [Stark Testimony, Vol. 1 at 126:17-20.]

20. Hasbro asserts that its 1967 stylized design registration is incontestable, but that design is no longer in use and has not been used by Hasbro since at least 1987. *None* of Hasbro's games-- whether those it has shown this Court, *or* those that were found by MGA in the marketplace or on Hasbro's website--use the 1967 design. [*See* Apps. 12, 3, 5, 7, 9 and 10 hereto.] In fact, when Hasbro renewed its registration in 1987, it submitted a specimen showing a *materially altered* design, in a *different* font than that shown in the 1967 stylized deign mark registration, thereby *conceding* that the particular registered design was no longer in use. [*See* Apps. 1, 2 and 3.] Hasbro admits that it no longer uses the stylized design shown in its 1967 registration. The font changed in 1978 and again in 1991. [Taft Testimony, Vol. 4 at 91:12-16, 93:12-94:1.] The incontestability status of the 1967 registration attached in 1972 and covered the 1967 design only. The stylized design Hasbro uses on products now is considerably different than *both* the 1967 and 1987 stylized designs. [*See* Apps. 12, 3, 5, 7, 9 and 10 hereto.] Consequently, the 1967 registration is inapplicable, and its alleged incontestability has no

---

[4] In case there were any doubt as to what Hasbro claims to own, it refers to its game as a *card*-matching game 13 times in its moving memorandum, and 8 times in its COMPLAINT.

bearing on this action. [Taft Testimony, Vol. 3 at 88:4-12, 91:12-25, 92:18-22; Vanasse Testimony, Vol. 3 at 93:17-94:1.]

21. Hasbro's "Memory" game is a *two*-dimensional *card*-matching game, like the game children have played since long before Hasbro started selling *its* game. [*See* App. 5 hereto.] In Hasbro's game, the first of multiple players places the cards face-down, and turns over two to see if there is a match between two identical cards. If no match is made, the cards are returned to a face-down position, with players all trying to remember what was on them. The next player turns over two cards and, testing his or her memory, tries to find a match. The game continues until all matching pairs are found. Hasbro calls this the "Memory" game. [Stark Testimony, Vol. 1 at 63:15-64:2; Whitehill Testimony, Vol. 2 at 77:7-21.] That is akin to Hasbro calling a blackjack card game "Blackjack" or "21", a poker game "Poker", or an *Old Maid* children's card game "Old Maid". These are all old, generic names for these games; they cannot function as trademarks, no matter how much money is poured into marketing them and no matter how long they are used.[5]

22. One of the key skills used in the game is recall or memory—players need to "remember" where certain cards are located. Recall is a synonym for memory. [Stark Testimony, Vol. 1 at 64:3-18, 120:21-121:22.]

23. Hasbro started selling themed versions of its "Memory" game, which feature licensed characters, including Dora the Explorer and now Spider-Man & Friends. [Stark

---

[5] In an apparent concession to the genericness of its alleged "Memory" mark, Hasbro has started to add the word "Brand" between "Memory" and "Game" on packaging. [*See, e.g.*, Apps. 9A and 10.] If "Memory" were truly distinctive by itself, Hasbro would not need to add "Game" and "Brand" to "Memory". By adding those elements, it concedes that "memory" is generic for this type of game. While the *design* aspects of the "Memory" design logo Hasbro uses today may, arguably, be a "brand" identifier, the word itself is not and cannot be. It is akin to aspirin pain reliever, rather than Charmin (brand) toilet tissue.

Testimony, Vol. 1 at 69:16-25; DX K.2, DX K.6, DX K.8, DX K.9, DX K.11 (physical samples of Hasbro memory games); Hambley Indiv. Depo. Desig. at 29:17-30:4.] Since their introduction, these themed versions of Hasbro's game have consistently outsold the "original" version of Hasbro's game that did not contain licensed characters and "themes". [PX 45 (2005 NPD sales data).]

24. Hasbro submitted evidence that it has sold millions of units—both themed and so-called "Original"—of its "Memory" game. [PX 148.]

25. Much of the evidence of advertising that Hasbro submitted is not focused on its "Memory" game. Instead, it appears that virtually all of Hasbro's recent advertising has been of categories or collections of multiple games, of which the "Memory" game was only one small part and in which it was not highlighted *or* noticeable unless one took the time to study the ad, in the case of the print advertising, or taped the ad and then did a "freeze-frame", in the case of its television commercial. [Stark Testimony, Vol. 1 at 81:8-14, 82:12-16, 87:12-88:18. 89:21-25, 91:23-92:10; PX 50-51 (the print ads run by Hasbro); PX 52 (the television commercial run by Hasbro).] Hasbro admitted that it has not advertised the "Memory" game on its own since the mid-1990s. [Stark Testimony, Vol. 2 at 19:9-12.]

26. Hasbro has not consistently advertised its "Memory" game. [*See* Hambley Indiv. Depo. Desig. at 68:4-6 (no advertising of Hasbro's "Memory" game between May 2006 and at least September 20, 2006).]

### F. Hasbro's Efforts To Interfere With MGA's Marvel License.

27. MGA's June 2005 *non-exclusive* license from Marvel gave it the right to create and distribute Marvel character products. [Lumabao Testimony, Vol. 5 at 176:18-25.] Six months *after* MGA got its license and *after MGA's "Memory Match-Up" game first appeared at retailers* in December 2005, Hasbro also secured a *non-exclusive* license from Marvel for Spider-

Man & Friends covering certain categories, including games, which was announced in January 2006. [Stark Testimony, Vol. 1 at 71:13-22; Stark Testimony, Vol. 2 at 27:4-7. Hasbro now offers a Spider-Man & Friends-themed "Memory" game. [App. 9A hereto; Stark Testimony, Vol. 1 at 71:23-72:4; Stark Testimony, Vol. 2 at 26:23-27:3, 33:7-10.] Because Hasbro, too, will have to follow Marvel's *Style Guide* in creating its game, including colors, character art and the Spider-Man & Friends logo, Hasbro's game will look similar in many respects to MGA's. [App. 9A hereto; Keossian Testimony, Vol. 5 at 125:3-23, 127:19-130:13, 131:4-134:20; DX X.48, DX X.54, DX X.55, DX L.1.] Both companies have a non-exclusive license, and Marvel clearly intended and expected the two different types of games to co-exist without confusion. *And they do*, just as Hasbro's game co-exists with *other* users of "Memory" for card-matching games that use the same licensed characters on their cards. By way of example, a Hasbro *Dora the Explorer*-themed "Memory" card-matching game co-exists with a *Dora the Explorer*-themed "Memory Match" card-matching game from Cardinal Industries. [App. 8; DX B.20, DX B.67, DX K.6.] The packaging looks similar, presumably because both licensees follow the same *Dora* style guidelines imposed by the *Dora* licensor, Viacom. Yet Hasbro co-exists with it, and apparently has not sued Cardinal.

28. As shown in detail below, the marketplace is full of *hundreds* of match-up games, based on the age-old "memory game" (played with a deck of cards), that bear or are marketed in connection with the word "memory". [*See* samples in Apps. 7, 8 and 11 hereto; DX B.1-DX B.179 (third party physical memory games); D.1-D.139 (printouts of third-party computer, Internet, or DVD memory games).] Yet, Hasbro has chosen to ignore them and attacks MGA's use, after Hasbro obtained its own license to the Marvel characters, which are very popular and the subject of numerous films, games and toys. [*See* Paragraph 28, *supra*, Section I(J), *infra*.] It was only after the success of MGA's game in the marketplace became

publicly known [Lumabao Testimony, Vol. 6 at 7:12-23, 8:7-9:13],[6] that Hasbro decided to try to turn its non-exclusive license into an exclusive one. With its motion, Hasbro is trying to use the trademark laws to force MGA's Spider-Man & Friends 3-D Memory Match-Up product out of the market, so Hasbro can introduce its Spider-Man & Friends game, all under the pretext that MGA's descriptive name "3-D Memory Match-Up" (formerly "Memory Match-Up") infringes Hasbro's rights.

### G. <u>Despite Side-by-Side Sales Since December 2005, No Instances Of Actual Confusion Have Arisen</u>.

29. Hasbro admits that it has experienced no instances of actual confusion between the parties' games, despite side-by-side sales in stores such as Target and Wal-Mart starting in December 2005. [DX MM.3, DX MM.6 (DVDs of memory games filmed by MGA in Target stores); Shapiro Testimony, Vol. 4 at 108:20-109:8; Lumabao Testimony, Vol. 5 at 177: 1-13; Stark Testimony, Vol. 1 at 79:23-80:1; 116:5-7 (no misdirected communications), Vol. 2 at 13:20-14:1 (no actual confusion and no misdirected phone calls or mail) ; Hambley Indiv. Depo. Desig. at 65:14-66:25 (no misdirected calls or mail).]

30. Consistent with that, MGA has not experienced any instances of actual confusion either, despite selling over a quarter of a million units of its game. [Lumabao Testimony, Vol. 6 at 7:12-23, 8:7-9:13, PX 45 (2005 NPD data).]

31. Given the distinct differences between the games, differences in the product names, how the product names are shown on the product and packaging, and the font used for the names, it is clear why there has been no actual confusion. [*See* Apps. 5, 6, 9A, 9B and 10 hereto.] The parties' games can coexist without confusion, especially given that there are

---

[6] Hasbro sent its demand to MGA in April 2006 right after national sales data was released showing that MGA's game had enjoyed a sharp spike in sales in March. [Lumabao Opp. Decl. ¶ 19, Docket No. 28, filed July 17, 2006.]

third-party memory games in the marketplace that are much closer in appearance, name and game play than the MGA game that Hasbro has accused of infringement. [*See* App. 11 hereto; Keossian Testimony, Vol. 5 at 136:14-139:9; Lumabao Testimony, Vol. 5 at 181:11-182:6; Lumabao Testimony, Vol. 6 at 35:11-12, 35: 17-36:1, 36:8-37:1; Shapiro Testimony, Vol. 4 at 81:1-19; Caspi Testimony, Vol. 4 at 154:21-25.]

### H. MGA's Lack Of Knowledge Of Alleged Protectability Of Hasbro's Game And Purported Exclusive Rights To MEMORY Mark.

32. MGA did not create or design its game with Hasbro's game in mind, nor were any of MGA's creators or designers even aware of Hasbro's game or purported mark. Hasbro has elicited no evidence of any wrongful intent by MGA in its selection and use of the name of its game.[7] Hasbro has provided no evidence of copying, or that any copying was intended. In fact, MGA's designers, as well as an employee involved in marketing the game, played a generic memory game with a standard deck of 52 playing cards when they were children. [Werner Testimony, Vol. 3 at 185:9-187:11; Caspi Testimony, Vol. 4 at 145:10-146:9, 146:15-147:5, 147:18-149:10, 154:13-14, 156:16-24; Keossian Testimony, Vol. 5 at 125:24-127:10, 139:22-140:7; Lumabao Testimony, Vol. 5 at 179:16-180:8, 185:5-13, 203:20-25; DX B.73- DX B.75 (Hebrew memory games played by Caspi as child in Israel).]

33. Immediately after Hasbro notified MGA of Hasbro's objection to MGA's game name, including MGA's use of a "TM" symbol after the word MATCH-UP and MGA's reference by MGA to a "Classic Memory Matching Game" on MGA's website, MGA

[7] Although MGA's trademark counsel conducted a clearance search for the name of MGA's game, MGA was required to withhold that opinion on privilege grounds during the injunction hearing to avoid waiver of privilege, given Hasbro's refusal to grant MGA a limited waiver to permit its counsel to testify. [*See, e.g.*, Lumabao Testimony, Vol. 6 at 21:2-22:15; Preliminary Argument, Vol. 4 at 24:11-25:1.]

immediately removed the "TM" symbol from its packaging as a running change and removed the reference on the website. [Keossian Testimony, Vol. 5 at 151:17-152:3, DX LL.19.]

**I. <u>Parents Are The Relevant Consumer For The Parties' Games, Particularly If Names Alone Are Being Considered</u>.**

34. Hasbro concedes that parents are the relevant consumer of the parties' games. [Stark Testimony, Vol. 1 at 65:1-21.]

35. Hasbro's game is meant for children three to five years of age. [Stark Testimony, Vol. 1 at 65:1-21, 121:23-122:1.]

36. Hasbro admits that the three to five-year-old end-users of its game do not read and therefore are not attracted to the word "memory" on Hasbro's game. [Stark Testimony, Vol. 1 at 122:2-8.] Given Hasbro's licensing of popular characters like Dora the Explorer [Stark Testimony, Vol. 1 at 122:12-22], which three to five-year-olds can see on the box, the three to five-year-olds are likely attracted to the themed characters, rather than the names appearing on the packaging, which they probably cannot read. [*See* DX K.6.]

**J. <u>Hasbro's Concession Of Non-infringement By Third-Party Uses Of "Memory"</u>.**

37. Hasbro admits that "if the word memory is being used in a descriptive sense," it does not violate its trademark. [Vanasse Testimony, Vol. 3 at 136:24-137:3, 139:8-9; Stark Testimony, Vol. 2 at 40:24-41:7.]

38. Hasbro admits that adding words to "memory" in a product name distinguishes them from Hasbro's mark and renders them non-infringing. [Vanasse Testimony, Vol. 3 at 139:10-140:17; Taft Testimony, Vol. 3 at 110:10-14, 113:2-8. *See also* Paragraph 41 *infra*.]

39. Hundreds of examples of games and toys with "memory" in the product name are in the marketplace. [*See* Paragraphs 59 and 68, *infra*.]

40. Hasbro actively monitors the actions of its competitors, including monitoring the press, retail shelves, third-party tracking studies, Trademark Office records and the Internet. [Stark Testimony, Vol. 1 at 107:12-25; Vanasse Testimony, Vol. 3 at 20:8-23, 22:11-14.]

41. Hasbro admits that the following companies are its competitors: Seko, Cranium, Mattel (which owns Fisher Price), and Sababa. [Stark Testimony, Vol. 1 at 112:2-8, 132:5-10.]

42. Hasbro has been aware of numerous third-party uses of games and toys that are in the marketplace with "memory" in the product name and, despite this knowledge, Hasbro has chosen not to pursue claims against these other companies. [Vanasse Testimony, Vol. 3 at 141:7-145:18; 147:22-154:17; DX B.5; DX B.15; DX B.17; DX B.147; DX B.161; DX B.160; DX B.169 (third-party physical memory games); DX E.12; DX E.13; DX E.14; DX E.16; DX E.25 (trademark registrations for third-party memory games with "memory" in the title/mark).] In *forty years*, Hasbro has filed *only one* other lawsuit to enforce its purported "memory" mark and *only one* currently stayed opposition proceeding[8] with the USPTO. [Vanasse Testimony, Vol. 3 at 49:4-50:1.] Hasbro has sent a small number of cease-and-desist letters, but many of the companies continue to offer the products about which Hasbro complained and Hasbro produced no evidence that it attempted to follow up with these companies. [*See, e.g,* DX V.33 (June 29, 2006 cease-and-desist letter to Briarpatch re "*I Spy Memory Game*" which is still on the market), *see http://briarpatch.com/product-page.asp?intID=5* (product available Feb. 5, 2007), PX 75 (July 16 2003 cease-and-desist letter

---

[8] An opposition or cancellation proceeding is an administrative action within the USPTO to prevent a registration of a mark from issuing or to cancel an already issued registration. [Chapman Testimony, Vol. 5 at 157:6-12.]

to Perfect Present Picker re online "memory" game), DX GG (October 21, 2006 printout from <u>*www.presentpicker.com*</u> showing continued use of "memory"), PX 141 (June 26, 2006 cease-and-desist e-mail to Plumeus, Inc. re online "memory" game which is still online), *see* <u>*http://www.queendom.com/mindgames/mindstretching/memory-games/memory-game2/index.html*</u> (product available Feb. 5, 2007), PX 146 (June 29, 2006 cease-and-desist letter to Creative Toys USA re "Math Memory" game which is still on the market), *see* <u>*http://www.teachersparadise.com/c/product_info.php/products_id/29157*</u> (product available Feb. 5, 2007), 147 (June 29, 2006 cease-and-desist letter to North-South Books re "*Milo's Magical Memory Game*" which is still on the market), *see* <u>*http://search.barnesandnoble.com/booksearch/isbninquiry.asp?r=1&ean=9780735817449*</u> (product available Feb. 5, 2007).] Indeed, *several* of these letters were apparently only sent *after* this action commenced. [DX V.33; PX 140, PX 141, PX 145-PX 147 (cease-and-desist letters sent June 29, 2006).] Hasbro also learned about a series of third-party trademark applications for use on card games and memory games, such as Mattel's application to register MATCHIN', MIXIN' MEMORY FUN!, which registered on July 11, 2006 for "*toys, games and playthings, namely, <u>board games, card games, equipment sold as a unit for playing a memory game</u>*" without any objection from Hasbro, but failed to send cease-and-desist letters or file opposition or cancellation proceedings. [Vanasse Testimony, Vol. 3 at 57:7-59:19, 119:5-132:17, 135:13-137:3; 139:8-145:19, 148:4-154:17; DX E.12-DX E.14, DX E.16, DX E.25, DX V.33, DX V.34, DX V.47, DX V.50, DX V.53, DX V.54, DX GG, DX JJ, DX KK.] For example, in 1993 Hasbro failed to oppose or seek cancellation of the trademark registration for MEMORYMAN" for "*games and playthings; namely, <u>board games</u> and action toy figures*". [Vanasse Testimony, Vol. 3 at 116:10-119:4, 167:6-18; DX V.56 (Hasbro's MEMORYMAN file), DX HH (registration details for MEMORYMAN mark).]

43. Enforcement of a mark that is at risk of becoming generic, if not generic already, would include sending three to five letters a week with significant follow up, rather than a small number of letters over forty years with virtually no follow up. [Shapiro Testimony, Vol. 4 at 51:13-52:1.] Hasbro's enforcement efforts are woefully deficient based on industry comparisons, and are evidenced by the large number of third-party users of "memory" for games. [Shapiro Testimony, Vol. 4 at 81:20-82:22.]

44. Hasbro previously successfully argued to the USPTO that its use of "Memory" could co-exist with "MEMORY LANE" for a card game, a composite name akin to that being used by MGA. [Taft Testimony, Vol. 3, 82:2-10, 109:18-25, PX 5 (Registration No. 834,282 file history).] In 1966, Hasbro (through its predecessor Milton Bradley, which Hasbro has acquired) applied to register its stylized "Memory" design mark in Class 28 for a "*card game with many pairs of designs on the cards having identical backs, wherein the players try to locate matching cards to make the most pairs*". [PX 5 at pp. 6, 9.] The Trademark Examiner *rejected* the application, stating: (1) Hasbro's unitary "Memory" application was likely to cause confusion with a pre-existing registration for the composite mark "Memory Lane" for "*apparatus for playing a card game*"; and (2) the specimen of use Hasbro submitted [PX 5] (a box for a card-matching memory game that stated "memory card matching game" and depicted the playing cards) showed that the word "Memory" *was merely descriptive*. [Apps. 1 and 2 hereto; PX 5 at p. 13.] The Examiner stated: "*The specimens in this case show the type [sic] game involved to be* ***a memory card matching game***." (*Id.*) The Examiner, therefore, recognized the mere descriptiveness or genericness of "Memory" for "*a memory card matching game*". (*Id.*) The Examiner then stated:

> "For such goods where the memory of the player is relied upon to locate matching cards the trademark, 'MEMORY', is held to be *merely descriptive* . . . and not subject to registration . . . . Applicant is advised that an identification of goods directed to a game is

> not acceptable because *it appears that the identifiable goods which bear the mark comprise the parts with which the game is played*."

(*Id.*) The Examiner required Hasbro to change its description of goods to: "*equipment comprising cards with many matching pairs of designs for playing a matching card game*", which Hasbro did. (*Id.*) Hasbro also came back and said the following:

> "Applicant's [Hasbro's] mark MEMORY is urged **not** to so resemble the cited mark MEMORY LANE as to be likely to cause confusion, or to cause mistake, or to deceive. The cited registration **differs** in appearance, sound and meaning from Applicant's mark; it is submitted that these differences are **significant** and dictate that the ordinary purchaser will **not be confused, deceived or mistaken** when he purchases the products of the parties." (Emphasis added.)

In other words, Hasbro expressly told the Trademark Office that its unitary "Memory" mark for *equipment for a card-matching game* could co-exist—*without confusion*—with the composite "Memory Lane" mark for *apparatus for playing a card game* because they looked and sounded different, and meant something different, presumably because of the addition of the word "Lane" in the pre-existing registration. (*Id.*) [Taft Testimony, Vol. 3 at 81:25-82:10, 105:15-110:14, 112:12-113:8.]

45. MGA's use of "memory" is consistent with the non-infringing uses of the term that Hasbro has recognized. Hasbro acknowledged in several letters to Mattel that descriptive use of "memory" was acceptable, as was composite use, as long as it did not conspicuously state "Memory Game", and that it was aware of numerous third party "memory" trademark registrations in Class 28, but distinguished them because of the additional words added to "memory":

> "*We recognize that where a game tests one's memory, the word 'memory' may be used in a descriptive sense to identify this fact*. However, your use of 'MEMORY GAME' transcends such descriptive use . . .."

[DX V.41 (Hasbro's "*Where's Waldo? Memory Game*" file containing 1991 and 1992 letters from Hasbro with this admission).]

> "We are aware that there are other registrations in Class 28 comprising the word MEMORY, or derivations thereof, as *a part of the mark*. However, *all of these are distinguishable from Milton Bradley's MEMORY registration because of the additional words included as part of the marks*. Certainly, *if Mattel were using the term MEMORY in combination with one or more other words*, similar to the manner in which the numerous registrations mentioned in your letter do so, *then Milton Bradley would not have made its claim of infringement* . . . ."

[*Id*.]

## K. The Record is Replete With Examples Of Hasbro's Own Generic Use Of "Memory" And "Memory Game".

### 1. Hasbro's Own Expert.

46. Hasbro's own expert's website refers to "Concentration" as "*an excellent memory game*." [Whitehill Testimony, Vol. 2 at 110:7-21; DX FF (printout from Whitehill's website of article written by Whitehill containing this statement) (emphasis added).]

### 2. On Games.

47. In the first version of its game, released in 1966, Hasbro uses "Memory Game" generically in the instructions for its game, and generically instructs players to "memorize" the cards. [App. 2 hereto.]

48. In Hasbro's Spider-Man and Friends and Go Diego Go "Memory brand" games, Hasbro uses "memory" descriptively (and not as a trademark) to promote that the game "develops concentration and *memory* skills." [Stark Testimony, Vol. 2 at 32:4-33:6, 33:11-34:3; PX 125A, PX 126A (physical samples of these games); App. 9A.]

49. In Hasbro's predecessor's, Milton Bradley, "*Shenanigans*" game from 1964, Hasbro depicts a "memory game" and uses those words in a generic sense on the cover of the game box. [App. 4 hereto; DX W.2 (physical sample of this game).]

50. In Hasbro's predecessor's, Milton Bradley, "*Deception the Memory Poker game*", it refers to "memory" generically in the tagline for the game. [DX W.1 (physical sample of this game); Stark Testimony, Vol. 2 at 28:10-28:9.]

**3. On Its Website.**

51. On its own website, Hasbro generically refers to each of its *Wheels on the Bus*, *Simon Trickster*, and *Simon Trickster* handheld games, as a "memory game," which Hasbro admits has no connection to its so-called Original Memory game or the themed versions of that game. [Stark Testimony, Vol. 2 at 27:14-32:3; DX T.2 (printouts from Hasbro's website, *www.Hasbro.com*, depicting Hasbro's use of the word "memory" to describe games).]

**4. In Its Patents.**

52. Hasbro referred generically to a "memory game" in its 2003 U.S. Patent No. 6,547,628, entitled "Electronic Learning Toy," without identifying "memory" as a trademark, as is required. [*See* Section 6, *infra*. *See also* Cooper Testimony, Vol. 6 at 61:19-63:6; DX Z.4, DX N.3 (certified copy of Hasbro's U.S. Patent No. 6,547,628, entitled "Electronic Learning Toy."), DX Z.4 (summary of U.S. patents related to Memory Games).]

53. There is a category of patents in the U.S. Patent Office called "memory or matching games; e.g., concentration subclass" (Class 273, subclass 273). [*See* Section 6, *infra*.] Hasbro owns two patents, 1999 U.S. Patent No. 5,906,369 and 2000 U.S. Patent No. 6,086,478, within this category. [Cooper Testimony, Vol. 6 at 55:24-57:14; DX Z.3 (FED. R. EVID. 1006 summary of U.S. Patents in Class 273/Subclass 273 (Memory or Matching Games, including Hasbro's patents, DX 0.35 and DX O.39).] The Court takes judicial notice of the underlying patents, which are government records, pursuant to FED. R. EVID. 201.

### 5. In Trademarks.

54. Hasbro's predecessor, Milton Bradley, owned a 1972 U.S. trademark registration (Reg. No. 936,549) for EYE WITNESS for "apparatus for playing a **memory**-type game." (Emphasis added.) The Court takes judicial notice of this trademark, which is a government record, pursuant to FED. R. EVID. 201.

55. Hasbro's predecessor, Milton Bradley, owned a 1973 U.S. trademark registration (Reg. No. 955,503) for PICK-PAIRS (Stylized) for "apparatus sold as a unit for playing a **memory**-type parlor game." (Emphasis added.) The Court takes judicial notice of this trademark, which is a government record, pursuant to FED. R. EVID. 201.

56. Hasbro owned a 1979 U.S. trademark application (Ser. No. 75/665,093) for TALKIN'ACHA for "hand held digital messaging units and **memory** cards for use therewith by children for recording and playing back conversations." (Emphasis added.) The Court takes judicial notice of this trademark application, which is a government record, pursuant to FED. R. EVID. 201.

## L. Extensive Third-Party Use Of "Memory" And "Memory Game".

### 1. Books, Dictionaries and Reference Materials Using "Memory" And "Memory Game".

57. "Memory" games are routinely found in reference books (*e.g.*, dictionaries, card- or game-related treatises and books, and encyclopedias) under entries that refer to the common, classic memory game where players match pairs of cards. [DX. A.1 through DX A.46 (copies from dictionaries, books and other reference materials discussing or defining classic memory game), DX Z.7 (FED. R. EVID. 1006 summary of all of the introduced books).] These references have no relation to Hasbro at all. In fact, several *predate* Hasbro's own alleged 1966 "first-use" date, making it clear that games under the name "memory" existed long before Hasbro launched its descriptive, if not also generically-titled, game. [DX A.1

(1956), DX A.2 (1964), DX A.20-DX A.30 (1946-1966), DX A.33 (1961), DX A.35 (1963), DX A.36 (1965), DX A.43 (1957); *see also* the DX Z.7 summary.] The following are samples of such reference materials:

- 1946: THE GAME BOOK identifies *Memory* as a generic type of card game and describing the game play as: "The first player turns up any card. He then turns up another card attempting to find a duplicate of the first card turned up. . . . If a card he turns up is a duplicate of the card some other player had turned bu and then turned face down, he tries to ***remember*** its location and turn it up." (emphasis added.) [DX A.27.]

- 1956: THE NEW COMPLETE HOYLE–THE OFFICIAL RULES OF ALL POPULAR GAMES OF SKILL AND CHANCE book CONCENTRATION (**MEMORY**, PELMANISM)" as a generic type of game under "Juvenile Games" and states that "[a]s its various names suggest, this game is an excellent exercise for the development of visual **memory**". [DX A.1.]

- 1961: THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE: THE UNABRIDGED EDITION provides the following definitions: *At p. 304*: "**con-cen-tra-tion** . . . **7.** Also called **memory**. *Cards*. a game for two or more players in which the pack is spread out face down on the table and each player in turn exposes two cards at a time and replaces them face down if they do not constitute a pair, the object being to take the most pairs by remembering the location of the cards previously exposed." *At p. 894*: "**mem-o-ry** . . . **12.** *Cards*. concentration (def. 7)." The same or virtually the same definition is found in previous and subsequent editions, including 1966 [DX A.28], 1987 [DX A.8], 2001 [DX A.39].

- 1963: WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED provides the following definitions: *At p. 469*: "**con-cen-tra-tion** . . . **5:** a card game for two or more players in which a pack of cards is laid out card by card face down and at random, the skill of the game consisting of remembering the position of such cards as are briefly turned up in play – called also *memory*". *At p. 1409*: "**mem·o·ry** . . . **5:** CONCENTRATION 5". The same or virtually the same definition is found in previous and subsequent editions, including 1961 [DX A.30], 1965 [DX A.36], and 1967 [DX A.37].

- 1964: THE NEW COMPLETE HOYLE book identifies "CONCENTRATION (**MEMORY**, PELMANISM)" in the same manner as WEBSTER'S. [DX A.2.]

- 1968: OFFICIAL RULES OF CARD GAMES book identifies "Concentration (**Memory**)" as a type of children's and family game. [DX A.3.]

- "Concentration/**Memory**–Card Game Rules" (*About.com* website). [DX A.19.]

- "Concentration or **Memory** is a card game of the Rummy family . . . ." (*Wikipedia.org*). [DX A.18.]

- THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (2d ed. 1987, unabridged): "**con·cen·tra·tion** . . . . 7. Also called **memory**. *Cards*: A game in which all 52 cards are spread face down on the table and each player in turn exposes two cards at a time and replaces them face down if they do not constitute a pair." "**mem·or·y** . . . . 13. *Cards*: concentration (def. 7)." [DX A.8.]

[*See* DX. A.1 through DX A.46.] The WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1966 edition) [DX A.37] and the RANDOM HOUSE UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE (1967 reprint of 1966 first edition) [DX A.28]—"the two . . . largest and most authoritative dictionaries"—both include definitions of "memory" as a card-matching game. [Disner Testimony, Vol. 5 at 16:14-16.] These dictionaries from 1966, when Hasbro alleges it first used its purported mark, offer "a snapshot of what American English speakers were doing at that time." Subsequent editions [DX A.37 (1967), DX A.8 (1987), DX A.39 (2001)] offer the same or virtually the same definition of memory. [Disner Testimony, Vol. 5 at 7:14-8:5, 8:21-9:6, 15:22-19:9, 19:19-25, 20:11-28:10, 28:17-40:9, 44:1-13, 45:25-48:13; DX A.1-DX A.43, DX Z.7.]

58. Numerous media sources, books and other materials refer to using a standard 52-card deck of cards to play the "memory game," without referring to Hasbro, its picture cards *or* its game. [*See* DX. A.1 through DX A.46, DX Z.7.] In fact, several of the references occurred before Hasbro alleges it first used its mark in 1966. The following are examples of pre-1966 references:

- 1956: THE NEW COMPLETE HOYLE book (Under the heading "Concentration (**Memory**, Pelmanism)": "A pack of 52 cards" is used for the classic memory game.
- 1964: THE NEW COMPLETE HOYLE book (same).

[DX. A.1, DX A.2.]

### 2. Third-Party Games' Use Of "Memory" And "Memory Game".

59. There are scores of examples of third-party physical games and toys that generically refer to "memory" and "memory games." [*See*, *e.g.*, Apps. 7, 8, 11 hereto; DX B.1-

DX B.179.] These include "*Sounds of the Seashore - The Magical Matching And Memory Game*" by Cranium, a significant competitor of Hasbro. [DX B.56.] Over 100 of these games that use "memory" in some fashion are card-matching games. [*See* Shapiro Testimony, Vol. 4 at 79:13-20; DX B.1-DX B.179.] Visits to various Target stores show widespread third-party use. [Stark Testimony, Vol. 1 at 131:7-12; Shapiro Testimony, Vol. 4 at 60:3-62:5, 66:25-67:3, 69:3-17, 79:13-20; Lumabao Testimony, Vol. 5 at 184:5-24; Lumabao Testimony, Vol. 6 at 4:15-5:2, 5:10-7:4, 35: 17-36:1, 36:8-37:1; Disner Testimony, Vol. 5 at 12:3-21, 40:13-41:18, 43:1-22, 48:14-49:21, 52:5-57:18; DX Z.8, DX MM.3 (video of visit to Target and Toys "R" Us stores in Porter Ranch, CA), DX MM.6 (video of visit to Target store in Seekonk, MA).] Despite all of these third-party memory games in the marketplace, Hasbro has encountered no instances of actual confusion between its game and any third-party games. [Stark Testimony, Vol. 2 at 13:20-14:1.]

60. Many of these third-party "memory" games are sold at Target (*e.g.*, DX B.1, DX B.7, DX B.16, DX B.21, DX B.24, DX B.27, DX B.50, DX B.56, DX B.105, DX B.126, DX B.135, DX B.166 and DX B.176), and Hasbro admits that games sold at one Target are typically sold at all Targets. [Stark Testimony, Vol. 1 at 119:6-15; *see also* Shapiro Testimony, Vol. 4 at 66:5-13 (at least 75% of products in one Target sold in other Target stores throughout the country (with regional differences attributable to climate, local pastimes, and other local interests)), 98:7-9.] Even Hasbro's own employees have found third-party memory games at Target. [Wiggins Testimony, Vol. 3 at 12:24-13:4.] Many of these games are available at other retailers as well. [Shapiro Testimony, Vol. 4 at 70:16-25, 95:5-96:7, 96:14-97:25; DX B.179.]

61. Several of these games are sold or manufactured by Hasbro's admitted competitors, such as Pressman, Cadaco, Great American Puzzle, International Playthings and

Leap Frog. [Stark Testimony, Vol. 1 at 138:12-13, 138:16-17, 140:13-15, 140:21-25, 141:25-142:3, 146:18-22.] Hasbro has not sent cease-and-desist letters regarding these games' names or filed suit against these competitors. Curiously, Hasbro identifies several of its competitors, who also market memory games, in a faulty survey it conducted. [Stark Testimony, Vol. 2 at 5:22-6:1; s*ee also* Section M, *infra*.]

62. Some of these third-party memory games have won the same awards that Hasbro has won or with which it is familiar. [Stark Testimony, Vol. 1 at 145:11-22.]

63. Also, several of the third-party memory games are included in sales data reports from NPD that Hasbro admits to reviewing at least annually. [Stark Testimony, Vol. 2 at 16:23-17:2.] The third parties listed in these sales reports include the *Noah's Ark Memory Game* from Cook Communications Ministries, which was introduced in *1997* and has had over $300,000 in estimated sales; the *I Spy Memory Game* from Briarpatch, which was introduced in *1996* and has had over $280,000 in sales; the Educational Game Company's *My First Memory* game, which was introduced in 1999 and has had over $190,000 in sales; another *I Spy Memory Game* from Briarpatch, which was introduced in 2000 and has had over $15,000 in sales; and the Briarpatch *Memory Game*, which was introduced in 2003. [Stark Testimony, Vol. 2 at 14:19-16:1; 16:8-20; PX 45.]

64. One of Hasbro's competitors, Cardinal Industries, sells a collection of Dora the Explorer games, including *Memory Match*, which is sold at Target. The *Memory Match* game is a card-matching game. [Caspi Testimony, Vol. 4 at 155:1-11; DX Z.8, DX B.67, DX B.20, DX B.176, App. 8 (Cardinal's Dora memory games).] Hasbro admits that the coloring (pinkish-red background) is the same for both Hasbro's and Cardinal Industries' Dora the Explorer games. [*See* App. 8 hereto; Stark Testimony, Vol. 1 at 125:8-11.] Hasbro's Vice President of Marketing admits that he has not asked Cardinal Industries to stop selling its Dora

the Explorer *Memory Match* game, nor is he aware of anyone at Hasbro who has done so. [Stark Testimony, Vol. 1 at 125:12-16.] As with MGA's game, Hasbro has produced no evidence of any actual confusion caused by Cardinal's game, despite the similarities.

65. Another of Hasbro's competitors, Briarpatch, sells a Spider-Man & Friends "*Matching and Memory Game*" for a card-matching game that looks similar to Hasbro's game and has similar game play. [App. 9C hereto; Stark Testimony, Vol. 1 at 132:23-134:2, 135:8-10, 138:9-11; DX B.177 (Briarpatch's Spider-Man & Friends memory game), PX 50.] As with MGA's game, Hasbro has produced no evidence of any actual confusion caused by Briarpatch's game, despite the similarities.

66. "Memory" is widely used in connection with adult content card-matching memory games, *not* affiliated with Hasbro. [*See* Opp. Ex. Nos. 7.1 through 7.15, Docket No. 26, filed July 17, 2006.]

### 3. <u>Internet And Computer Use Of "Memory" And "Memory Game"</u>.

67. A Google search for the word "memory" yields *933,000,000* results; for "memory" and "game," *143,000,000* results; for "memory game" as a phrase, *1,340,000* results; and for "memory game" plus "match," *332,000* results. [DX F.47 through DX F.50.]

68. "Memory" has been extremely widely used in connection with card-matching "memory games" played on the Internet, computers and DVDs that are not affiliated with Hasbro. [Disner Testimony, Vol. 5 at 41:21-42:9, 43:1-22, 48:14-49:21, 52:5-57:18; Shapiro Testimony, Vol. 4 at 59:5-60:2; DX D.1-D.139, DX II, DX JJ, DX KK.]

69. There are many media references to non-Hasbro "memory game" references in Internet sites and newspaper/periodical articles. In 1971, NBC aired a television game show called "*Memory Game*," also known as "*Joe Garagioloa's Memory Game*." [Disner

Testimony, Vol. 5 at 42:12-25, 43:1-22, 48:14-49:21, 52:5-57:18; DX F.1-DX F.51 (printouts of media references to non-Hasbro "memory game"), DX GG, DX FF.]

**4. Categories Of "Memory" And "Memory Game".**

70. Numerous stores or game directories, including those appearing online, have a generic category of games called "memory games," including the following:

- "Memory Games" category, All Star Puzzles website (*www.allstarpuzzles.com*)
- "Memory & Matching" category, Oompa Toys website (*www.oompa.com*)
- "Memory Match" category of games, CRpuzzles website (*www.crpuzzles.com*)
- "Matching & Memory" category, Amazon.com website (*www.amazon.com*)
- "Matching & Memory" category, ToysRUs.com website (*www.toysrus.com*)
- "Memory & Matching" category, MSN Shopping website (*shopping.msn.com*)
- "Learning + Memory" category, Target (*www.target.com*)

[*See*, *e.g.*, DX B.27w, DX B.79w, DX B.160w, DX D.15, DX D.72 (website printouts from these sites showing these categories).]

**5. Governmental Use Of "Memory" And "Memory Game".**

71. There are numerous memory games, referred to as such, available on the Internet, in use by the U.S. Government, including by the U.S. Treasury Department and U.S. Forest Service. [Shapiro Testimony, Vol. 4 at 57:22-58:4; DX D.82, DX D.84-DX D.93, DX D.95]

**6. Patents With "Memory" And "Memory Game".**

72. The USPTO has a category of patents called "memory or matching games; *e.g.*, concentration" (Class 273, subclass 273), which was created around 1978. Class names do not have trademarks in them; instead, the class is named with the common name for the category. Within subclass 273, there are 172 patents. [Cooper Testimony, Vol. 6 at 49:7-55:23; DX O.2 (copy of the USPTO's Class Definition for Class 273), DX Z.3 (summary of patents in Class 273/Subclass 273 (Memory or Matching Games)).]

73. There are 58 patents that use the phrase "memory game" in the text of the patent, not as a trademark but rather as the generic term for a matching style of game. The USPTO requires that certain language, font or symbols be used with words in patents acting as trademarks, but none of these are used with the appearance of "memory game" in any of hose 58 patents. [Cooper Testimony, Vol. 6 at 58:9-59:6, 60:19-63:6; DX Z.4 (summary of patents related to memory games).]

### 7. <u>Trademarks with "Memory" And "Memory Game"</u>.

74. The USPTO has a manual of the acceptable generic identification of goods and services, which provides guidance as to what identification will be acceptable. In the manual, there is an entry for "equipment sold as a unit for playing a **<u>memory game</u>**," which has been in the manual since 1994. [Chapman Testimony, Vol. 5 at 158:9-18, 160:19-161:12, 161:22-162:11, 165:14-21; DX R.1, DX R.1A (USPTO printouts showing this entry).]

75. The USPTO prohibits the inclusion of a trademark in the identification of goods and services in a trademark application or registration. There are 345 trademark applications and registrations with "memory" or "memory game" in the identification of goods and services. [Chapman Testimony, Vol. 5 at 158:22-160:8; DX R.2 (copy of Chapter 1400 of the USPTO's publicly available TRADEMARK MANUAL OF EXAMINING PROCEDURE), MGA Request For Judicial Notice Exhibit Nos. DX Q.1-DX Q.345, Docket No. 87, filed October 17, 2006.] The Court takes judicial notice of these trademark applications/registrations, which are government records, pursuant to FED. R. EVID. 201.

76. Hasbro's biggest competitor, Mattel, has over 70 trademark applications/registrations that include "memory game" in the goods. [Chapman Testimony, Vol. 5 at 162:12-20; MGA Request For Judicial Notice Exhibit Nos. DX Q.1-DX Q.345, Docket No.

87, filed October 17, 2006.] The Court takes judicial notice of these trademark applications/registrations, which are government records, pursuant to FED. R. EVID. 201.

77. There are numerous trademark registrations with MEMORY in the mark. [DX E.12-DX E.16, DX HH.]

78. There are numerous trademark applications and registrations for marks containing the word "memory," with which Hasbro is apparently co-existing without complaint, including 46 registrations and pending applications containing the word "memory" or "memories" in Class 28 (toys and sporting goods).[9] [*See* MGA Opposition, Exhibit 5.] The following are particularly pertinent U.S. references:

- **MATCHIN', MIXIN' MEMORY FUN!**: *Registered* by Mattel *on July 11, 2006* in Class 28 (the same as Hasbro) for "*card games*, equipment sold as a unit for playing *a memory game*". Mattel is using it on a children's card-matching memory game featuring the Koala Brothers and Miss Spider characters. [DX B.22, DX B.71.] The USPTO issued this registration after finding that it was not likely to cause confusion with any marks that were already registered (which would include Hasbro's two registrations in the same class, also for card games). *Hasbro never objected to this registration and now co-exists with it, presumably without confusion*. [DX E.12.]
- **MEMORY LANE**: *Registered* in September 2005 in Class 16 for arts and crafts kits to entertain people with diminished memory. The USPTO issued this registration after finding that it was not likely to cause confusion with any marks already registered (which would include Hasbro's). *Hasbro never objected to this registration and now co-exists with it, presumably without confusion*. [DX. E.14.]
- **MAKING MEMORIES TOGETHER**: *Registered* in January 2001 in Class 28 (the same as Hasbro) for use with playing board *games*. *Hasbro never objected to this registration and now co-exists with it, presumably without confusion*. [DX. E.16.]

[9] Of those, applications to register **MEMORY** LANE, **MEMORY** MATCH, **MEMORY**MAN, BIBLE **MEMORY** BUGS, BIBLE **MEMORY** BUDDY, BIBLE **MEMORY** BUDDIES, PAW PRINT **MEMORY** BEARS, EMOTION **MEMORY**, THANKS FOR THE **MEMORY**, FRAME A **MEMORY**, **MEMORY** GRIP, **MEMORY** BEARS, MUSCLE **MEMORY**, THANKS FOR THE **MEMORY**, **MEMORY** MADNESS, COLOR-ME **MEMORY** CRAYON, DYNAMIC **MEMORY**, MOVIE **MEMORY**, **MEMORY** MANIA, **MEMORY** DOLLS, **MEMORY**-GEL, SWING **MEMORY**, **MEMORY** LOK, **MEMORY** BANK, **MEMORY** FOAM BY CECILE, **MEMORY** PUTT, SWEET **MEMORY**, and **MEMORY** BALLS, were filed *before* Hasbro applied to register the unitary word **MEMORY** (which ultimately issued as Reg. No. 2,894,970) and proceeded to registration. [*See* MGA Opposition, Exhibit 5.] Applications to register **MEMORY** MATCHING MONKEYS and **MATCHIN'**, MIXIN' **MEMORY** FUN! were filed *after* Hasbro applied to register its purported mark and *all* proceeded to registration without objection from Hasbro. [*See* DX E.12-E.16, E.25.]

- **<u>MEMORY</u> MATCHING MONKEYS**: *Registered* in December 2005 in Class 28 (the same as Hasbro) for a matching game with a magnetic <u>*game*</u> board and pieces. *Hasbro never objected to this registration and now co-exists with it, presumably without confusion*. [DX. E.13.]

- **<u>MEMORY</u> MATCH**: *Registered* by AOL in December 2002 in Class 41 for online <u>*games*</u>. AOL is using it for a series of <u>*online versions of the classic card-matching memory game*</u>. *Hasbro never objected to this registration and now co-exists with it, presumably without confusion*. [DX. E.25.]

In the preceding examples, the USPTO examined its records—which necessarily included Hasbro's two registrations—and determined that these uses could co-exist with Hasbro's, *even for card-matching games* and *even in the same Hasbro registration class* (Class 28), <u>*without confusion*</u>. Despite Hasbro's contention that it monitors and pursues third-party game-related uses of "memory", including "monitoring trademark applications in the [USPTO]," Hasbro did *not* oppose *any* of these applications, *allowed all to go to registration*, and now co-exists with them, even though they are *all* for games or entertainment. If Hasbro decided it can co-exist with ***Memory*** *Match*, ***Memory*** *Matching Monkeys*, ***Memory*** *Lane*, *Making* ***Memories*** *Together*, and *Matchin', Mixin'* ***Memory*** *Fun!* amongst many others for card-matching games, other games and entertainment, it can *also* co-exist with MGA's use of the composite phrase *3-D Memory Match-Up* (formerly *Memory Match-Up*). [Vanasse Testimony Vol. 3 at 20:8-23, 22:9-25, 23:13-22, 48:19-23, 50:17-25, 51:14-23, 64:17-22, 118:9-25, 119:10-23, 120:20-121:12, 123:17-124:20, 128:14-129:1, 129-132, 141:15-142:12, 148:3-6, 149:1-6, 150:12-15.]

79. "Memory" has repeatedly been treated as descriptive by the USPTO.[10] Several applicants of "memory"-related marks have disclaimed exclusive use of the word "memory," except as part of a composite mark, because the word was deemed merely

---

[10] A disclaimer can be used where a portion of a mark is descriptive to make it clear that no claim is being made to that unregistrable component of the mark. 15 U.S.C. § 1056; TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1213.

descriptive.[11] Many applicants have had to make a Section 2(f) [15 U.S.C. § 1052(f)] showing of secondary meaning before they could register on the Principal Register because "memory" is descriptive.[12] Several applicants have sought registration on the Supplemental Register because "memory" is descriptive.[13]

### M. Hasbro's Defective Survey And Survey Expert Evidence.

80. Hasbro offered what it called an internal "survey" in an effort to show secondary meaning, but even Hasbro's survey expert admits that the Hasbro study does "not directly measure secondary meaning." Rather, the purpose of Hasbro's study was "to find out awareness of the games and not necessarily the awareness of the manufacturers." [DuPont Testimony, Vol. 2 at 133:11-16, 140:9-11, 141:17-19.] The study, therefore, asked for information from respondents who saw "Memory Card Game" or "Original Memory", without differentiating between Hasbro's game, a generic game (including the game played with a standard 52-card deck of playing cards) or a third-party game. Instead, it was an internal study looking at many Hasbro products, designed by Hasbro, conducted by Hasbro, and directed to persons in circumstances that may have indicated that the study was being done by Hasbro. It included the names of third-party manufacturers who produced their own "Memory"-named matching games, it asked respondents to consider generic terms for various games, and it asked respondents to consider the word "Memory" in lists of hundreds of other names, and then failed

---

[11] There are 274 live and dead applications and registrations for "memory"-related marks, where "memory" was disclaimed. [*See* Opp. Ex. Nos. 5.7, 5.8, 5.21, 5.25, 5.27, 5.38, 5.39, 5.40, 5.44-E.49, 5.57, Docket No. 26, filed July 17, 2006.] The Court takes judicial notice of these trademark applications/registrations, which are government records, pursuant to FED. R. EVID. 201.

[12] There are 21 live and dead applications and registrations for "memory"-related marks where the applicant was required to make a Section 2(f) showing. [*See generally* www.uspto.gov.]

[13] There are 47 live and dead applications and registrations for "memory"-related marks on the Supplemental Register. [*See* Opp. Ex. Nos. 5.9, 5.10, Docket No. 26, filed July 17, 2006.]

to determine just what the respondents had in mind when they stated they recognized the word. For example, Hasbro's survey asked respondents if they were aware of Fisher-Price (which makes its own memory game). [PX 59 (Hasbro's study), DX B.168 (Fisher-Price's *The Puzzle Place Memory Match Game*.] *Hasbro and its survey expert concede that respondents could have thought the survey referred to third-party games.* There was no control in the study presented to this Court that would allow one to conclude that a particular respondent, seeing the word "memory" in the questionnaire, had only Hasbro's game in mind, and not the memory card-matching game he or she might have played as a child or with children, or any of the myriad other "Memory"-named games in the marketplace produced by third parties. Also, the Hasbro study did nothing to factor out generic use. [Stark Testimony, Vol. 1 at 157:20-158:5; Stark Testimony, Vol. 2 at 9:4-12, 11:3-6, 12:16-22; DuPont Testimony, Vol. 2 at 133:6-24; 148:19-149:9; 158:21-160:2, 163:13-164:7, 165:18-167:21.]

81. Hasbro's survey expert's reliance on the survey evidence is highly suspect, as he did not conduct the study himself or bother to review the underlying data supporting the survey results, or ascertain the manner and methods used by those who conducted the surveys. [DuPont Testimony, Vol. 2 at 145:4-15.]

### N. <u>Hasbro's Misstatements To The USPTO</u>.

82. Hasbro misstated the facts to the USPTO during the prosecution of both of its registrations.

83. Hasbro failed to disclose that it is operating under a license from Ravensburger and, in submitting a specimen in connection with its 2004 registration, failed to include a specimen showing the part of Hasbro's packaging that disclosed that license. [*See* PX 6, PX 7 (Registration No. 2, 894,970 file history).]

84. Hasbro's SVP, Barry Nagler, submitted a declaration to the USPTO [*id*.] where he stated, under oath, that "he believes [Hasbro] to be the owner of the trademark/service mark sought to be registered", and that "*to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce*".

85. In light of the statements on Hasbro's packaging about the Ravensburger license *and* the overwhelming evidence (detailed above) of third-party use of "memory" with card-matching games predating Hasbro's first use, *both* statements appear to be false.

### O. Hasbro's Knowledge Of MGA's Use And Hasbro's Unreasonable Delay.

86. MGA's "Memory Match-Up" game first appeared on Target store shelves in December 2005, adjacent to Hasbro's products. [Lumabao Testimony, Vol. 5 at 177:1-5.] Hasbro kept silent.

87. Hasbro's Vice President of Marketing, Mark Stark, admits that he makes monthly visits to retail stores (including Target, one of Hasbro's biggest customers), during the first nine months of the year, and semi-monthly visits during the last quarter of the year. He also concedes that others at Hasbro regularly visit retail stores, including Target. [Stark Testimony, Vol. 1 at 117:21-25, 118:20-24. *See also* Mitchell Depo. Design., at 20:14-21:4 (admitted seeing MGA's Memory Match-Up game in January or February 2006).]

88. MGA's game has been listed on MGA's website's "Products" page since February 10, 2006. [Lumabao Testimony, Vol. 5 at 177:1-7.] Again Hasbro did not object.

89. Hasbro filed this action on May 26, 2006, and filed its MOTION on June 29, 2006. Hasbro contends that its delay from April to June is excused by purported settlement discussions. However, the correspondence between the parties shows that they did not even begin to contemplate "settlement discussions" until May 29, 2006. Most of their discussions then concerned whether the parties would engage in alternative dispute resolution and, if so,

how, and did not truly constitute settlement discussions. MGA proposed alternative dispute resolution on June 13, 2006, and Hasbro made a settlement offer on June 19, 2006. Thus, the parties were engaged in purported settlement discussions only from June 19, 2006 to June 29, 2006, when Hasbro filed its motion. Even if one were to interpret the term "settlement discussions" loosely, the parties were engaged in settlement discussions only from May 29, 2006 until June 29, 2006. [DX LL.1-DX LL.50 (correspondence between the parties).]

90. Hasbro did not file suit until five months after the product first started to be sold in the same stores as Hasbro's games have been sold, and almost a year after the product was seen by Hasbro games category managers at retail chains. [Docket No. 1. *See also* Mitchell Depo. Design., at 20:14-21:4 (admitted seeing MGA's Memory Match-Up game in January or February 2006).] Hasbro then delayed another month (until June 19) to file this MOTION. [Docket No. 13.]

**P. <u>Harm To The Parties</u>.**

**1. <u>Harm To MGA From Injunctive Relief</u>.**

91. An order enjoining MGA from selling its game would be devastating to MGA. MGA would lose shelf space at retailers, which it might not obtain later. This game is MGA's first entry into the preschool game category, so it does not have other products to put on that shelf space. Given that Hasbro is the dominant player in the industry, it is very likely that a Hasbro game would replace MGA's game on retailers' shelves. [Lumabao Testimony, Vol. 6 at 10:4-19; Caspi Testimony, Vol. 4 at 145:1-3.]

92. MGA would also suffer lost business opportunities and damage to reputation, as well as significant lost sales if it were forced to recall its Spider-Man & Friends game, especially due to its inherent association with the widely publicized *Spider-Man 3* movie

coming out in May 2007. [Lumabao Testimony, Vol. 6 at 10:20-11:6; *http://www.imdb.com/title/tt0413300/releaseinfo*.]

93. If MGA has to pull the game from retailer shelves, substantial resources would have to be redirected to the massive task of removing games from retailers (including Target and Wal-Mart) and distribution centers. That redirection of resources would prevent MGA from working on product development. MGA's investment in production, sales and marketing of the current product would also be lost. [Lumabao Testimony, Vol. 6 at 11:7-13.]

**2. <u>Any Injunction Would Require A Large Bond, But Hasbro Has Not Proffered One, Thereby Further Injuring MGA</u>.**

94. Because of Hasbro's unnecessary delay in seeking injunctive relief, MGA's product was on the shelves for seven (7) months before Hasbro filed its motion for injunction and has now been on the shelves for over a year. [*See* Lumabao Testimony, Vol. 5 at 177:1-7.]

95. MGA has committed large sums to creating and packaging thousands of units that are either currently in stores, in retailer distribution centers, or are ready to be shipped. [Lumabao Opp. Decl. ¶ 17, Docket No. 28, filed July 17, 2006.]

96. An injunction at this late date would require the removal of the thousands of units in stores and distribution centers, and result in lost sales and sales opportunities to MGA while Hasbro awaits final judgment. [Lumabao Testimony, Vol. 6 at 10:20-11:13.]

97. Recall would also result in the non-fulfillment of numerous contracts with retailers and would badly damage relations with retailers and Marvel as licensor. [Contrares Opp. Decl., Docket No. 28, filed July 17, 2006.]

98. MGA's monetary damages from an injunction would total hundreds of thousands of dollars, if not more. [*See* Caspi Opp. Decl. ¶ 14; Lumabao Opp. Decl. ¶ 17; Contreras Opp. Decl., Daniels Opp. Decl.; Ex. 8, Docket No. 28, filed July 17, 2006.]

99. Hasbro has never even offered to post a large bond, which would be required to address these considerable prospective losses.

**3. <u>Lack Of Harm To Hasbro From Maintaining The Status Quo</u>.**

100. As noted in Section I(G), *supra*, Hasbro has experienced no actual confusion despite side-by-side sales.

101. Hasbro provided sales data through 2005, but it failed to provide data for 2006 when the parties' products co-existed in the marketplace. Presumably, if the 2006 sales dropped from 2005 levels, Hasbro would have produced those figures. Because Hasbro failed to provide 2006 data, presumably the sales figures improved, showing that MGA did not, in fact, hurt Hasbro's sales. [*See also* Stark Testimony, Vol. 2 at 25:17-26:17.] Consistent with that finding, Hasbro cannot identify a single sale lost because of MGA's game. [Stark Testimony, Vol. 2 at 26:18-22.] MGA's games expert confirmed that MGA's game will not cannibalize Hasbro's game's sales. [Shapiro Testimony, Vol. 4 at 77:9-20.]

102. Hasbro admits that it cannot identify any missed licensing opportunities because of MGA's game. [Stark Testimony, Vol. 2 at 22:9-13, 22:23-23:1, 25:1-16.]

103. Hasbro admits that it has not had any inventors or licensors shy away from working with Hasbro because of MGA's game. In fact, it was able to license the game rights from Marvel *after* MGA launched its product. [*Id*.; Stark Testimony, Vol. 2 at 23:2-15.]

104. Hasbro claimed that an injunction was needed because otherwise there would be an influx of infringing and competing memory games, yet Hasbro testified that it is aware of only one other allegedly newly infringing game, *Smart Splash Memory Match Clams* [DX B.147], that has entered the market, despite MGA's game being on the market since December 2005. Hasbro admits, however, that nothing indicates that the one new game entered the market because of MGA's game. Moreover, numerous other third-party memory games

predate MGA's game and remain without objection by Hasbro. [Stark Testimony, Vol. 2 at 23:16-24:25.] There is no support for Hasbro's contention, and Hasbro has not demonstrated that it will suffer any injury by the denial of the preliminary injunction, which would maintain the status quo.

## II. CONCLUSIONS OF LAW.

105. The central dispute in this case is whether the public is likely to be confused by MGA's use of the phrase "3-D MEMORY MATCH-UP" on a three-dimensional character-matching game featuring the Marvel Spider-Man & Friends characters, in light of Hasbro's claimed trademark rights in the solitary word "Memory", which it uses as the name of a two-dimensional card-matching game. The evidence produced in the evidentiary hearing in this case shows that there is no likelihood of confusion—the core requirement for an infringement finding in any trademark case—arising from the parties' respective uses. Hasbro, as discussed in detail below, has failed to meet its burden that it is likely to prevail in such a finding.

106. But Hasbro has a more fundamental problem with its claims in this case. Even before Hasbro gets to a likelihood of confusion analysis, it must establish the fundamental "jurisdictional" requirement that allows it to assert a trademark claim—that Hasbro indeed owns a valid, protectable trademark that it then can assert against someone to substantiate an infringement claim. Hasbro cannot show that the purported marks that form the basis of its COMPLAINT against MGA—namely, a 1967 stylized design mark registration and a 2004 word mark registration, both of which are limited to a card-matching game—are valid, let alone infringed.

### A. Preliminary Injunction Standard.

107. "The granting of a preliminary injunction is an exercise of a very far reaching power, never to be indulged in *except* in a case clearly demanding it. The burden is on

the plaintiff to establish a clear right to temporary injunctive relief." *Flex-Let Corp. v. Curran*, 111 F. Supp. 536, 537 (D.R.I. 1953) (emphasis added). *See also Berlent v. Focus Features, LLC*, No. 06 Civ. 28342006, WL 1594478, at *2 (S.D.N.Y. June 8, 2006).

108. This Circuit weighs four factors in deciding whether to grant a preliminary injunction: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm to the movant if the injunction is denied; (3) the balance of relevant impositions, *i.e.*, the hardship to the nonmovant if enjoined, contrasted with the hardship to the movant if not enjoined; and (4) the effect (if any) of the court's ruling on the public interest. The party seeking the preliminary injunction bears the burden of establishing that these factors weigh in its favor." *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (citations omitted). Having sought preliminary injunctive relief, Hasbro bears the burden of establishing each of these four factors in its favor.

109. "None of these criteria should be slighted." *Garnier v. Andin Int'l*, 844 F. Supp. 89, 98 (D.R.I. 1994). "A failure . . . to meet any [of these] requires a denial of the motion." *Figueroa v. Wall*, No. C.A.05 415 T, 2006 WL 898166, at *2 (D.R.I. Mar. 14, 2006). This Court concludes that Hasbro has not met its burden of showing entitlement to a preliminary injunction and, therefore, denies Hasbro's motion.

### B. <u>Hasbro Is Not Likely To Prevail On The Merits</u>.

110. "'The *sine qua non* of [the] four-part [injunction] inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of curiosity.'" *Esso*, 445 F.3d at 18.

111. At the core of each of Hasbro's claims in this action is its claim to exclusive ownership of trademark rights in the word "memory" for use as the name of a matching game. In order to establish a likelihood of success on the merits of such a claim,

Hasbro must show ownership of a protected mark, and the use of the same or a confusingly similar mark by MGA in commerce that is likely to cause confusion as to the source of goods. *See Commerce Natl Ins. Ser. v. Commerce Ins. Agcy.*, 214 F.3d 432, 437 (3rd Cir. 2000); *Bay State Savings Bank v. Baystate Financial Services, LLC*, 338 F. Supp. 2d 181, 187 (D. Mass. 2004); *Railroad Salvage Of Conn., v. Railroad Salvage*, 561 F. Supp. 1014, 1019 (D.R.I. 1983). Because Hasbro is not likely to succeed in making that showing, it is not entitled to preliminary injunctive relief.

### 1. Hasbro Is Not Likely To Prevail On The Merits Because It Has Failed To Establish That It Owns A Valid, Protectable Mark.

112. A prerequisite to a federal infringement claim is a valid, protectable trademark, which Hasbro lacks. To be protectable, a trademark must either be inherently distinctive *or* have acquired secondary meaning, if descriptive. *The Beacon Mutual Ins. v. OneBeacon Ins. Co.*, 376 F. Supp. 2d 251, 255 (D.R.I. 2005) (on remand). *See also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769-70, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992). The trademarks claimed by Hasbro are invalid and not protectable for three reasons, discussed in further detail below.

113. *First*, the word "memory" is not inherently distinctive—it is not arbitrary, fanciful, or suggestive when applied to a card-matching game that requires the player to use his or her *memory* in order to *remember* where matching pairs of cards lie. *Beacon*, 376 F. Supp. 2d at 255. The word "memory" instead is merely descriptive of the game at best. It describes a "memory" card-matching game as well as a characteristic of the game—namely, using one's memory to recall where matching cards are located. But descriptive words are not inherently distinctive and cannot function as trademarks unless they have acquired secondary meaning sufficient to identify the source of the goods with which the word is used. *Id*. *Hasbro has not met its burden of establishing that "Memory" has acquired sufficient secondary meaning to*

*identify Hasbro, and only Hasbro, as the source of "memory" games*. It submitted no proper, objective, methodologically valid survey or other probative evidence showing that an appreciable number of consumers, when presented with the word "memory," think of Hasbro as the only source of the products marketed under that name. As a result, Hasbro's purported "Memory" mark and its two "Memory" registrations are invalid and unprotectable.

114. *Second*, one of the trademark registrations Hasbro relies on in this action (Reg. No. 834,282, issued to its predecessor Milton Bradley in 1967) is for a particular stylized design for the word "Memory" [*see* App. 1 hereto, PX 5]:

memory

But Hasbro admits that it has long ceased all use of that particular stylized design. Therefore, that mark has been abandoned by Hasbro and is not protectable.

115. *Third*, in addition to being merely descriptive when applied to the classic card-matching game being marketed by Hasbro, the word "memory" is generic as it is the actual, commonly used name of the classic card-matching game, just as poker, old maid, blackjack, and go fish are generic terms for those games. Generic words are never protectable because they can never function as trademarks. *I.P. Lund Trading ApS v. Kohler Co*., 163 F.3d 27, 39 (1st Cir. 1998); *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979); *Beacon*, 376 F. Supp. 2d at 255.

116. Without a valid, protectable mark, all of Hasbro's claims fail.

**a. <u>Hasbro's alleged mark is invalid because it is, at best, descriptive, without secondary meaning</u>.**

**(1) <u>"Memory" describes the nature, use and characteristics of a card-matching "memory game"</u>.**

117. Descriptive terms without secondary meaning cannot be enforced as trademarks. *Beacon*, 376 F. Supp. 2d at 255. A word is descriptive if it "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 256; *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2nd Cir. 1993) (a descriptive term "may point to a product's intended purpose, its function or intended use, its size, or its merit"); *Abercrombie*, 537 F.2d at 11.

118. In this case, "memory" describes the nature, use and characteristics of a card-matching "memory game", in which players use their memories to identify matching pairs of cards, particularly when it is used together with the word "game", as Hasbro does on all of its packaging for the game. It therefore is a descriptive term, if not actually a generic term, and descriptive terms are not inherently distinctive. *Beacon*, 376 F. Supp. 2d at 255. Hasbro tries to avoid this conclusion by asserting that its game is really a "recall" game that requires one to use "recollection", and therefore the term "memory" as applied to the game is suggestive or otherwise inherently distinctive. But that assertion fails, as "recall" and "recollection" are merely synonyms for "memory". [*See* Section I.E at ¶ 22, *supra*.]

119. Perhaps most telling, *Hasbro's own packaging and instructions for its game confirm that "memory" is merely a descriptive term*. Hasbro's packaging describes the nature of the game inside the box, and consistently refers to using one's "memory" to play the game:

- "Develops concentration and ***memory*** skills" [*Original Memory Game* packaging, PX 12; *Backyardigans Memory Game* packaging, PX 21; *Spider-Man & Friends Memory Game*, PX 126; App, 9A.]
- "This is excellent practice for developing concentration and ***memory*** skills" [*My Little Pony Memory Game* and *Winnie the Pooh Memory Game* instruction sheets, PX 14, PX 31.]
- "[J]ust some of the toys featured in this ***memory*** skills game" [*Toy Story Memory Game* packaging, [PX 30.]
- "Can you **remember** what's hiding where?" [*Original Memory Game* packaging, PX 12.]

*See Beacon*, 376 F. Supp. 2d at 256 ("Finally, Beacon itself has capitalized upon the descriptive significance of its mark by putting out a newsletter in the past entitled 'Guiding Light.'").

120. Even the USPTO found that "memory" is descriptive for a card-matching game. In connection with its examination of Milton Bradley's 1966 application to register a particular stylized design for the word "Memory", the USPTO concluded that the game that was the subject of Hasbro's application was a "*memory card matching game*" and that the proposed mark "Memory" was "*merely descriptive*" of the game because the "*memory of the player is relied upon to locate matching cards*." [PX 5.] Ultimately, Hasbro was allowed to register the mark, but only for a particular stylized design, which it no longer uses, as long as it amended the description of goods in its application to state that it was for "*equipment comprising cards with many matching pairs of designs for playing a matching card game*".

#### (2) Descriptive third-party use of "Memory" for matching games.

121. In addition to Hasbro's own descriptive use of "memory", there is extensive third-party use of "memory" with similar products that shows that "memory" is

descriptive as applied to matching games. *See Beacon*, 376 F. Supp. 2d at 256; *Labrador Software, Inc. v. Lycos, Inc.*, 32 F. Supp. 2d 31, 33 (D. Mass. 1999) (injunction denied because marks were descriptive without secondary meaning); *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1008 (D. Mass. 1988) ("In determining whether a particular word has a descriptive or suggestive significance as applied to a field of merchandise or service, it is proper to take notice of the extent to which it has been used in trademarks by others in the same field"); *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 (5th Cir. 1974) ("The industry itself evidently recognizes the truth of the district court's finding because the word 'heritage' is used in the corporate names of insurance companies all over the country.").

122. The very widespread third-party use of "memory" in the names of physical and online matching games, in describing matching games, as the name for categories of games, to describe a quality or feature of a matching game, in dictionaries and reference books describing matching games, in numerous media sources referencing matching games, in U.S. trademark applications and registrations for "memory"-related marks (where third-party applicants and registrants have "disclaimed" exclusive rights to the word "memory") for games, all confirm that "memory" is descriptive, at best. [*See, e.g.*, Apps. 4, 7, 8, 9C and 11 hereto.] The only way such a term can be turned into a trademark is if it has acquired secondary meaning. The Court concludes that Hasbro has not met its burden of establishing secondary meaning.

**(3) <u>Hasbro has not established that its use of the descriptive term "memory" has acquired secondary meaning</u>.**

123. "[S]econdary meaning occurs when 'the primary significance . . . in the minds of the consuming public is not the product but the producer.'" *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 42 (1st Cir. 1998). *See also Beacon*, 376 F. Supp. 2d at 256 ("A mark has acquired secondary meaning only if its primary significance in the minds of the public is to

identify the source of the product or service."). Secondary meaning is difficult to establish. *See Boston Beer Co. Ltd. Partnership v. Slesar Bros. Brewing Co., Inc.*, 9 F.3d 175, 181 (1st Cir. 1993). "[S]econdary meaning cannot be recognized where, despite a degree of association between the mark and the producer, the original meaning remains dominant; so long as the mark remains descriptive in its primary significance, subsidiary connotations cannot justify trademark treatment." *Boston Beer*, 9 F.3d at 182.

124. MGA has rebutted any presumption of validity of Hasbro's mark. Hasbro, therefore, bears the burden of proving secondary meaning. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 118 (1st Cir. 2006); *Colt Defense LLC v. Bushmaster Firearms, Inc.*, No. Civ.04-240-P-S, 2005 WL 2293909, at *20 (D. Me. Sept. 20, 2005).

125. To evaluate secondary meaning, courts consider: (1) the length and manner of the mark's use; (2) the nature and extent of advertising and promotion of the mark; (3) efforts made in the direction of promoting a conscious connection between the name and a specific product; and (4) market surveys, if any. *Beacon*, 376 F. Supp. 2d at 256; *Boston Beer Co.*, 9 F.3d at 182.

126. There is no secondary meaning arising from Hasbro's use of "memory" in connection with a card-matching game because Hasbro's alleged mark was adopted in 1966 in the context of substantial pre-existing, common use of "memory" as the name for the card-matching game, and because Hasbro's use has co-existed since then with continuing extensive third-party use. [*See*, *e.g.*, Appendix 4, 7, 8, 9, and 11 hereto.] Many examples of current third-party use with which Hasbro's game co-exists in the marketplace were admitted into evidence. Such extensive third-party use makes it unlikely that purchasers would be confused and believe that a product marketed under a composite name containing the word "memory" came from a particular single source. *See Gruner + Jahr*, 991 F.2d at 1078. This widespread, unchecked

third-party use of "Memory"-related names in connection with myriad non-Hasbro matching games precludes a finding of secondary meaning finding.

127. As for the advertising factor, the advertising must be sufficient to educate the public so that it associates the purported mark with a single source, which Hasbro has *not* shown it has done. Simply spending money will not suffice. *See In re Boston Beer Co. L.P.*, 198 F.3d 1370 (Fed. Cir. 1999); *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357 (2nd Cir. 1983); *In re Redken*, 170 U.S.P.Q. (BNA) 526, 529 (TTAB 1971). Hasbro offers no admissible evidence on the nature and extent of the advertising it has done that is directed *only* at its "Memory" games, rather than at other products, brands or company equity, or as part of multi-product or "co-op" advertising. In fact, much of the evidence of advertising that Hasbro submitted is not even focused on its "Memory" game. Instead, it appears that virtually all of Hasbro's recent advertising has been of categories (*e.g.*, preschool) or collections of multiple games, of which the "Memory" game was only one small part and in which it was *not* even highlighted or noticeable unless one took the time, in the case of the print advertising, to study the ad, or, in the case of Hasbro's television advertising [PX 52], to first tape the ad and then freeze it on a particular frame in order to see the fleeting depiction of the "Memory" game. Hasbro submitted *no* evidence indicating that any appreciable number of consumers even noticed the "Memory" game in those ads and then associated it with Hasbro, as opposed to any one of the many *non*-Hasbro manufacturers of "memory"-named games in the marketplace.

128. Hasbro's alleged "survey" submitted to this Court is insufficient to establish secondary meaning, and this Court gives it little weight. It was not an objective, methodologically sound, true survey. Instead, it was merely an internal study that examined many Hasbro products; it was designed by Hasbro, conducted by Hasbro, and directed to persons in circumstances that may have indicated that this was a Hasbro-sponsored study. The

questionnaire that was provided to the respondents included the names of third-party manufacturers who produced their own "Memory"-named matching games, asked respondents to consider generic terms for various games, and asked respondents to consider lists of hundreds of names, which included the term "Memory", but then failed to determine just what the respondents might have had in mind when they stated they recognized the word. There was no control in the study presented to this Court that would allow one to conclude that a particular respondent, seeing the word "Memory" in the questionnaire, had only Hasbro's game in mind, and not the memory card-matching game he or she might have played as a child or played with children, or any of the myriad other "Memory"-named games in the market produced by third parties. Hasbro's expert, Thomas DuPont, who testified about this study did not even conduct the study himself, and admitted that he had not even examined *any* of the raw data gathered in the study. His conclusions, therefore, lack any probative value.

129. Hasbro has *not* established any of the factors that would show that its purported mark has acquired secondary meaning in the minds of consumers. Hasbro's alleged mark is, at best, merely descriptive, without secondary meaning, and therefore is invalid and unprotectable as a trademark.

**b. Hasbro's 1967 registration of a particular stylized design of the word "Memory" is invalid.**

130. The 1967 trademark registration (Reg. No. 834,282) on which Hasbro relies, in part, in this action is for a particular stylized design of the word "memory". [Appendix 1 hereto.] Hasbro claims "incontestability" status for that 1967 stylized design registration.

131. In 1987, Hasbro renewed its registration. In connection therewith, it was required to submit a new specimen of use. But the new specimen Hasbro submitted materially altered the previously registered design. [App. 3 hereto.] A mark cannot be amended in a registration where it will "alter materially the character of the mark," because the new version

must convey essentially the same commercial impression and have the essence of the original mark. 15 U.S.C. § 1057(e); 37 C.F.R. § 2.173(a); TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1609.02(a), available at www.uspto.gov.

132. Changing the font of Hasbro's stylized mark, or deleting a font altogether in the 1967 registration, would constitute a material change in the registration. Such a change precludes Hasbro from being able to amend its registration to assert rights in the current design it uses, *or* to the word alone *without* any stylized font at all. *See In re Richards-Wilcox Mfg. Co.*, 181 U.S.P.Q. (BNA) 735 (Comm'r of Patents 1974) (change from FYER-WALL (stylized with design) to word mark was a material change); *In re CTB Inc.*, 52 U.S.P.Q.2d (BNA) 1471 (T.T.A.B. 1999) (change from TURBO (stylized with design) to word mark alone found to be material change); *In re Dillard Dep't Stores Inc.*, 33 U.S.P.Q.2d (BNA) 1052 (Comm'r of Patents 1993) (change from INVESTMENTS (stylized with design) to different font with design found to be material change). As a result, Hasbro, by materially changing its design mark in its 1987 renewal of the 1967 registration, admitted to no continuing use of the mark and thereby abandoned its 1967 design mark. Having abandoned it, Hasbro cannot assert it against MGA.

133. In addition, a trademark is abandoned by lack of use. *Uncas Mfg. Co. v. Clark & Coombs Co*., 200 F. Supp. 831, 834-35 (D.R.I. 1962). Cessation of use for longer than three (3) years is *prima facie* evidence of abandonment. 15 U.S.C. § 1127. Hasbro admits that it ceased all use of that design long ago. It presented *no* evidence of any continued use of that mark for much longer than three years, *or* of any intent to again use it. As a result, that stylized design mark has been abandoned and is unprotectable.

134. Even if Hasbro had not abandoned that mark, its attempt to rely on its alleged incontestability status fails. Incontestability is limited to the exact goods identified in the registration, and cannot extend to the word "memory" separate from the stylized design that was

registered. *See* 15 U.S.C. § 1115(b); *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 312 (S.D.N.Y. 2004) (incontestability for fragrances does not extend distinctiveness to clothing; "the presumption of distinctiveness [arising from incontestability] applies only to the trademark as a whole, and does not extend to its components"); *Time, Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 119 (2d Cir. 1999) (court distinguished between no longer used registered stylized mark and current unregistered stylized mark; citing *Grunar + Jahr* that trademark rights in the stylized appearance of a word are distinct from the word itself). Hasbro's 1967 registration is only for "*equipment comprising cards with many matching pairs of designs for playing a matching card game*". Because MGA neither uses the word "memory" in connection with a "matching card game" or "equipment comprising cards with many matching pairs of designs," nor uses the particular stylized design in Hasbro's 1967 registration, the purported incontestability of this registration has no probative value.

135. In conclusion, this Court finds that Hasbro is not likely to prevail on the merits of its claims because it has failed to meet its burden of showing that it owns a valid, protectable trademark.

**c. <u>Hasbro's alleged "Memory" mark is invalid because it is generic</u>.**

**(1) <u>Legal standard for genericness</u>.**

136. Hasbro's alleged trademark rights also fail for genericness. "Generic terms are those which refer to a genus of which a particular product is a species, without distinguishing its source of origin." *S.S. Kresge*, 598 F.2d at 696. The generic name of a product answers "What are you?," while a trademark answers "Who are you? Where do you come from?" *National Nonwovens*, 397 F. Supp. 2d at 252. In this case, the word "memory" answers the question, "What are you?"—a memory game. The word "memory", by itself, does not answer the questions, "Who are you?" or "Where do you come from?".

137. To prove that a term is generic, one must show that to "a substantial majority of the public," the mark refers to a genus of product, rather than any specific product or brand. *The Murphy Door Bed Co., Inc. v. Inter. Sleep Systems, Inc.*, 874 F.2d 95, 101 (2nd Cir. 1989). In this case, a consumer survey is not needed as there are many public sources, including two leading American unabridged dictionaries predating Hasbro's first use of the term "memory", that identify the term as generic for a card-matching game of the type being marketed by Hasbro.

138. Genericness occurs in two ways: (1) a seller takes an existing generic term and claims to hold exclusive rights in it as a trademark (which is the case here), *or* (2) a seller establishes trademark rights in a term and a majority of the relevant public appropriates the term as the general name for a type of product, as opposed to as a brand or source identifier. *National Nonwovens*, 397 F. Supp. 2d at 254; *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001).

139. No amount of secondary meaning can convert a generic term into a trademark. *Retail Servs. Inc. v. Freebies Publ'g*, 364 F.3d 535, 547 (4th Cir. 2004). In other words, once a term is generic for a product, it can never be turned into a trademark for that product, no matter how much advertising or sales might be invested in the term. *Miller Brewing Co. v. Falstaff Brewing Corp.*, 655 F.2d 5, 8 (1st Cir. 1981); *Retail Servs.*, 364 F.3d at 547. The reason behind this is one of public policy. No one should be permitted to take away from the public lexicon a term that the public has come to know and use to refer to a genus of product. "Public policy demands that generic terms be free for all to use and not susceptible to appropriation by one company. Allowing a trademark in a generic term is like granting a company a monopoly." *National Nonwovens, Inc. v. Cons. Prods. Enterprs., Inc.*, 397 F. Supp. 2d 245, 254 (D. Mass. 2005). Hasbro's reliance on *Singer Mfg. Co. v. Briley*, 207 F.2d 519 (5th

Cir. 1953), is misplaced. In that case, the proper name Singer had become generic for sewing machines by 1896, but then over time the name *lost its generic significance* and was held by the Fifth Circuit in 1953 to be reclaimed as a trademark due to *exclusive use* of the name Singer. However, the Second Circuit held in 1999 that the *Singer* case does *not* allow one seller to appropriate as a trademark a word that had and continues to have a generic meaning, like "memory," and *Singer* is distinguishable in that it was a proper name of a manufacturer rather than the commonly used name of an article. *Harley-Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 808, 811 (2nd Cir. 1999) (reversing and vacating injunction because plaintiff's alleged HOG mark had become a generic term for large motorcycles long before plaintiff adopted it and because current use indicated it was still used generically; noting public use of HOG in the publications and dictionaries before Harley's cited first use of HOG). In *Harley-Davidson*, the Court noted that use of HOG in dictionaries before Harley's first use and continuing use of the word in dictionaries to the present indicate that "the word has not lost its generic meaning." *Id.* at 810-11. "No manufacturer can take out of the language a word . . . that has generic meaning as to a category of products and appropriate it for its own trademark use." *Id.* at 810. Also, the First Circuit, on review of a District of Rhode Island opinion, reversed a finding of probability that a generic word had been reclaimed as a trademark because there must be proof that a word *ceased* to have any generic meaning. *Miller*, 655 F.2d at 7, 8, n.2 (distinguishing *Singer* and reversing injunction because the asserted mark was generic). In *Miller*, the First Circuit quoted from Judge Friendly of the Second Circuit that no amount of money in promotion and no amount of successful sales can deprive competing manufacturers of a product of the right to call an article by its name. Otherwise, that would grant a monopoly by precluding a competitor of the ability to describe his goods as what they are. *Id.* at 7-8 (*quoting Abercrombie & Fitch Co. v.*

*Hunting World, Inc*., 537 F.2d 4, 9 (2d Cir. 1976) and *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 13 (2d Cir. 1975)).

140. The recognition that generic terms can never act as trademarks is in the LANHAM ACT. Under the LANHAM ACT, after a certain period of uncontested usage and once certain other conditions are met, a trademark registration can become what is called "incontestable", which status cuts off certain defenses directed at the trademark. But one defense that can *never* be cut off by an incontestable registration is genericness. *See* 15 U.S.C. §§ 1064, 1127; *S.S. Kresge Co.*, 598 F.2d at 696. The incontestability status of Hasbro's 1967 registration for the "Memory" design mark is of no import against a genericness challenge.

141. This Court finds that the word "Memory" for a card-matching game is generic for the card-matching game that Hasbro markets under that term. Hasbro has taken an existing generic term, which was generic for a card-matching game before Hasbro started using it, and now claims to hold exclusive rights in it as a trademark. Based on the evidence produced to date, it appears likely that a majority of the relevant public uses the term as the general name for the type of card-matching game marketed by Hasbro, *as opposed to* viewing it as a source identifier referring to Hasbro. "Memory" appears in the two leading unabridged American dictionaries, as well as in numerous other reference sources both before and after 1966 when Hasbro claims a date of first use, as a generic term for a card-matching game of the type being marketed by Hasbro. *See National Nonwovens*, 397 F. Supp. 2d at 254; *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001).

**(2) Hasbro's 1966 adoption of the generic term "memory" for card games.**

142. If a seller merely appropriates a pre-existing generic term to refer to the seller's product, which is the same as the thing to which the generic term refers, then the seller *never* had trademark rights and genericness is shown simply by examining the term itself.

*Horizon Mills Corp.*, 161 F. Supp. 2d at 213. A generic term may be a noun that references a product, such as "cola" for a soft drink, or an adjective that designates a characteristic of a type of product, such as "Light Beer" and "Lite Beer" for a type of beer that is light in body/taste with a low alcohol/calorie content. *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75 (7th Cir. 1977); *Dixi-Cola Labs. v. Coca-Cola Co.*, 117 F.2d 352 (4th Cir. 1941); *In re Cooperative Produttori Latte E Fontina Valle D'Acosta*, 230 U.S.P.Q. (BNA) 131 (T.T.A.B. 1986) ("fontina" for cheese); *In re Computer Store, Inc.*, 211 U.S.P.Q. (BNA) 72 (T.T.A.B. 1981) ("The Computer Store" for computer sales services); *J. Kohnstam, Ltd. v. Louis Marx & Co.*, 280 F.2d 437 (C.C.P.A. 1960) ("matchbox" for small toy car); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2nd Cir. 1976) ("safari" for type of clothing worn on a safari). Here, Hasbro uses the term "memory" as a noun to refer to a type of card-matching game, which is the same game as the game that Hasbro markets under that noun. Hasbro also uses it to designate a characteristic of a type of product—in this case, a "*memory* game". Either way, it is generic for the product that Hasbro markets under that term.

143. Other evidence can also support a genericness finding: (1) generic use by the plaintiff or others in the same business; (2) generic use in books, newspapers and magazines; (3) generic use in government documents; (4) generic use on the Internet; (5) generic use in dictionaries; (6) U.S. Patent and Trademark Office and Trademark Trial and Appeal Board decisions related to the term at issue; (7) the alleged owner's efforts at policing the alleged mark; and (8) consumer surveys. *Horizon Mills Corp.*, 161 F. Supp. 2d at 214; *Murphy Door*, 874 F.2d at 101 (dictionary definitions and media references reflect the general public's perception of a mark's meaning and implication); *National Nonwovens*, 397 F. Supp. 2d at 253; *S.S. Kresge*, 598 F.2d at 695-96 ("Mart" generic despite stores' long-time use of "The Mart"; evidence based on "[a] survey of well-known dictionaries reveals that the term 'mart' is generic since it is another

word for store or market, and over thirty federally registered trade names and trademarks included the word mart;" "owner" failed to show "that the term in this case has any meaning [to] consuming public other than store or market"). The wealth of such evidence presented in this case, including multiple pre-1966 game reference books and American unabridged dictionaries, shows that "Memory" was already a generic name for a children's card-matching game where players match pairs of cards *at the time* Hasbro adopted it in 1966, *and* that the term remains generic for that game today.

144. Hasbro appropriated the common name for the memory game and then impermissibly tried to convert it into a trademark in order to claim exclusive rights to use it for any type of matching game, whether the game uses cards or not. Hasbro's attempt to appropriate the word "memory" from the public lexicon to refer to a card-matching game is no more permissible than if Hasbro were to try to claim trademark rights in the terms "poker", "blackjack" (aka "21"), "rummy", "go fish", or "old maid" for *those* games. And even if Hasbro were successful in its appropriation, Hasbro reaches too far. *First*, the term is generic for a card-matching game. MGA's game, however, uses no cards, and instead matches different halves of three-dimensional sculptures. *Second*, MGA does not use the term alone, as does Hasbro. MGA uses it as just one part of a composite phrase identifying or describing its product—"3-D MEMORY MATCH-UP" (or formerly, just "MEMORY MATCH-UP"). *See S. S. Kresge*, 598 F.2d at 696.

**(3) Extensive generic use of "memory" and "memory games" by the public and in reference materials.**

145. The term "memory" as the common name of a type of card-matching game, rather than as a source-identifier for the game, is dedicated to the public's use and ownership, as demonstrated by the numerous generic references submitted into evidence in this case, in many reference materials discussing, describing and cataloging games, in store

directories, in American dictionaries, in the USPTO's patent and trademark records, and in many other materials.

146. These public uses, coupled with a general lack of references to "memory" or "memory game" as referring to just Hasbro's game, clearly show that consumers and the public are *not* referring to Hasbro, its game *or* its picture cards when referring to a "memory game," and that the public does *not* exclusively associate "memory" with Hasbro's game. The evidence produced in this case shows that the public does not view Hasbro's use of the word "Memory" as a trademark use.

**(4) <u>Hasbro's alleged "Memory" mark and registrations have become generic, if they were not already generic, because of Hasbro's failure to police its alleged, claimed rights against similar uses by others</u>.**

147. Even if the term "memory" had not already been generic at the time that Hasbro decided to adopt it in 1966, it has become so. A trademark that is not initially generic may become so when it is appropriated by the public and used to identify a general type of product. *See Horizon Mills Corp.*, 161 F. Supp. 2d at 214. Examples of one-time marks that became generic include "aspirin," "cellophane," "escalator," "thermos" and "murphy bed". *Bayer v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921); *Dupont Cellophane Co. v. Waxed Products Co.*, 85 F.2d 75 (2nd Cir. 1936); *Haughton Elevator Co. v. Seeberger*, 85 U.S.P.Q. (BNA) 80 (Comm'r of Patents 1950); *King-Seeley Thermos Co. v. Alladin Indus., Inc.*, 321 F.2d 577 (2d Cir. 1963); *Murphy Door*, 874 F.2d at 101. Such appropriation can take place when the alleged "owner" fails to police its mark, resulting in widespread use by third parties. *Id*. That is precisely the situation faced by Hasbro today. The marketplace is crowded with third-party users and uses of "memory" to refer to matching games and Hasbro has allowed this type of usage to occur unchecked. [*See, e.g.*, Apps. 7, 8, 9, and 11 hereto.]

148. Admitted into evidence in this case are many "Memory"-inclusive trademark registrations that have issued for card-related games, patents using "memory" to refer to matching games (including in a U.S. Patent Office classification specifically set aside for "memory games"), an overwhelming number of third-party users of the word in connection with matching games, many of whom are well-known game producers (*e.g.*, Mattel, Briarpatch, Cardinal) of whose games Hasbro must know, numerous reference books and articles that use "memory game" to generally refer to the classic card-matching game, including the two most respected unabridged American dictionaries,[14] which include as a definition for "memory" the card-matching game, and Hasbro's own use of "memory" in its own publications and games in the generic sense. Hasbro's Milton Bradley division even published a game called "Shenanigans" in 1964 (the front cover bears a "© 1964 BY MILTON BRADLEY CO." notice, *see* DX W.2A)—two years *before* it adopted "Memory" for its card-matching game—that prominently depicts a "MEMORY GAME" on its cover. [*See* App. 4 hereto.]

149. Despite all the evidence of third-party use of "memory" in connection with matching games that has been admitted, Hasbro submitted evidence of only a handful of actions it has taken to try to control such third-party use in the 40 years it has used "Memory". Several objections (*e.g.*, to Briarpatch, Creative Toys USA, Alphabet Alley, OddTodd.com, Plumeus, Inc., and North-South Books) apparently were made only *after* MGA was sued in this action and submitted examples of close to 200 third-party uses of the term "Memory" to refer to a card-matching game on games and in books, articles, websites, and other materials—none of which

---

[14] This Court finds that Hasbro's reliance on the lack of a definition for "memory" referring to a card-matching game in the OXFORD ENGLISH DICTIONARY is not probative. That British publication reflects largely British usage, and is primarily directed at a historical record of words, as opposed to current usage. It therefore is not surprising that it might not reflect the relatively recent (mid- to late-20th Century) use in the U.S. of the word "memory" as the name of a card-matching game. [Disner Testimony, Vol. 5 at 33:20-35:13.]

referenced or had anything to do with Hasbro or its game. Some objections were made *years* after the first use by third parties of "memory" with their memory games, including, in the case of Briarpatch, sending a cease-and-desist letter on June 29, 2006 objecting to its *I Spy Memory Game* where the game had been on the market for twelve years before Hasbro objected and earned awards and other recognition. [DX V.33, DX V.34, the cover of DX B.6.] Hasbro submitted evidence of other objections it made, but Hasbro failed to follow up on them or show this Court that such objections resulted in the stopping of the complained-of use. Other objections that Hasbro made were simply waived with Hasbro agreeing to allow the use (*e.g.*, use by Mattel of "Memory" in the "Where's Waldo Memory Game?" for "a reasonable sell-off period"). But essentially, in light of the many current uses of "Memory" that MGA found in the marketplace and submitted to this Court, Hasbro's claimed policing efforts over the course of 40 years are *de minimis* and woefully insufficient to preserve any claimed trademark rights. Instead, Hasbro has been content to let the public use the term "memory", in apparent recognition of the fact that the term is descriptive, without secondary meaning, if not actually generic, for a card-matching game.

150. The impact of Hasbro's failure to police is perhaps most telling when one examines the widespread third-party use of "memory" in connection with adult-oriented memory games that contain nudity and pornographic content. Hasbro is a children's game and toy company. One would think that, of all of the different types of uses of its claimed property that it would be most diligent about pursuing and stopping, would be uses with such content. *Yet Hasbro has not provided a single example of any effort to stop such adult uses.* Again, this supports the Court's conclusion that Hasbro recognizes that the public owns rights to the generic term, and that there is little, if anything, that Hasbro can now do to change that.

151. The evidence demonstrates that "memory" is the generic term for card-matching memory games, whether when adopted by Hasbro in 1966 *or* through Hasbro's failure to police. The generic status of Hasbro's alleged "Memory" mark renders it unprotectable and invalid.

### 2. Hasbro Is Not Likely To Prevail On The Merits Because It Did Not Meet Its Burden Of Proving Likelihood Of Confusion.

152. "A plaintiff must prove that there exists 'a substantial likelihood that the public will be confused as to the source' of the relevant goods or services." *Beacon*, 376 F. Supp. 2d at 259; *Leathersmith of London, Ltd. v. Alleyn*, 695 F.2d 27, 29 (1st Cir. 1982); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194 (1st Cir. 1980). This requires a "likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing*, 103 F.3d 196, 201 (1st Cir. 1996). "A plaintiff is not entitled to a preliminary injunction on a trademark infringement claim unless it can persuade the district court that it is likely to be able to demonstrate consumer confusion." *I.P. Lund Trading*, 163 F.3d at 43.

153. Eight factors are considered when determining likelihood of confusion: (1) similarity of the marks; (2) similarity of the goods; (3) relationship between the parties' channels of trade; (4) relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) defendant's intent in adopting its mark; and (8) the strength of plaintiff's mark. *Beacon*, 376 F. Supp. 2d at 259; *Pignons S. A. v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981). None is determinative; each must be considered. *Beacon*, 376 F. Supp. 2d at 259; *Astra Pharmaceutical Prods. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir. 1983).

154. Hasbro has failed to meet its burden of showing a likelihood of confusion, and therefore is not likely to prevail on any of its claims.

**a. <u>The purported marks are not similar</u>.**

155. "[S]imilarity is determined on the basis of the designation's total effect . . . and infringement 'does not exist, though the marks be identical and the goods very similar, when the evidence indicates no [likelihood of confusion].'" *Int'l Ass'n of Machinists*, 103 F.3d at 203-04. *See also Astra Pharmaceuticals*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487; *Hasbro, Inc. v. Clue Computing, Inc.*, 66 F. Supp. 2d 117, 122 (D. Mass 1999) (finding no infringement despite defendant's use of mark identical to that used for Hasbro's "Clue" game). "'[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features.'" *Pignons*, 657 F.2d at 487 (citing several Circuit cases). In addition, "in certain circumstances otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos or other source-identifying designations of the manufacturer." *Int'l Ass'n of Machinists*, 103 F.3d at 204; *Hasbro, Inc.*, 66 F. Supp. 2d at 122. *See also Astra Pharmaceuticals*, 718 F.2d at 1205; *Pignons*, 657 F.2d at 487.

156. While both names used by the parties include the descriptive or generic term "memory," Hasbro uses the word "Memory" alone. MGA, on the other hand, uses it in the middle of a phrase—either "3-D MEMORY MATCH-UP" (presently) or "MEMORY MATCH-UP" (formerly). [App. 10.] "Memory", when combined with other words, has a significantly different commercial (and visual and aural) impression than just the word "Memory" standing alone (the depicted sizes are approximately proportionate to how they actually appear on the parties' packaging). [App. 10, DX B.13, DX B.32, PX 15, PX 126, DX L.2, DX L.1.]

157. "Similarity of marks is assessed in terms of their sight, sound, and meaning." *M2 Software, Inc. v. Madacy Ent't*, 421 F.3d 1073, 1082 (9th Cir. 2005). *See also Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002); *Stop & Shop Supermarket Co. v. Big Y Foods, Inc.*, 943 F. Supp. 120, 124 (D. Mass. 1996). In this case, the

parties' uses are sufficiently dissimilar to militate against any likelihood of confusion. Hasbro uses a single word; MGA a four-word composite. Hasbro's use is three syllables; MGA's is seven syllables. "Memory" is the first, last, and only word in Hasbro's use; "Memory" is in the middle of MGA's composite phrase. MGA's composite phrase starts with "3-D" and ends with "MATCH-UP", neither of which have a similar-sounding counterpart in Hasbro's use. Hasbro uses "Memory" in many different colors on contrasting color backgrounds; MGA uses yellow letters in a particular font on a red background, as called for in the Marvel *Style Guide* that MGA was required to follow. The fonts used by the parties are different. Hasbro's use of "Memory" is in a "squeezed" design (vertically compressed in the middle of the word); MGA's use of "Memory" is in plain block letters. Hasbro's use is the most prominent feature on its packaging; the word "Memory" takes up almost a third of the cover of the box. MGA's use, on the other hand, is prominently branded with the "SPIDER-MAN & FRIENDS" logo and characters, with the "3-D MEMORY MATCH-UP" phrase appearing at the bottom of the box in a relatively small font size. MGA's packaging bears the MGA logo; Hasbro's bears the Milton Bradley logo. *See Gruner + Jahr*, 991 F. 2d at 1078 (no confusing similarity between magazine titles containing the word "parents" because logos had different typefaces, defendant's use was accompanied with "Ladies' Home Journal" above its "Parent's Digest" title, and defendant's use of "Parents" took up half as much space on cover as plaintiff's "Parents" title).

158. Hasbro itself has admitted to the USPTO that it believes its use of "Memory" alone can co-exist with other "Memory"-related marks, even on the same products, as long as such other marks add additional, distinguishing words. Hasbro's 1967 registration is for "*equipment comprising cards with many matching pairs of designs for playing a matching card game*". After Hasbro filed its registration application, the USPTO examined it and responded,

citing a pre-existing 1965 registration for "MEMORY LANE" for "*apparatus for playing a card game*" against Hasbro. In response, Hasbro stated:

> "*Applicant's mark MEMORY is urged not to so resemble the cited mark MEMORY LANE as to be likely to cause confusion, or to cause mistake, or to deceive. The cited registration differs in appearance, sound and meaning from Applicant's mark; it is submitted that these differences are significant and dictate that the ordinary purchaser will not be confused, deceived or mistaken when he purchases the products of the parties*."

[PX 5.] If Hasbro believed its registration of MEMORY for *equipment for playing a card matching game* could co-exist with a pre-existing registration of MEMORY LANE for *apparatus for playing a card game* without any likelihood of confusion, just because the earlier use contained the added word "LANE", its use of MEMORY can co-exist with MGA's use of 3-D MEMORY MATCH-UP.

159. In light of the significant differences between the two uses, this Court concludes that this factor weighs against a likelihood of confusion finding.

**b. <u>The goods are dissimilar</u>.**

160. Even where both parties sell the same types of goods, there is no likelihood of confusion if the products appear strikingly different. *Pignons*, 657 F.2d at 487-88 (finding no confusing similarity despite the fact that both products were single lens reflex cameras because the products' appearances were so different that "one could not be mistaken for the other.").

161. Here, the parties' products are strikingly different. Hasbro's game matches identical pairs of two-dimensional cards; MGA's game matches different (non-identical) top and bottom halves of three-dimensional plastic Marvel character pieces hidden under opaque cups. Hasbro's game is sold in a standard cardboard box; MGA's is sold in a distinctive red molded-plastic carrying case that also unfolds to double as the game's playing surface. MGA's game is likely more difficult to play than Hasbro's game because it requires the matching of different

items rather than identical pairs of items. The packaging shapes, materials, and uses are very different. [*Compare* Apps. 5 and 6.] *See Pignons*, 657 F.2d at 487 (two marks not confusingly similar in part because each party used distinctive packaging).

162. In light of the significant differences between the two products, this Court concludes that this factor weighs against a likelihood of confusion finding.

### c. <u>The channels of trade, advertising and class of prospective purchasers</u>.

163. Channels of trade, advertising, and the class of prospective purchasers are typically addressed together. *Int'l Ass'n of Machinists*, 103 F.3d at 204. *See also Beacon*, 376 F. Supp. 2d at 260-61.

164. Some overlap of trade and advertising channels does not necessarily indicate a likelihood of confusion. *Hasbro, Inc.*, 66 F. Supp. 2d at 123; *Pignons*, 657 F.2d at 488-89 (determining that these factors weighed *against* likelihood of confusion despite the fact that the parties sold their products in some of the same stores and advertised their products in some of the same magazines because the products were also sold in different stores, and the advertising campaigns for the two products stressed different attributes). *See also Beacon*, 376 F. Supp. 2d at 260-61 (finding these factors weighed against confusion despite some overlap in consumers and channels of trade, and similar pricing).

165. The first two factors weigh against a finding of likelihood of confusion because MGA and Hasbro do not sell their products at all the same stores; MGA's packaging is distinctive and the advertising on it is accordingly distinctive; other, third-party card-matching memory games can be found in close proximity to both Hasbro's "Memory" games and MGA's game at Target and other stores. MGA's packaging, containing its house mark, in-use photos showing children playing the game, Spider-Man & Friends character art, and text and graphics

emphasizing the three-dimensional nature of the game, all serve to reduce any chance of confusion.

166. As to the third of these factors, "In considering whether the class of prospective purchasers will confuse the two products, 'a court called upon to assay the likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark.'" *Hasbro, Inc.*, 66 F. Supp. 2d at 123. *See also Beacon*, 376 F. Supp. 2d at 261 (holding sophistication of consumers weighed against confusion). Because the parties' products are both age-rated for children three and up, parents (and not children) are the potential purchasers and, like most parents of pre-school and primary school children, will likely shop with care for the products with which their children will play, especially given the different play patterns involved. *See Original Appalachian Artworks, Inc. v. Blue Box Factory Ltd.*, 577 F. Supp. 625, 632 (S.D.N.Y. 1983) (parents rather than children buy Cabbage Patch Kids dolls and will shop with care).

167. This Court concludes that these three factors weigh against a finding of a likelihood of confusion.

**d. <u>There is no actual confusion evidence</u>.**

168. "[A]bsent evidence of actual confusion, when the marks have been in the same market, side by side, for a substantial period of time, there is a strong presumption that there is little likelihood of confusion." *Pignons*, 657 F.2d at 490 (internal citations omitted).

169. The parties submitted evidence showing that millions of Hasbro's games have been sold, while MGA has sold over a quarter of a million units of its game. The evidence, including a video shot by MGA and testimony and photographs from Hasbro, shows that, at least at Target and Wal-Mart stores, both products have been sold right next to each other in the same sections of the stores' toy departments for several months. Yet, both Hasbro and MGA admitted

that neither had experienced a single instance of actual confusion, despite the fact that, by the last day of the evidentiary hearing in this matter, the products had co-existed for almost a full year. This indicates that the products and their branding are sufficiently distinct such that no likelihood of confusion is present. This Court concludes that this factor weighs strongly against a likelihood of confusion finding.

**e. <u>There is no evidence of any bad intent on MGA's part in adopting "Memory Match-Up" or "3-D Memory Match-Up"</u>.**

170. "The fact that [defendants] knew of the existence of the game does not in any sense mean that they intended for their company to infringe upon or benefit from Hasbro's mark." *Hasbro, Inc.*, 66 F. Supp. 2d at 125; *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 574 (D. Colo. 1997), *aff'd* 185 F.3d 1084 (10th Cir. 1999) (continuing to use logo after receiving notice of alleged infringement is not evidence of bad faith if there is a good faith belief that continuing use is non-infringing). *See also Beacon*, 376 F. Supp. 2d at 264 (finding that intent factor favored defendant despite knowledge of plaintiff's mark). In this case, however, the evidence shows that none of the persons responsible for creating MGA's game or the graphics for it, or for coming up with the name for the product, had any knowledge of Hasbro's game or Hasbro's claim of rights to the word "Memory".

171. Evidence of a reasonable trademark search and plausible conclusion by defendant that use would not infringe indicates no bad intent. Because disclosure of an opinion results in waiver of privilege, an adverse inference cannot be drawn from a withholding of the opinion to maintain privilege. *Astra Pharm. Prods., Inc. v. Beckman Instruments*, 220 U.S.P.Q. (BNA) 609, 612 (D. Mass. 1983), *aff'd* 718 F.2d 1201 (1st Cir. 1983) (no "adverse inference from the proper assertion of an attorney-client privilege"). Although MGA's trademark counsel conducted a clearance search for the name of MGA's game, MGA was required to withhold that

opinion on privilege grounds during the injunction hearing to avoid waiver of privilege. [*See* Paragraph 32, and footnote 7 thereto, of the Findings of Fact, above.]

172. Hasbro argues that MGA is guilty of bad intent, but Hasbro has produced no evidence that copying occurred or that any such copying was intentional, both of which are required to obtain the rebuttable presumption of likely confusion. *See WCVB-TV v. Boston Athletic Assn.*, 926 F.2d 42, 45 (1st Cir. 1999). Nor has Hasbro produced any evidence to contradict that the MGA designers who created the game and its artwork and came up with its name did *not* even know of Hasbro's "Memory" game while they were engaged in that process and did not learn of Hasbro's game until this lawsuit commenced. MGA, on the other hand, produced credible evidence of independent creation both of its game and its name, done without any reference to Hasbro's game. With respect to the graphic design of MGA's game, the elements about which Hasbro complains—the Spider-Man & Friends characters and colors, the Marvel colors, the font and color used for "3-D MEMORY MATCH-UP", the location of that description on the packaging—were all mandated by the Spider-Man & Friends *Style Guide* that Marvel provided to MGA and that MGA had to follow, and that Marvel ultimately approved. MGA's evidence of independent creation rebuts any assertion of bad intent.

173. MGA's creation of a unique product which, with its red molded-plastic carrying case, looks very different than the standard cardboard game boxes commonly seen in game sections at toy stores, such as that used by Hasbro for the "Original" and various themed versions of its game, also signifies a lack of bad intent. *See Pignons*, 657 F.2d at 491 (defendant's unique packaging and promotional materials belied an intent to deceive, palm-off or benefit from plaintiff's good will). MGA's decision to add "3-D" to its product name in order to further describe and distinguish its product from all of the other "memory" games on the market, including Hasbro's, after receipt of Hasbro's objection to MGA's use, also demonstrates good

faith. *See The American Automobile Assn. v. AAA Automobile Club of Queens*, No. 97 CV 1180 SJ, 1999 WL 97918, at *7 (E.D.N.Y. Feb. 8, 1999).

174. This Court concludes that this factor weighs against a likelihood of confusion finding.

**f. <u>The strength of Hasbro's purported mark is diminished because it exists in a crowded field of many similar uses</u>.**

175. MGA presented voluminous evidence showing that there is a very crowded field of uses of marks and terms with the word "memory" in them referring to matching games. [*See*, *e.g.*, Appendix 7, 8, 9, and 11.] MGA introduced into evidence over 100 third-party physical games using "memory" in a name, mark, title, tagline or description for the game. MGA produced voluminous examples of online matching games using "memory" in a name, mark, title, tagline or description. MGA produced voluminous examples of written materials, including dictionaries, books, articles, patents and trademark records, referring to "memory" games. MGA also produced other trademark registrations for "memory"-related marks in the same class of goods as that in which Hasbro registered its mark, none of which have any reference to Hasbro, yet Hasbro has apparently also peacefully co-existed with them. Such a crowded field of use wholly contradicts and negates the claimed strength and distinctiveness of Hasbro's alleged mark. *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 273 (S.D.N.Y. 2006). Hasbro's and MGA's respective games co-exist in that crowded field without instances of actual confusion having occurred, further showing the weakness of Hasbro's purported mark.

176. Because Hasbro's purported mark is weakened by existing within this very crowded field of third-party uses, the scope of what it can do to protect its alleged rights is exceedingly narrow. Even if one assumes for the sake of argument that Hasbro's mark is valid

despite the descriptiveness and genericness conclusions stated above it cannot monopolize the word "memory" any further than, at most, the very narrow confines of what it registered the mark for—"*card matching games*" (2004 registration) and "*equipment comprising cards with many matching pairs of designs for playing a matching card game*" (1967 registration). MGA, however, does *not* market a card-matching game *or* equipment for such a game. [App. 6.]

177. This Court concludes that this factor weighs against a likelihood of confusion finding.

### 3. Hasbro's Common Law Infringement And Unfair Competition Claims Also Fail.

178. The same likelihood of confusion standard under the LANHAM ACT applies to Hasbro's Rhode Island common law trademark infringement and unfair competition claims. *See Beacon Mutual Ins. v. OneBeacon Ins. Group*, 376 F.3d 8, 14-15 (1st Cir. 2004). Because Hasbro's LANHAM ACT claims fail due to a failure to establish a likelihood of confusion, its parallel common law claims fail as well.

179. On balance, this Court concludes that Hasbro is not likely to prevail on any of its claims in this action.

## C. Hasbro Has Not Met Its Burden Of Establishing That It Will Be Irreparably Injured If A Preliminary Injunction Does Not Issue.

180. To obtain an injunction, the movant must show "probable future irreparable injury." *Flex-Let*, 111 F. Supp. at 537. "The burden of demonstrating that a denial of interim relief is likely to cause irreparable harm rests squarely upon the movant." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). "[N]o matter how strong the likelihood of success, some irreparable harm in the absence of an injunction *must be proven*." *Biogen Idec Ma, Inc. v. Trustees of Columbia U.*, 332 F. Supp. 2d 286, 296 (D. Mass. 2004) (emphasis added). Hasbro must provide evidence of *certain and imminent* irreparable injury

absent an injunction. *Boston Athletic Assn. v. Sullivan*, 867 F.2d 22, 26 (1st Cir. 1989) (noting that a finding of irreparable harm is *not* automatic upon a finding of likelihood of confusion). Even if Hasbro were likely to succeed on the merits (which this Court finds it will not), the requested injunction must be denied because Hasbro has not satisfied its burden of *proving* irreparable injury.

### 1. **Hasbro Is Not Entitled To A Presumption Of Irreparable Injury.**

181. A presumption of irreparable injury arising from a showing of likely success in an infringement action is *rebuttable,* and "falls when opposing evidence is offered." *Clonus Assoc. v. Dreamworks LLC*, 417 F. Supp. 2d 248, 251 (S.D.N.Y. 2005) (citation omitted). Evidence of delay, *de minimis* harm, or failure to police the trademark rebuts that presumption and alone constitutes grounds for denying injunctive relief. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2nd Cir. 1995) (vacating preliminary injunction because district court "adopted the general presumption of irreparable injury" without considering plaintiff's delay); *Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99, 100 (2nd Cir. 1992) (reversing preliminary injunction because "the district court gave insufficient weight to the moving party's delay in seeking relief."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2nd Cir. 1985) (reversing and vacating preliminary injunction because district court's "perfunctory comment" that "'[h]aving determined that the plaintiffs are likely to succeed on the merits given the likelihood of confusion, irreparable harm "almost inevitably follows"'" "provided insufficient consideration to the factor of irreparable harm"). *First*, no such presumption arises here because Hasbro has not shown that it is likely to prevail on the merits. *Second*, MGA has shown that all three factors—delay, *de minimis* harm, and failure to police the mark—exist here and Hasbro, therefore, is not entitled to a presumption of irreparable injury.

**a. <u>Hasbro's delay negates any presumption of irreparable injury</u>.**

182. Delay such as that engaged in by Hasbro has been found to rebut the presumption of harm and return the burden of proof to the movant to clearly establish irreparable harm. *Christopher Norman Chocolates, Ltd. v. Schokinag Chocolates N.A.*, 270 F. Supp. 2d 432, 439 (S.D.N.Y. 2003) (4-month delay rebutted presumption); *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345, 350 (S.D.N.Y. 2000) (18-week delay overcame presumption); *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419-20 (S.D.N.Y. 1998) (unexcused 4½ month delay); *Orson, Inc. v. Miramax Film Corp.*, 836 F. Supp. 309, 311 (E.D. Pa. 1993) (50-day delay).

183. Hasbro delayed six (6) months before seeking an injunction after MGA's product first appeared on store shelves in mass retailers in December 2005, thereby negating any presumption of irreparable harm. Such delay constitutes an independent ground for denying a request for a provisional, equitable remedy. *See Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 98 (D. Mass. 1996).

184. Laches bars both an injunction as well as an underlying infringement action where the plaintiff unreasonably delayed seeking relief, as that constitutes implied or passive consent to the defendant's conduct. *Profitness Physical Ther. v. Pro-Fit Orthopedic*, 314 F.3d 62, 68 (2nd Cir. 2002). "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy relief and cannot complain of the delay involved pending any final relief . . . after a trial on all the issues." *Helena Rubinstein, Inc. v. Frances Denney, Inc.*, 286 F. Supp. 132, 134 (S.D.N.Y. 1968); *Le Cordon Blue, S.A. v. BPC Publ., Ltd.*, 327 F. Supp. 267 (S.D.N.Y. 1971) (13-week delay barred preliminary injunction where defendant spent over $1 million during that time); *Programmed Tax Sys., Inc. v. Raytheon Co.*, 419 F. Supp. 1251 (S.D.N.Y. 1976) (4-month delay evidenced lack of irreparable injury; used as separate ground to deny injunction).

185. Hasbro asserts that its delay was excused by settlement discussions. This Court has examined the correspondence related to the so-called "settlement" discussions submitted by the parties. That correspondence indicates that discussions relating to a means by which the parties could obtain private resolution of their dispute did not commence until May 29, 2006, and were sporadic and short-lived thereafter. Hasbro did not make an actual settlement proposal until June 19, 2006. [DX LL.1-DX LL.50 (correspondence between the parties).] This Court finds that those discussions had minimal, if any, impact on Hasbro's delay in pursuing its claims, and that Hasbro's delay in seeking relief bars its request for a preliminary injunction.

**b. Hasbro's failure to police negates any finding of a presumption of irreparable injury.**

186. As discussed in Section II(B)(1)(a)(2), above, the marketplace is crowded with third-party uses of "memory" in connection with matching games. Hasbro's history of indifference to that crowded field, and peaceful co-existence with all of those third-party uses, particularly those involving adult content, contradicts and wholly discredits any claim of irreparable injury. *Garnier*, 844 F. Supp. at 99 ("total indifference to the manufacture and sale by others of an infringement" signified no irreparable harm).

**c. Any alleged injury will be *de minimis* and compensable.**

187. The presumption of irreparable harm may be rebutted if "the plaintiff's damages appear to be trivial." *Clonus Assoc.*, 417 F. Supp. 2d at 251. MGA's addition to the marketplace of its *3-D character piece-matching* game cannot be argued to have caused more than incremental or minimal harm, *if any*, given all the third parties Hasbro has allowed to use the term "memory" for *card*-matching games without objection.

188. Conclusory allegations of harm do not warrant a presumption of irreparable injury. *Id.* at 254. This Court finds that Hasbro has done little more than submit conclusory allegations. Hasbro has not alleged that MGA's product is of inferior quality such

that MGA's product could damage Hasbro's reputation. *See Christopher Norman Chocolates*, 270 F. Supp. 2d at 435. Hasbro has failed to show any instances of actual confusion, despite the close proximity of sales of hundreds of thousands of the parties' products in Target and Wal-Mart stores. Hasbro testified that it is unable to cite to a single instance of a lost sale because of MGA's game. It has allowed numerous third parties to market "memory" games over the past 40 years, and the field is crowded today with numerous third-party "memory" games. To the extent Hasbro has suffered any injury to its sales, such injury does not appear to be due to MGA's sales of its "3-D MEMORY MATCH-UP" or "MEMORY MATCH-UP" game.

189. There is no evidence that MGA's three-dimensional character piece-matching game is a substitute for Hasbro's two-dimensional card-matching game. The fact that both can co-exist is indicated by Marvel's entry into non-exclusive licenses with both parties that included "game products" as a category. Marvel has licensed and allowed both Hasbro and MGA, as well as another competitor, Briarpatch, to sell Spider-Man & Friends games. Marvel, therefore, presumably believes that both can co-exist. [*See* Apps. 9A and 9B; *see also* Briarpatch's Spider-Man & Friends "Matching and Memory Game" as another Marvel-licensed entrant to this market (App. 9C hereto).]

190. Under these circumstances, Hasbro will not suffer anything but negligible, if not speculative, harm from MGA's use of "memory". *See Clonus*, 417 F. Supp. 2d at 256.

### 2. Having Failed To Establish Entitlement To A Presumption Of Irreparable Injury, Hasbro Also Failed To Prove Any Irreparable Injury.

191. "If a defendant successfully rebuts the presumption [of harm], the burden of proof reverts to the plaintiff to *prove* irreparable harm." *Berlent*, 2006 WL 1594478, at *2 (emphasis added). Here, because MGA has successfully rebutted any presumption of irreparable injury, Hasbro must *prove* irreparable injury.

192. "'Irreparable harm' is proven if, absent an injunction, the plaintiff 'will suffer[] *substantial* injury that is not accurately measurable or adequately compensable by money damages.'" *Biogen*, 332 F. Supp. 2d at 296 (emphasis added). Because Hasbro has not proved any basis for any alleged irreparable injury, the preliminary injunction must be denied.

#### a. Hasbro cannot suffer irreparable injury because it is not likely to succeed on its claims.

193. Without a likelihood of prevailing on its claims, Hasbro cannot suffer irreparable injury as a result of MGA's actions. [*See* Section II(B), *supra*.] *See Public Serv. Co. of N.H. v. West Newbury*, 835 F.2d 380, 382 (1st Cir. 1987).

#### b. Speculative assertions of harm are insufficient.

194. Conclusory, speculative, and unsupported allegations of harm will not satisfy plaintiff's burden to show imminent and certain irreparable injury. *Public Serv. Co. of N.H.*, 835 F.2d at 383; *Figueroa*, 2006 WL 898166, at *2; *Charlesbank Equity Fund II*, 370 F.3d at 162. *See also Biogen*, 332 F. Supp. 2d at 296 ("'[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm.'"). Hasbro's conclusory predictions of the harm it allegedly will suffer, but *without* any supporting evidence, are insufficient to establish irreparable injury. Hasbro admitted that it cannot identify a single lost sale due to MGA's game. Therefore, any projections of lost sales are too speculative to constitute irreparable injury. Given the admitted lack of any instances of actual confusion among retailers since the game was introduced *or* among consumers since its launch almost a year ago, *and* the overwhelming presence of other "memory" users in the marketplace, Hasbro's claims that harm is "real and immediate" must be rejected. *See Biogen*, 332 F. Supp. 2d at 296.

### 3. Damages Can Address Any Harm To Hasbro.

195. Whatever incremental damage is allegedly created by adding one more "memory" user to a crowded field of hundreds of such users can certainly be compensated by a monetary award, if any liability is ultimately found as a result of MGA's use.

## D. The Balance Of Hardships Weighs Against An Injunction.

196. To obtain a preliminary injunction, Hasbro must establish that its hardship without an injunction is greater than the hardship to MGA as the result of the issuance of an injunction. *Esso Standard Oil Co.*, 445 F.3d at 18; *Wine and Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 46 (1st Cir. 2005). Hasbro failed to meet this burden and thus is not entitled to a preliminary injunction.

### 1. Hasbro Will Suffer Little Or No Hardship Absent An Injunction.

197. Because of the deficiencies in Hasbro's claims, its delay and lack of irreparable injury, discussed in detail above, Hasbro will suffer little or no harm due to the denial of an injunction. *See Giorgio Beverly Hills, Inc. v. Revlon Consumer Prods. Corp.*, 869 F. Supp. 176, 186 (S.D.N.Y. 1994); *Kadant, Inc. v. Seely Machine, Inc.*, 244 F. Supp. 2d 19, 38-39 (N.D.N.Y. 2003) (where injury to defendant from injunction is more concrete than the alleged injury to plaintiff absent an injunction, the balance favors no injunction); *Arthur Guinness & Sons, PLC v. Sterling Pub. Co., Inc.*, 732 F.2d 1095, 1101 (2nd Cir. 1984); *Mego Corp. v. Mattel, Inc.*, 203 U.S.P.Q. (BNA) 377 (S.D.N.Y. 1978) (delay caused balance of hardships to tip in defendant's favor).

### 2. MGA, On The Other Hand, Will Suffer Severe Hardship If An Injunction Issues.

#### a. An injunction would damage MGA's business relationships.

198. If an injunction would damage a defendant's customer relations or force a breach of contractual obligations to others, it should be denied. *See Lever Bros. Co. v. Mattel, Inc.*, 609 F. Supp. 1395 (S.D.N.Y. 1985); *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 960 (Fed. Cir. 1984) (denying injunction because of interference with customer relationships and potential contractual liability).

199. Granting a preliminary injunction at this late date would substantially damage MGA's reputation and goodwill, as well as its business and contractual relationships with retailers and with Marvel, its Spider-Man & Friends licensor, both of whom have a contractual interest in the continued sale of MGA's "3-D MEMORY MATCH-UP" game, warranting denial of the preliminary injunction. [Lumabao Testimony, Vol. 6 at 10:4-19.] *See Fort Smith Beepers, Inc. v. Mobilefone Serv., Inc.*, 533 F. Supp. 685, 689 (W.D. Ark. 1981) (denying injunction because of potential damage to reputation and goodwill).

#### b. The cost of an injunction could be hundreds of thousands of dollars due, in part, to Hasbro's delay.

200. Where a defendant's hardships are multiplied by a plaintiff's undue delay, an injunction should be denied. *Nabisco, Inc. v. PF Brands, Inc.*, 50 F. Supp. 2d 188, 212 (S.D.N.Y. 1999), *aff'd* 191 F.3d 208 (2nd Cir. 1999) (injunction denied; 5-month delay; and substantial hardship because defendant had produced $3.4 million of allegedly infringing product and contracted with advertisers for television and print promotions and with retail customers for shipment and shelf space). MGA's cost to comply with an injunction and recall order could exceed hundreds of thousands of dollars (including legal fees, lost inventory, lost sales, nonrefundable royalties due to Marvel, and potential liability for being ordered not to perform, as

contracted for, under agreements with Marvel and retailers). Hasbro, on the other hand, having waited six months to even seek an injunction, would suffer no quantifiable harm if an injunction is denied.

201. Where a defendant has invested considerable time and money in creating and marketing the allegedly infringing product, it will suffer great hardship if thereafter enjoined. *See Uno's Pizza, Inc. v. Pizzeria Uno Corp.*, 722 F. Supp. 971, 976 (W.D.N.Y. 1989); *Grondin v. Rossington*, 690 F. Supp. 200, 209 (S.D.N.Y. 1988). MGA's product has been on the market for a year. Forcing its recall would cause immense injury to MGA in terms of lost production, lost sales, damage to customer good will, the loss of coveted shelf space at some of the largest retailers in the country, loss of the ability to further develop and exploit MGA's entry into the game market, and loss of its investment in production, sales and marketing of the product. [Lumabao Testimony, Vol. 6 at 10:12-11:15]

202. The inequity between MGA's potentially overwhelming injury from injunction, particularly where Hasbro has not even proposed posting a significant bond to protect MGA from losses due to an improperly issued injunction, and the little to no harm that Hasbro will suffer absent an injunction, requires the denial of the injunction request. This is so particularly in light of all the other users of "Memory" for games who are already in the marketplace competing with Hasbro, none of whom will be impacted by an injunction in this case, which unfairly singles out MGA. This inequity mandates denial of the requested relief, particularly in light of Hasbro's delay and unclean hands in this action (misrepresentations to the USPTO and use of this action to improperly force a competitor's product out of the marketplace). *See, e.g., Trustco Bank Nat'l Ass'n v. Glens Falls Nat'l Bank and Trust Co., N.A.*, 903 F. Supp. 335, 344 (N.D.N.Y. 1995).

**c. An injunction would cause MGA to lose out on the current popularity of comic book-related products.**

203. An injunction would result in a substantial loss of sales for MGA that could not be replaced because MGA's "Spider-Man & Friends" game is currently being sold during an especially popular time for comic book-related merchandise, and particularly in light of the upcoming release of the *Spider-Man 3* movie, scheduled for release on May 4, 2007. [*See* Lumabao Testimony, Vol. 6, 10:20-11:6, *http://www.imdb.com/title/tt0413300/releaseinfo*.]

**3. The Severe Potential Injury to MGA Requires Hasbro To Make A Very Strong Showing Of Likely Success on the Merits, Which It Cannot Do.**

204. Where the harm likely to be suffered by the defendant substantially outweighs any injury threatened by its conduct, the plaintiff must make an *exceedingly* strong showing of likely success on the merits, *MacDonald v. Chicago Park Dist.*, 132 F.3d 355, 357 (7th Cir. 1997). In order to obtain equitable relief, Hasbro must also come to this Court without delay and with clean hands. Hasbro, however, has failed to show that its delay was reasonably justified, that it was forthcoming in its representations to the USPTO, that it has asserted its trademark claims in good faith and for a proper competitive purpose, and that the evidence it has presented shows that it has an exceedingly strong chance of succeeding on the merits. Hasbro, therefore, is not entitled to an injunction.

**4. The Substantial Harm That MGA Would Suffer If A Preliminary Injunction Is Ordered Would Be Greatly Increased Due To Hasbro's Failure To Even Proffer Posting A Very Large Bond.**

205. A bond is mandatory for an injunction, and must adequately cover damages for a wrongfully issued injunction. *See Int'l Ass'n of Machinists and Aerospace Workers v. Eastern Airlines, Inc.*, 925 F.2d 6, 10 (1st Cir. 1991); *Buddy Systems, Inc. v. Exer-Genie, Inc.*, 545 F.2d 1164, 1167-68 (9th Cir. 1976); FED. R. CIV. P. 65(c). Hasbro, however, has not even proffered a bond.

206. Due to Hasbro's unnecessary, six-month delay in seeking injunctive relief, the time that has passed since MGA's game first hit the shelves in December 2005, the number of products that are now in the marketplace, the contractual commitments that MGA has to retailers and Marvel for its "3-D Memory Match-Up" game, the damage an injunction will cause to MGA's good will with Marvel and those retailers, MGA's damages from the issuance of an injunction are much greater now than they would have been had Hasbro acted promptly.

207. If an injunction were to be granted, MGA's damages would total hundreds of thousands of dollars, if not more, including lost investments in creating and packaging existing units, removal of the thousands of units in stores, damages for breach of numerous contracts, and badly damaged relations with retailers and Marvel, MGA's licensor. As a result, before being entitled to an injunction, Hasbro should have proffered a bond. Any bond should reflect and provide security for these projected losses. *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000) ("When setting the amount of security, district courts should err on the high side."). Hasbro, however, has not done so. Therefore, for this additional reason, it is not entitled to preliminary injunctive relief.

### E. <u>The Public Interest Would Not Be Served If An Injunction Were To Issue</u>.

208. An injunction should not issue where it would adversely affect the public interest. *Bayshore Group Ltd. v. Bay Shore Seafood Brokers*, 762 F. Supp. 404, 415 (D. Mass. 1991).

209. The public interest disfavors injunctions if the plaintiff has failed to establish a likelihood of success. *Bionx Implants, Inc. v. Innovative Devices, Inc.*, 45 F. Supp. 2d 75, 79 (D. Mass. 1999). In such a situation, "[t]he public has an interest in product availability." *Hewlett-Packard Co.*, 882 F. Supp. at 1154. This is because lawful competition results in lower prices and greater incentives for companies to create a variety of quality products. *Hewlett-*

*Packard Co. v. Genrad, Inc.*, 882 F. Supp. 1141, 1154 (D. Mass. 1995). Hasbro's actions are squarely against the public's interest because it is using this injunction to impede competition by an innovative and different type of game from MGA while it introduces its own Spider-Man & Friends-themed card-matching "Memory" game.

210. Hasbro's unclean hands in attempting to impede MGA's lawful exploitation of its Marvel license warrants denial of the injunction. And not only MGA's actions are the subject of Hasbro's anticompetitive conduct. Following the initiation of this lawsuit, Hasbro has sent cease-and-desist letters to other users of "memory" in the marketplace, many of whom (*e.g.*, Briarpatch) have been selling "Memory"-named games for years without any objection from Hasbro. None of those parties' interests are represented in this action. The entry of an injunction in this action would be against the public interest by denying those third-parties a fair opportunity to be heard in opposition to Hasbro's claim that only it has the right to use the word "memory" in connection with a matching game.

### F. MGA's Other Defenses Also Mandate Denial Of The Injunction.

#### 1. MGA's Use Of The Word "Memory" Within The Phrase "3-D Memory Match-Up" Is A Fair Use.

211. "[F]air use [is] established if mark descriptive, not used in trademark sense, and used in good faith." *WCVB-TV v. Boston Athletic Ass'n*, 926 F.2d 42, 46 (1st Cir. 1991). MGA meets all three requirements.

212. MGA descriptively uses "memory" in "3-D Memory Match-Up" to refer to a three-dimensional game wherein a player uses his or her *memory* to *match up* two different three-dimensional halves of superhero characters. The word "memory" is not being used in a trademark sense. Hasbro asserts that MGA's placement of a "TM" symbol next to the "UP" in the "MEMORY MATCH-UP" label on its initial packaging (removed immediately in good faith by MGA after receiving notice from Hasbro) indicates that MGA was claiming trademark rights in

the word "Memory" therein. The evidence is to the contrary, however, particularly because it was adjacent to the last word of the composite phrase. MGA witnesses testified that the symbol was placed on the packaging, without thinking about it because its Hong Kong employees tend to put the "TM" symbol in the graphics for packaging. As soon as Hasbro complained, MGA removed it in an effort to address Hasbro's concerns and without admitting liability. [DX LL.19.] Thus, MGA's use of "memory" is a fair use, which bars liability.

### 2. **Hasbro Engaged In Unclean Hands In Misrepresentations In Its USPTO Filings.**

213. Misrepresentations to the USPTO in procuring a trademark registration warrants cancellation if there are knowing, false misstatements in the plaintiff's applications for registration, regarding facts material to the decision to grant the registration. *Orient Express Trading Co., Ltd. v. Fed. Dept. Stores, Inc.*, 842 F.2d 650, 653 (2nd Cir. 1988). Hasbro's knowing misstatements or omissions in obtaining its registration, on which the USPTO relied, warrant cancellation of the registrations and, as a further form of unclean hands, preclude injunctive relief.

### 3. **Attorneys' Fees.**

214. While the issue of awarding attorneys' fees under 15 U.S.C. § 1117(a), 28 U.S.C. § 1927, or this Court's inherent equitable powers is not presently before the Court on this MOTION, this Court notes that such an award may be appropriate in light of the overreaching and legally insufficient claims asserted by Hasbro herein.

**G. Conclusion.**

215. For all of the foregoing reasons, this Court denies Hasbro's motion for a preliminary injunction.

IT IS SO ORDERED.

Dated: __________ ___, 2007

______________________________________

THE HONORABLE WILLIAM E. SMITH,
UNITED STATES DISTRICT JUDGE

Dated: February 5, 2007

Defendant and Counterclaimant,
MGA ENTERTAINMENT, INC.
By its attorneys,

/s/ George E. Lieberman

BROOKS R. MAGRATTEN, R.I. Bar ID #3585
GEORGE E. LIEBERMAN, R.I. Bar ID #3860
VETTER & WHITE
20 Washington Place
Providence, Rhode Island 02903
Telephone: (401) 421-3060
Facsimile: (401) 272-6803
E-mail: bmagratten@vetterandwhite.com
glieberman@vetterandwhite.com

KENT R. RAYGOR, admitted *pro hac vice*
SHEPPARD MULLIN RICHTER & HAMPTON LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
Telephone: (310) 228-3700
Facsimile: (310) 228-3701
E-mail: kraygor@sheppardmullin.com

400191642.2

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I hereby certify that I electronically filed the within **DEFENDANT/COUNTERCLAIMANT MGA ENTERTAINMENT, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING MOTION FOR PRELIMINARY INJUNCTION AND RECALL FILED BY PLAINTIFF/COUNTERCLAIM-DEFENDANT HASBRO, INC.** on February 5, 2007. It is available for viewing and downloading from the Court's Electronic Case Filing system. Service on the below-listed counsel of record has been effectuated by electronic means.

Michael Sant'Ambrogio, Esq.
Kim J. Landsman, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, New York 10036-6710

Jeffrey K. Techentin, Esq.,
Adler Pollock & Sheehan P.C.
One Citizens Plaza, 8th Floor
Providence, RI 02903-1345

/s/ Michael Daly
Michael Daly