UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| HASBRO, INC., Plaintiff, | |
| v. | C.A. No. 06-262 S |
| MGA ENTERTAINMENT, INC., Defendant. | |

**MEMORANDUM AND DECISION**

WILLIAM E. SMITH, United States District Judge.

This case involves a trademark dispute between Hasbro, Inc. and MGA Entertainment, Inc. over the use and application of the word "Memory" as it applies to certain two- or three-dimensional matching games marketed and sold by each company. Hasbro seeks a preliminary injunction against MGA barring any further shipping or selling of MGA's game "3-D Memory Match-Up," and additionally seeks a recall order requiring MGA to recall its game from distributors and retailers. The basis for Hasbro's action is its claim that MGA's use of the word "Memory" infringes on Hasbro's registered trademark of that word for a line of card-matching games it has sold since 1966. Because Hasbro is unable to establish its likelihood of success on the merits, the motion for a preliminary injunction is DENIED.

## I. Background

In 1964, Hasbro's predecessor Milton Bradley Co. acquired the rights to a game called "Memory" from a German company, Otto Maier Verlag Ravensburg, through a licensing agreement. With the knowledge and permission of Ravensburg, Milton Bradley applied for, and was granted, a trademark for the term "Memory" in 1966. The trademark was registered with the United States Patent and Trademark Office ("USPTO") in 1967 for the single word "Memory" in a particular stylized design, for use with "equipment comprising cards with many matching pairs of designs for playing a matching card game."[1]

The initial game consisted of 36 pairs of matching cards that featured characters or other images on one side. The players mixed the cards up (akin to shuffling a deck of cards) and then placed them in rows, face down on a flat surface. Play began with each

---

[1] This was, in point of fact, Milton Bradley's second effort at obtaining a trademark for "Memory." The first application was refused because Milton Bradley's application "show[ed] the type of game involved to be a memory card matching game." For this type of game, "where the memory of the player is relied upon to locate matching cards," the Trademark Examiner held that the word "Memory" was "merely descriptive . . . and not subject to registration." The Trademark Examiner advised Milton Bradley that "an identification of goods directed to a game is not acceptable because it appears that the identifiable goods which bear the mark comprise the parts with which the game is played."

Milton Bradley reapplied, arguing that the word "Memory" did "not describe the goods, their function or manner of use." Instead, Milton Bradley argued that "Memory" "may suggest the type of game involved, but it does not describe them." The Trademark Examiner accepted this explanation and approved the trademark in 1967.

player, in turn, selecting two cards and turning them image-side up. If the two selected cards were identical, the player had made a match and could keep the two cards and select again, otherwise, the cards were replaced, face down and play passed to the next player. This process was repeated until all of the cards were out of play. The player who collected the most pairs of cards was declared the winner.

In 1972, Milton Bradley sent an affidavit to the USPTO to establish the 1967 mark's incontestability. Milton Bradley averred that it "owned" the 1967 mark, that the mark was still in use, that the mark had been used for five consecutive years, and that there had been no final decision adverse to its claim of ownership of the mark. The "Memory" mark then underwent a series of font changes beginning in 1978, and next in 1984 when Hasbro acquired Milton Bradley. The mark was renewed in August of 1987.

In 2003, Hasbro, the now-owner of the 1967 trademark, filed a second application to register the "Memory" trademark. The USPTO registered the mark on October 19, 2004, for "card matching games, in Class 28." The registration also reflected that "[t]he mark consists of standard characters without claim to any particular font, style, size, or color."

Over the past thirty-nine years, Hasbro and Milton Bradley have issued numerous themed versions of the Memory game. Hasbro's stated policy on themed versions is to allow the "core basic

original game" to "grow to a state of awareness and significance that it has become big enough to expand" into a themed line of games. On several occasions, Hasbro has also licensed its Memory mark for use on a variety of merchandise. Hasbro also has licensed the use of "Memory" for software and books.

Total revenues from "Memory" sales exceed $130 million. In the past eight years, Hasbro has spent over $20 million in "Memory" advertisements and promotions. This includes two recent national campaigns, "My First Games" and "Games Make Great Gifts," which each featured "Original Memory" (Hasbro's original card-matching game), and advertisements on the radio; "Memory" is additionally often featured in periodicals as a favorite toy.

Sometime in either 2003 or 2004 MGA game developers came up with an idea for a three-dimensional version of a memory game. This version eschewed the traditional two-dimensional card model for a design that employed a set of plastic cups, under which certain objects could be placed.

This initial idea, however, was shelved for approximately two years, until MGA acquired a license from Marvel for the "Spider-Man & Friends" name, logo, images and characters. Having acquired the license, MGA reworked the memory game concept into its current form. The game contains 10 molded plastic characters (all "Spider-Man and Friends" characters) that come in two different halves which can snap together (an upper half corresponding with the head

and torso and a lower half corresponding with the hips and legs of the character). Game play occurs after the characters are split apart and each half is placed under one of 20 plastic cups. Players take turns picking up two cups at a time to try and match the top half of a character with its corresponding bottom half. Upon finding two matching halves, the player snaps them together and keeps the character. Play continues until all matching character halves are found.

MGA's game originally appeared on store shelves in December 2005 with the name "Memory Match-Up," but after it received Hasbro's initial complaint, it changed the name of the game to "3-D Memory Match-Up." Additionally, MGA originally placed a "™" next to the "Up," but removed it when Hasbro complained. MGA has put very little effort into advertising its game, focusing promotion only on its own website's Products page.

Six months after MGA acquired its license from Marvel for "Spider-Man and Friends," Hasbro also obtained a similar license (both licenses were non-exclusive). Upon obtaining this license, Hasbro decided to issue a "Spider-Man and Friends" themed version of its "Original Memory" game, which, based on past performance, it believed would be quite profitable. However, because Marvel places strict requirements on the style and color of any licensed product including the character appearances for the Spiderman and Friends

characters, Hasbro's game would be forced to look very similar to MGA's "3-D Memory Match-Up."

On May 5, 2006, before Hasbro had released its "Spider-Man and Friends" memory game, it filed an action for injunctive relief against what it deemed to be MGA's trademark infringement of its "Memory" mark. The Court held an evidentiary hearing that ranged over seven days and included testimony from each of the companies along with expert testimony in connection with the origin and history of the memory card-matching game and the use and understanding of the word "Memory." The parties also submitted evidence, including advertising and product sales history, consumer surveys and market penetration reports, to establish both the nature of the mark itself and the likelihood of consumer confusion.

## II. Analysis

During the evidentiary hearing, the parties fought unsparingly for every inch of legal ground. It appears that no potentially probative piece of evidence was left out and every possible argument, on either side, was vigorously pursued, proving that when it comes to fun and games, there is no fooling around. Nevertheless, at the center of this case is a dispute over two main issues: 1) whether the term "memory" is a generic name for a class of card (or card-variant) matching games; and 2) whether Hasbro's trademark is entitled to protection and, if so, whether MGA has

infringed upon it. Of these, only the first merits discussion at this preliminary stage.

Before a preliminary injunction may be entered, Hasbro must show (1) it will likely succeed in its infringement case against MGA; (2) that irreparable harm would result if the injunction were denied; (3) that the balance of equities is in its favor; and (4) that the injunction would serve the public interest. See Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006). In infringement cases, "likelihood of success" is the most critical, and essentially, the determinative factor. See id. Once a likelihood of success is established, "the other decisions will flow from that ruling." Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989).

In order to succeed on an infringement action, a party must first prove two elements: (1) that its mark merits protection; and (2) that the alleged infringement of that mark is likely to result in consumer confusion. Borinquen, 443 F.3d at 116. But, for purposes of a preliminary injunction, a party need only establish a likelihood of success in proving these elements. See id.

In order to establish that a mark is entitled to trademark protection, it must first qualify as distinctive. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992). "When considering whether a mark meets that standard, courts often employ a taxonomy that classifies marks along a continuum of increasing

distinctiveness." Borinquen, 443 F.3d at 116. This "distinctiveness" continuum contains five categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful. Two Pesos, 505 U.S. at 768. "By definition, generic marks can never be ranked as distinctive," and "suggestive, arbitrary, and fanciful marks are considered inherently distinctive." Borinquen, 443 F.3d at 116.

Hasbro has registered two marks, one registered in 1967 and the other registered in 2003. For registered marks, the registration itself is prima facie evidence of the validity of the registered mark and, where the mark is registered without requiring the applicant to prove secondary meaning, the mark is considered presumptively distinctive rather than descriptive. 15 U.S.C. § 1115(a);[2] Equine Techs., Inc. v. Equitechnology, Inc., 68 F.3d 542, 545 (1st Cir. 1995). Thus, the 2003 mark can be considered presumptively distinctive. The other, the 1967 mark, has attained

---

[2] § 1115(a) states:

> [Evidence of registration] shall be admissible in evidence and shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein, but shall not preclude another person from proving any legal or equitable defense or defect . . . .

"incontestable"[3] status.[4] 15 U.S.C. §1065; see Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 205 (1985) (where a mark has attained "incontestable" status, the presumption of distinctiveness becomes conclusive and, subject to only a few affirmative defenses, may be used to enjoin others from infringing upon the mark).

Notwithstanding the protection to which registered (or unregistered) marks may be entitled, a finding of genericness will render the term unprotectable. See S.S. Kresge Co. V. United Factory Outlet, 598 F.2d 694, 696 (1st Cir. 1979); see also TE-TA-MA Truth Found.-Family of URI, Inc. v. World Church of the Creator, 297 F.3d 662, 665 (7th Cir. 2002) (noting that even an incontestable mark is subject to cancellation "if it is or becomes generic"). "A generic term is one that does not distinguish the goods of one producer from the goods of others. Instead, it is one that either by definition or through common use has come to be understood as referring to the genus of which the particular product is a species." Keebler Co. v. Rovira Biscuit Corp., 624

---

[3] Incontestability is established "when [a mark's] owner files an affidavit with the PTO attesting that the following requirements have been met: (i) there has been no final decision adverse to its ownership or enforcement rights for the preceding five-year period; (ii) there is no pending case or proceeding regarding the owner's rights in the mark; and (iii) the owner is still using the mark." Borinquen, 443 F.3d at 117 n.3; 15 U.S.C. § 1065.

[4] MGA attacks the "incontestable" status on a number of grounds. For the reasons discussed below, however, it is unnecessary at this juncture to address these arguments.

F.2d 366, 373-74 (1st Cir. 1980) (internal quotations and citation omitted). Generic terms are unprotectable through trademark registration because such protection would frustrate legitimate competition, "mak[ing] it difficult for competitors to market their own brands of the same product." Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986). Courts often approach the task of determining whether a mark is generic by recognizing that generic terms answer the question "What are you?" while a mark answers the question "Where do you come from?" See Colt Defense LLC v. Bushmaster Firearms, Inc., 486 F.3d 701, 705 (1st Cir. 2007).

For a term to be generic, its "primary significance . . . to the relevant public must be to identify the nature of a good, rather than its source." Id. (internal quotations and citation omitted). This can occur in one of two ways. First, an invented name may become "genericized," Nat'l Nonwovens, Inc. v. Consumer Prods. Enters., Inc., 397 F. Supp. 2d 245, 254 (D. Mass. 2005); that is, the term "began life as a 'coined term'" but became generic through common usage. See Hunt Masters, Inc. v. Landry's Seafood Rest., Inc., 240 F.3d 251, 255 (4th Cir. 2001). Second, a term may be generic if it was commonly used prior to its association with the specific products at issue. Id.; see Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 874 F.2d 95, 100-01 (2d Cir. 1989).

Under either approach, evidence of the relevant public's understanding of a term can be used to prove genericness. See 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed. 2006). This evidence may include competitors' use (use of the term by competitors which has not been contested by plaintiff), plaintiff's use (use of the term as a generic name by the plaintiff), dictionary definitions, media usage, testimony of persons in the trade, and consumer surveys. See id.

The Court of Appeals for the First Circuit has never expressly determined who, precisely, bears the burden of persuasion (or what that burden is) when an incontestable mark is challenged as generic, although it has determined the burden for registered, contestable marks. See, e.g., Colt Defense, 486 F.3d at 705 (holding that a registered, contestable mark creates a rebuttable presumption that may be overcome "where the alleged infringer demonstrates genericness by a preponderance of the evidence"). The Courts of Appeal for the Ninth Circuit and Sixth Circuit have declined to heighten the burden for incontestable marks, holding that the alleged infringer "has the burden of showing genericness by a preponderance of the evidence" where the mark is registered and incontestable. Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1135 (9th Cir. 2006); Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 405 (6th Cir. 2002) (finding that a mark's "incontestable" status does not increase the burden for proving

genericness of a registered mark). The Court of Appeals for the Seventh Circuit, on the other hand, may require some lower burden necessary to prove genericness. See TE-TA-MA, 297 F.3d at 665 (holding that, in genericness challenges, an incontestable registration acquires a "bursting-bubble presumption of non-generic-ness" as opposed to the conclusive presumption such registration normally commands); see also Nat'l Nonwovens, 397 F. Supp. 2d at 252 (reading TE-TA-MA's "bursting-bubble presumption" to create a rebuttable presumption of protection which "evaporates as soon as evidence of invalidity is presented" but not clarifying how much evidence is necessary to "burst the bubble"); but see Door Sys., Inc. v. Pro-line Door Sys., Inc., 83 F.3d 169, 172 (7th Cir. 1996) (applying the "bursting bubble presumption" to a registered, but not necessarily incontestable, mark).

This Court need not definitively choose, at this stage, which burden applies, however, because even applying the higher burden - requiring the alleged infringer to prove by a preponderance of the evidence that the term is generic - MGA has at this juncture presented sufficient evidence of the term's genericness to defeat Hasbro's motion for a preliminary injunction.[5] In other words, MGA

---

[5] A complication can be noted here. Because the evidentiary hearing occurred in the context of a preliminary injunction, the burdens controlling entry of a preliminary injunction collide rather obliquely with the burdens governing the genericness inquiry: to establish genericness, MGA must prove (assuming for now the heightened burden) by a preponderance of the evidence that the term is generic, but for this preliminary injunction, Hasbro

has met its burden of proving by a preponderance of the evidence that the term "Memory" is generic such that Hasbro is unable to demonstrate it likely will succeed on the merits of its claim of infringement.

Over the course of the seven day evidentiary hearing, MGA submitted compelling evidence that the term "Memory" has been used to describe a generic card game since before Hasbro obtained its first trademark in 1967. For instance, "The Game Book," published in 1946 identifies "Memory" as a card game where:

> The first player turns up any card. He then turns up another card attempting to find a duplicate of the first card turned up . . . . If a card he turns up is a duplicate of the card some other player had turned up and then turned face down, he tries to remember its location and turn it up.

In the New Complete Hoyle - The Official Rules of All Popular Games of Skill and Chance, published in 1956, in an entry under the "Juvenile Games" section, a game called "Concentration (Memory, Pelmanism)" is described and corresponds with the above description. This entry is also contained in The New Complete

---

must prove a likelihood of success on the merits. Assuming for the moment that MGA were to come up just short of meeting its burden of proof for genericness, what effect would this have on Hasbro's preliminary injunction claim? Nevertheless, because MGA has, at this stage, proven by a preponderance of the evidence that the term is generic, the nuances of this shifting scale do not require exploration.

Hoyle published in 1964 and in the Official Rules of Card Games published in 1968.[6]

MGA also submitted dictionary use as evidence establishing the genericness of the term. In the 1961 edition of the unabridged Random House Dictionary, the seventh definition of "**con-cen-tra-tion**" is:

> 7. Also called memory. *Cards*. A game for two or more players in which the pack is spread out face down on the table and each player in turn exposes two cards at a time and replaces them face down if they do not constitute a pair, the object being to take the most pairs by remembering the location of the cards previously exposed.

Random House Dictionary of the English Language: The Unabridged Edition 304 (1961). Similarly, the twelfth definition for "Memory" is: "12. *Cards*. Concentration (def. 7)." Id. at 894. This definition is likewise found in the 1966, 1987 and 2001 editions. The 1963 "Webster's Third" dictionary also provides the following definition:

> "**con-cen-tra-tion** . . . **5**: a card game for two or more players in which a pack of cards is laid out card by card face down and at random, the skill of the game consisting of remembering the position of such cards as are briefly turned up in play - called also *memory*."

---

[6] These sources are not technically dictionaries, and Hasbro argues that they are therefore not competent evidence. But this merely means that they fall within another category of evidence, such as media usage. That they are essentially trade publications clearly directed to consumers is competent, and in this case compelling, evidence of genericness. See Colt Defense, 486 F.3d at 707 (noting that trade usage is only problematic where the publication is directed at producers); Liquid Controls Corp. v. Liquid Control Corp., 802 F.2d 934, 938 (7th Cir. 1986) (trade publications competent evidence of genericness).

Webster's Third New Int'l Dictionary of the English Language Unabridged 469 (1963). The fifth definition for "Memory" refers back to this definition. Id. at 1409. The same definition, or one substantially similar, is found in the 1961, 1965 and 1967 editions.[7]

This dictionary evidence is persuasive because "[i]f the term . . . appear[s] in a standard dictionary in lower case, [it is] powerful evidence that the term [is] generic, because nouns and other nominatives listed in dictionaries, save for the occasional proper name, denote kinds rather than specific entities ('dog,' not

---

[7] Hasbro argues that these definitions should be considered "uncommon" because they occur toward the end of the entry's definitional list or that the definitions are irrelevant because they are not found in more "authoritative" dictionaries like the Oxford English Dictionary. Hasbro's first claim is unpersuasive and its second misses the point. No case suggests that the placement of a definition in the entry list is dispositive, or even particularly relevant, to whether the term is generic or not. Moreover, even were location particularly relevant, in this case there is at best a conflict of opinion regarding the meaning of the definition's location, rendering such evidence not especially useful. Dictionary use is simply one factor that must be taken into consideration in determining genericness. See Nartron, 305 F.3d at 407 (finding that the failure to provide any dictionary definitions was not determinative because "[d]ictionary definitions are merely one source from which genericness may be proven"). It suffices here that in these dictionaries, published before Hasbro obtained it's trademark, "Memory" was defined as a card-matching game and not as a specific entity. Additionally, it bears noting that the dictionaries submitted by MGA have, in point of fact, been used in a number of genericness cases, lending support to their credibility for this type of inquiry. See In re Bayer Aktiengesellschaft, – F.3d –, 2007 WL 1502078 *4 (Fed. Cir. May 24, 2007) (Webster's Third); Colt Defense, 486 F.3d at 710 (Webster's Third); Murphy Door, 874 F.2d at 101 (Webster's Third); Liquid Controls, 802 F.2d at 936 (Random House).

'Fido')." Door Sys., 83 F.3d at 171; see also Liquid Controls, 802 F.2d at 937 (concluding that the definition contained in the 1967 Webster's Third New International Dictionary was the "everyday, dictionary understanding of the term"). The definitions here suggest, rather forthrightly, that the term "Memory" referred at the time Hasbro registered its mark, and continues to refer, to a type of game, and consequently, a class of products rather than Hasbro's specific one.

MGA has additionally adduced evidence of Hasbro's own generic use of the term. For example, in Milton Bradley's (Hasbro's predecessor) game "Shenanigans" an aspect of the game is called, generically, "memory game" and appears to refer to a card-matching game. And on its website, Hasbro describes a number of handheld games which require similar card-matching skills as "memory games," even though they are unrelated to the specific game "Memory." Although limited, this evidence is relevant because "[a] kind of estoppel arises when the proponent of [a] trademark use is proven to have itself used the term before the public as a generic name . . . ." See Colt Defense, 486 F.3d at 707 (quoting McCarthy § 12:13). MGA also put forth substantial evidence of competitors' use of the term. Specifically, MGA identified a substantial number of (non-Hasbro) games that use the term "Memory" in their title or on their packaging to describe some aspect of the card-matching game. A number of these games are sold by direct competitors of

Hasbro - including Cranium, which sells a game titled, "Sounds of the Seashore - The Magical Matching and Memory Game" and Cardinal Industries, which sells a game called "Memory Match." Many of these games are also sold in the same stores that Hasbro's game is sold, including Target and Toys "R" Us.

MGA also supports its generic claim with considerable evidence of the term "Memory" being used in conjunction with internet card-matching "memory games." See In re Bayer, - F.3d -, 2007 WL 1502078 at *4 (endorsing the use of internet evidence as admissible and competent evidence for evaluating a trademark). As just one example, MGA submitted the Netscape "Celebrity" "Memory Match" game, a game designed to be played on the Netscape website requiring players to match celebrity cards. There also exist, as MGA points out, many websites which contain a category of games called, more or less, "memory games." This includes www.amazon.com, which has a "Matching & Memory" category, and www.allstarpuzzles.com, which contains a "Memory Games" category. These sites offer (either for download or sale) more than just Hasbro's "Memory" game.

The substantial volume of evidence of competitors' use of the term "Memory" to describe a memory matching game is particularly significant, and probative, for the question of genericness because "[t]he more members of the public see a term used by competitors in the field, the less likely they will be to identify the term with

one particular producer." Colt Defense, 486 F.3d at 706 (quoting Classic Foods Int'l Corp. v. Kettle Foods, Inc., 468 F. Supp. 2d 1181, 1190 (C.D. Cal. 2007)). Where four other competitors' use of a term to describe a product may support a finding of genericness, see Schwan's IP, LLC v. Kraft Pizza Co., 460 F.3d 971, 974 (8th Cir. 2006), the sheer volume of the competitors' use of the term "Memory' to describe a memory game is highly persuasive to a determination that the term refers not to Hasbro's specific game but to a class of products all revolving around a basic, i.e., generic card-matching game. See Colt Defense, 486 F.3d at 706 (finding that as more competitors use the term, the support for a finding of genericness increases).

It is true that MGA failed to offer any consumer surveys in support of its genericness claim, and that, additionally, Hasbro offered its own brand penetration surveys, which, it claims, demonstrate that consumers associate Hasbro's specific game with the term "Memory."[8] But, it has been made clear that such evidence is not dispositive on the question of genericness; rather, it is merely one of several factors that may be considered. See 2 McCarthy, supra, § 12:13. This is also true of relative sales

[8] For example, a recently completed study by Hasbro showed that 70% of target purchasers, comprised of mothers with children ages 3-5, were aware of Hasbro's "Memory" brand game and 34% owned it. Hasbro's expert, Dr. Thomas Dupont, testified that this study revealed that "Memory has substantial awareness among the target market."

volume. Although Hasbro argues that its dominant market position rebuts any claim that the relevant public would view the term "Memory" as generic, in the absence of actual evidence proving this, the Court cannot draw such a conclusion. See Kresge, 598 F.2d 697. There has been no presentation of evidence suggesting that consumers associate the term "Memory" with Hasbro's game, just that Hasbro's game occupies a large market share. See Kellogg Co. v. Nat'l Biscuit Co., 305 U.S. 111, 118-19 (1938).

In sum, at this juncture, MGA has carried its burden of proving by a preponderance of the evidence that the term "Memory" is and has been a generic term not entitled to trademark protection. See Nat'l Nonwovens, 397 F. Supp. 2d at 254. This conclusion establishes that Hasbro has not proven that it is likely to succeed on the merits of its trademark infringement case, establishing that a preliminary injunction is inappropriate. It bears noting, however, in this case especially, that "a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial on the merits." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991). It may be the case that, at trial, Hasbro will successfully negate MGA's attempts to prove genericness and ultimately establish its infringement claim.[9]

---

[9] Of course, the opposite is true as well. The risk of trial is that Hasbro's mark may be found definitively generic with all the consequences that may flow from such a determination.

## III. Conclusion

For the reasons stated above, Hasbro's motion for a preliminary injunction is DENIED.

It is so ordered.

WESmith

William E. Smith
United States District Judge
Date: 7/31/07